**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**Case No. 18-cv-20101-Civ-MARTINEZ/GOODMAN**

GOVERNMENT EMPLOYEES INSURANCE CO.,
GEICO INDEMNITY CO., GEICO GENERAL
INSURANCE COMPANY and GEICO CASUALTY
CO.,

      Plaintiffs,

v.                                                                          **Jury Trial Demanded**

QUALITY DIAGNOSTIC HEALTH CARE INC.
JORGE E. MARTINEZ, CARLOS ACEBO
MARTINEZ, LUIS ANIBAL QUERAL, M.D.,
MOULTON KEANE, M.D., IVELIS GARCIA,
and MICHEL VIERA, LMT,

      Defendants.

_____

## AMENDED COMPLAINT

Plaintiffs, Government Employees Insurance Co., GEICO Indemnity Co., GEICO

General Insurance Company and GEICO Casualty Co. (collectively "GEICO" or "Plaintiffs"),

sue Defendants and allege as follows:

1.    This action seeks to recover more than $145,000.00 that the Defendants

wrongfully obtained from GEICO by submitting, and causing to be submitted, thousands of

fraudulent no-fault ("no-fault", "personal injury protection", or "PIP") insurance charges through

Defendant Quality Diagnostic Health Care Inc. ("Quality Diagnostic") relating to medically

unnecessary, illusory, unlawful, and otherwise unreimbursable health care services, including

initial examinations, follow-up examinations, and physical therapy services (collectively the

"Fraudulent Services"), that purportedly were provided to Florida automobile accident victims

("Insureds") who were eligible for coverage under GEICO no-fault insurance policies.

2.      In addition, GEICO seeks a declaration that it is not legally obligated to pay reimbursement of more than $75,000.00 in pending, fraudulent no-fault insurance claims that the Defendants have submitted or caused to be submitted through Quality Diagnostic because:

(i)      at all relevant times, Quality Diagnostic was operated in violation of: (a) the Florida Health Care Clinic Act, Fla. Stat. § 400.990 et seq. (the "Clinic Act"); (b) Florida's patient brokering act, Fla. Stat § 817.505 (the "Patient Brokering Act"); and (c) Florida's anti-kickback statute, Fla. Stat. § 456.054 (the "Anti-Kickback Statute"), rendering it ineligible to collect no-fault insurance benefits in the first instance, and rendering its no-fault insurance charges noncompensable and unenforceable;

(ii)     the underlying Fraudulent Services were not medically necessary, and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them;

(iii)    in most cases, the Fraudulent Services were not reimbursable as a matter of Florida law, because they were provided – to the extent that they were provided at all – by unsupervised massage therapists, and Florida law prohibits no-fault insurance reimbursement for massage or for services provided by unsupervised massage therapists;

(iv)    the Fraudulent Services were not reimbursable as a matter of Florida law, because they were provided – to the extent that they were provided at all – by independent contractors, and Florida law prohibits no-fault insurance reimbursement for services provided by independent contractors;

(v)     in many cases, the Fraudulent Services never were provided in the first instance; and

(vi)    the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to fraudulently inflate the charges submitted to GEICO.

3.      The Defendants fall into the following categories:

(i)      Defendant Quality Diagnostic, through which the Fraudulent Services purportedly were performed and were billed to insurance companies, including GEICO, falsely purported to be a properly-licensed health care clinic that operated in compliance with the licensing and operating requirements set forth in the Clinic Act.

(ii)     Defendant Jorge E. Martinez ("Martinez") purported to be the vice president, owner, and shareholder of Quality Diagnostic, participated in the operation and management of Quality Diagnostic, and directed the submission of fraudulent billing through Quality Diagnostic to GEICO. In addition, since September 2017, Martinez secretly and unlawfully has held an undisclosed ownership interest in Quality Diagnostic.

(iii)    Defendant Carlos Acebo Martinez ("Acebo Martinez") purported to be the president of Quality Diagnostic, participated in the operation and management of Quality Diagnostic, and directed the submission of fraudulent billing through Quality Diagnostic to GEICO. Upon information and belief, Acebo Martinez is Martinez's brother.

(iv)    Defendant Ivelis Garcia ("Garcia") was employed by Quality Diagnostic as a manager, and knowingly submitted fraudulent billing through Quality Diagnostic to GEICO at the direction of her co-Defendants.

(v)    Defendant Luis Anibal Queral, M.D. ("Queral") is a physician licensed to practice medicine in Florida, falsely purported to serve as the medical director of Quality Diagnostic, and participated in the submission of fraudulent billing through Quality Diagnostic to GEICO.

(vi)    Defendant Moulton Keane, M.D. ("Keane") is a physician licensed to practice medicine in Florida, purported to perform many of the Fraudulent Services at Quality Diagnostic, and participated in the submission of fraudulent billing through Quality Diagnostic to GEICO.

(vii)    Defendant Michel Viera, LMT ("Viera") is a massage therapist licensed to practice massage therapy in Florida, and purported to perform many of the Fraudulent Services at Quality Diagnostic.

4.    As set forth below, the Defendants at all relevant times have known that:

(i)    Quality Diagnostic was operated in violation of the Clinic Ac, the Patient Brokering Act, and the Anti-Kickback Statute, rendering it ineligible to collect no-fault insurance benefits in the first instance, and rendering its no-fault insurance charges unlawful, noncompensable, and unenforceable;

(ii)    the Fraudulent Services were not medically necessary, and unlawfully were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them;

(iii)    in most cases, the Fraudulent Services were not reimbursable as a matter of Florida law, because they were provided – to the extent that they were provided at

all – by an unsupervised massage therapist, and Florida law prohibits no-fault insurance reimbursement for massage or for services provided by unsupervised massage therapists;

(iv)    the Fraudulent Services were not reimbursable as a matter of Florida law, because they were provided – to the extent that they were provided at all – by independent contractors, and Florida law prohibits no-fault insurance reimbursement for services provided by independent contractors;

(v)    in many cases, the Fraudulent Services never were provided in the first instance; and

(vi)    the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to fraudulently inflate the charges submitted to GEICO.

5.    As such, the Defendants do not now have – and never had – any right to be compensated for the Fraudulent Services that were billed to GEICO through Quality Diagnostic.

6.    The chart attached as Exhibit "1" sets forth a large representative sample of the fraudulent claims that have been identified to date that the Defendants have submitted, or caused to be submitted, to GEICO.

7.    The Defendants' fraudulent scheme began as early as 2016 and has continued uninterrupted since that time. As a result of the Defendants' fraudulent scheme, GEICO has incurred damages of more than $145,000.00.

8.    The Defendants' fraudulent scheme is another in a long line of insurance fraud scams aimed at Florida consumers and insurers. It is part of an insurance fraud epidemic that – in 2014-2015 alone – led to almost 1,200 convictions in Florida. See Florida Department of Financial Services, Division of Insurance Fraud Annual Report for Fiscal Year 2014-2015.

## THE PARTIES

### I.   Plaintiffs

9.      Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co. (collectively, "GEICO") are Maryland corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue automobile insurance policies in Florida.

### II.   Defendants

10.      Defendant Quality Diagnostic is a Florida corporation with its principal place of business at 620 N.W. 33rd Avenue, Miami, Florida 33125. At all relevant times, Quality Diagnostic falsely purported to be a properly-licensed health care clinic that operated in compliance with the licensing and operating requirements set forth in the Clinic Act. Quality Diagnostic was incorporated in Florida on November 8, 2016, and purported to have Acebo Martinez as its president and Martinez as its vice president. Quality Diagnostic falsely purported to have Queral as its medical director, and was used by the Defendants as a vehicle to submit fraudulent no-fault insurance billing to GEICO and other insurers.

11.      Defendant Martinez resides in and is a citizen of Florida. Martinez is not and never has been a physician or other health care professional. Martinez – who also owned and controlled Benefica Health Center, Corp. – used Quality Diagnostic as a vehicle to submit fraudulent no-fault insurance billing to GEICO and other insurers.

12.      Martinez was originally listed as the president and sole owner and shareholder of Quality Diagnostic. However, as of August 2017, Martinez's name was removed from Quality Diagnostic's corporate filings submitted to the Florida Division of Corporations.

13.      In reality, since September 2017, Martinez secretly and unlawfully has held an

undisclosed ownership interest in and control over Quality Diagnostic.

14.     Defendant Acebo Martinez resides in and is a citizen of Florida. Acebo Martinez is not and never has been a physician or other health care professional. Acebo Martinez used Quality Diagnostic as a vehicle to submit fraudulent no-fault insurance billing to GEICO and other insurers.

15.     As of August 2017, Acebo Martinez purported to be the president of Quality Diagnostic.

16.     Defendant Garcia resides in and is a citizen of Florida. Garcia was employed by Quality Diagnostic as its manager, and knowingly submitted fraudulent billing through Quality Diagnostic to GEICO at the direction of her co-Defendants.

17.     Defendant Queral resides in and is a citizen of Florida. Queral was licensed to practice medicine in Florida in 2013, and falsely purported to serve as medical director at Quality Diagnostic.

18.     Defendant Keane resides in and is a citizen of Florida. Keane was licensed to practice medicine in Florida in 1972, and purported to perform many of the Fraudulent Services at Quality Diagnostic.

19.     Keane has a history of professional misconduct that has resulted in discipline by the State of Florida Board of Medicine (the "State Board").

20.     For example, on March 23, 1994, the State Board filed an Administrative Complaint (the "1994 Administrative Complaint") against Keane, alleging that Keane had falsified a patient's medical records in his work as an obstetrician/gynecologist.

21.     The 1994 Administrative Complaint further alleged that, in a parallel civil lawsuit, Keane had given sworn testimony in which he admitted to falsifying patient records in

an attempt to cover up his failure to discover and document a potential health risk facing the patient-mother.

22.     In a Consent Agreement dated November 2, 1995 (the "Consent Agreement"), the State Board issued Keane a public reprimand, assessed a $2,000.00 administrative fine, and placed Keane's license to practice medicine on probation for a period of one year.

23.     Then, on December 18, 2009, Keane was again the subject of an Administrative Complaint filed by the State Board (the "2009 Administrative Complaint").

24.     The 2009 Administrative Complaint alleged that Keane had inappropriately and excessively prescribed controlled substances – including Ativan, Oxycotin, Soma, and Xanax – to various patients between 2006 and 2007.

25.     Specifically, the 2009 Administrative Complaint alleged that Keane routinely prescribed patients between 60 and 120 pills of multiple controlled substances on a monthly basis, in gross excess of the prevailing standard of care.

26.     Following these charges, in a Settlement Agreement dated April 10, 2010, Keane agreed to be issued a second public reprimand, pay a $10,000.00 administrative fine, complete a course on the proper prescription of controlled substances, complete 50 hours of community service, and have his practice monitored by a licensed risk manager for 60 days following the Settlement Agreement.

27.     Upon information and belief, Keane's record of professional discipline – which can be located by prospective employers through a simple internet search – made it virtually impossible for Keane to obtain legitimate employment as a physician, and made him amenable to participation in the Defendants' fraudulent scheme.

28.     Defendant Viera resides in and is a citizen of Florida. Viera was licensed to

practice massage therapy in Florida in 2012, and secretly performed many of the Fraudulent

Services without supervision, which then were billed to GEICO in contravention of Florida law.

**III.    The 2018 Arrests of Garcia and Keane at Quality Diagnostic**

29.    On May 21, 2018, Garcia and Keane were arrested on felony insurance fraud-

related charges stemming from their fraudulent activities at Quality Diagnostic.

30.    Specifically, Garcia and Keane were each charged with the following crimes:

(i)    Insurance Fraud in violation of Fla. Stat. § 817.234(1), a Third Degree Felony
        punishable by up to five years in prison, which prohibits a person from presenting
        or causing to be presented "any written or oral statement as part of, or in support
        of, a claim for payment or other benefit pursuant to an insurance policy or a health
        maintenance organization subscriber or provider contract, knowing that such
        statement contains any false, incomplete, or misleading information concerning
        any fact or thing material to such claim";

(ii)   Grand Theft in the Third Degree in violation of Fla. Stat. § 812.014(2)(C), a Third
        Degree Felony punishable by up to five years in prison, which prohibits a person
        from stealing property from another where the property stolen is valued at
        $5,000.00 or more; and

(iii)  a violation of the Florida Communications Fraud Act, Fla. Stat. §
        817.034(4)(A)(3), a Third Degree Felony punishable by up to five years in prison,
        which prohibits a person from engaging in a scheme to defraud where the
        property wrongfully obtained is valued at less than $20,000.00.

31.    For her part, Garcia was charged with paying kickbacks to a patient – and offering

to pay additional kickbacks to other referred patients – in exchange for, among other things, the

patients' receiving "treatment" at Quality Diagnostic.

32.    Specifically, Garcia was charged with having paid a patient $1,000.00 for

receiving "treatment" at Quality Diagnostic and for undergoing diagnostic testing at a particular

diagnostic testing facility.

33.    Moreover, Garcia was charged with "coaching" this patient as to what the

patient's testimony ought to be at an examination under oath conducted by the patient's

insurance carrier, and for paying the patient $100.00 for ultimately appearing at the examination under oath.

34.     Garcia was also charged with having offered to pay a patient between $300.00 and $500.00 for referring a friend to Quality Diagnostic, and offering to pay the referred patient $1,000.00 in exchange for their "treating" at Quality Diagnostic.

35.     For his part, Keane was alleged to have fabricated the results of a patient examination at Quality Diagnostic.

36.     Specifically, Keane was charged with having reported the results of a putative physical examination of a patient, despite the fact that Keane is alleged to have never left his chair to actually physically examine the patient.

37.     For example, Keane was charged with falsely reporting having tested, among other things, a patient's range of motion, grip strength, deep tendon reflexes, and cranial nerves. This, despite the fact that video evidence revealed that, although these tests would require physical contact with the patient, Keane never left his chair during the putative "examination".

38.     In keeping with the fact that the charges against Garcia and Keane were meritorious, several of the patient encounters described above – including those in which Garcia paid a patient in exchange for the patient's treating at Quality Diagnostic – were captured on video.

## JURISDICTION AND VENUE

39.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the total matter in controversy, exclusive of interest and costs, exceeds the jurisdictional threshold of $75,000.00, and is between citizens of different states.

40.     This Court also has original jurisdiction pursuant to 28 U.S.C. § 1331 over claims

brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ("RICO") Act).

41.     In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

42.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Southern District of Florida is the District where one or more of the Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS COMMON TO ALL CLAIMS

**I.     An Overview of the Pertinent Law Governing No-Fault Insurance Reimbursement**

**A.     The Florida No-Fault Law**

43.     Florida has a comprehensive statutory system designed to ensure that motor vehicle accident victims are compensated for their injuries.  The statutory system is embodied within the Florida Motor Vehicle No-Fault Law (the "No-Fault Law", Fla. Stat. §§ 627.730-627.7405), which requires automobile insurers to provide Personal Injury Protection benefits ("PIP Benefits") to Insureds.

44.     Under the No Fault Law, an Insured can assign his or her right to PIP Benefits to health care services providers in exchange for those services. See Fla. Stat. § 627.736. Pursuant to a duly executed assignment, a health care services provider may submit claims directly to an insurance company in order to receive payment for medically necessary services, using the required claim forms, including the Health care Financing Administration insurance claim form (known as the "HCFA-1500 form"). See id.

**B.     No-Fault Reimbursement and Compliance with Florida Law Governing Health care Practice**

45.     In order for a health care service to be eligible for PIP reimbursement, it must be "lawfully" provided. See Fla. Stat. § 627.736.

46.     Pursuant to the No-Fault Law, "lawful" or "lawfully" means "in substantial compliance with all relevant applicable criminal, civil, and administrative requirements of state and federal law related to the provision of medical services or treatment." See Fla. Stat. § 627.732.

47.     Thus, health care services providers, including clinics licensed under the Clinic Act, may not recover PIP Benefits for health care services that were not provided in substantial compliance with all relevant applicable criminal, civil, and administrative requirements of Florida and federal law related to the provision of the underlying services or treatment. See, e.g., State Farm Mut. Auto. Ins. Co. v. B&A Diagnostic, Inc., 145 F. Supp. 3d 1154, 1163 (S.D. Fla. 2015); State Farm Mut. Auto. Ins. Co. v. Med. Serv. Ctr. of Fla., 103 F. Supp. 3d 1343, 1355 (S.D. Fla. 2015).

48.     By extension, insurers such as GEICO are not required to make any payments of PIP Benefits for health care services that were not provided in substantial compliance with all relevant applicable criminal, civil, and administrative requirements of Florida and federal law related to the provision of the underlying services or treatment.

**C.     No-Fault Reimbursement and the Clinic Act**

49.     Subject to certain limited exceptions that are not applicable in this case, the Clinic Act defines "clinic" to mean "an entity where health care services are provided to individuals and which tenders charges for reimbursement for such services, including a mobile clinic and a portable equipment provider." See Fla. Stat. § 400.9905.

50.     Pursuant to the Clinic Act, clinics operating in Florida must – among other things – "appoint a medical director or clinic director who shall agree in writing to accept legal responsibility for [certain enumerated] activities on behalf of the clinic." See Fla. Stat. § 400.9935(1).

51.     Among other things, a clinic medical director must "[c]onduct systematic reviews of clinic billings to ensure that the billings are not fraudulent or unlawful. Upon discovery of an unlawful charge, the medical director or clinic director shall take immediate corrective action." See Fla. Stat. § 400.9935(1).

52.     In addition, a clinic medical director must "[e]nsure that all practitioners providing health care services or supplies to patients maintain a current active and unencumbered Florida license", and "[e]nsure that all health care practitioners at the clinic have active appropriate certification or licensure for the level of care being provided." See Fla. Stat. § 400.9935(1).

53.     Pursuant to the Clinic Act, clinics and their owners must disclose their ownership interests in a clinic as part of the clinic licensing application process, and clinic owners must submit to background screening if they hold more than a 5 percent ownership interest in a clinic. See, e.g., Fla. Stat. §§ 400.991, 408.806; 59A-33.002, F.A.C.

54.     Pursuant to the Clinic Act, "[a] charge or reimbursement claim made by or on behalf of a clinic that is required to be licensed under this part but that is not so licensed, or that is otherwise operating in violation of this part, regardless of whether a service is rendered or whether the charge or reimbursement claim is paid, is an unlawful charge and is noncompensable and unenforceable. A person who knowingly makes or causes to be made an unlawful charge

commits theft within the meaning of, and punishable as provided in, [Fla. Stat. §] 812.014." <u>See</u> Fla. Stat. § 400.9935(3).

55.    Thus, pursuant to both the No-Fault Law and the Clinic Act, clinics that operate in violation of the Clinic Act's medical director, ownership disclosure, or other operating requirements are not entitled to collect PIP Benefits, whether or not the underlying health care services were medically necessary or actually provided. <u>See</u>, <u>e.g.</u>, <u>Allstate Ins. Co. v. Vizcay</u>, 826 F.3d 1326, 1330-1331 (11th Cir. 2015); <u>B&A Diagnostic, Inc.</u>, <u>supra</u>, 145 F. Supp. 3d at 1164-1165.

56.    By extension, insurers such as GEICO are not required to make any payments of PIP Benefits to clinics that operate in violation of the Clinic Act's medical director, ownership disclosure, or other requirements, <u>whether or not the underlying health care services were medically necessary or actually provided. See</u>, <u>e.g.</u>, <u>Med. Serv. Ctr. of Fla.</u>, <u>supra</u>, 103 F. Supp. 3d at 1355 ("Florida law clearly states that [an insurer] can refuse payment for services unlawfully rendered. Fla. Stat. § 627.736(5)(b)(1)(b). As a result of Defendants' conduct, Plaintiffs paid claims which it was statutorily entitled to deny. Accordingly, it would be inequitable to allow Defendants to retain those benefits, regardless of whether those services were medically necessary."); <u>State Farm Fire & Cas. Co. v. Silver Star Health & Rehab, Inc.</u>, 2011 U.S. Dist. LEXIS 145629 at * 16 - * 17 (M.D. Fla. Dec. 19, 2011)(same).

**D.    No-Fault Reimbursement and the Patient Brokering Act**

57.    Florida's Patient Brokering Act, Fla. Stat. § 817.505, broadly prohibits any person from offering, paying soliciting, or receiving any commission, bonus, rebate, kickback, or bribe – directly or indirectly, in cash or in kind – or from engaging in any fee-splitting arrangement of any type whatsoever, to either induce a patient referral or in exchange for a patient referral.

58.     What is more, the Patient Brokering Act makes it unlawful for any person to "aid, abet, advise, or otherwise participate" in such conduct.

59.     Clinics and other health care providers that operate in violation of the Patient Brokering Act are not entitled to collect PIP Benefits, whether or not the underlying health care services were medically necessary or actually provided. See, e.g., B&A Diagnostic, Inc., supra; Med. Serv. Ctr. of Fla., supra.

60.     By extension, insurers such as GEICO are not required to make any payments of PIP Benefits to clinics and other health care providers that operate in violation of the Patient Brokering Act, whether or not the underlying health care services were medically necessary or actually provided. See, e.g., Med. Serv. Ctr. of Fla., supra; Silver Star Health & Rehab, Inc., supra.

**E.      No-Fault Reimbursement and the Anti-Kickback Statute**

61.     Florida's Anti-Kickback Statute, Fla. Stat. § 456.054, prohibits any health care provider from offering, paying, soliciting, or receiving a kickback, directly or indirectly, overtly or covertly, in cash or in kind, for referring or soliciting patients.

62.     Pursuant to Section 456.054, violations of the Anti-Kickback Statute also constitute violations of the Patient Brokering Act.

63.     As with the Patient Brokering Act, clinics and other health care providers that operate in violation of the Anti-Kickback Statute are not entitled to collect PIP Benefits, whether or not the underlying health care services were medically necessary or actually provided. See, e.g., B&A Diagnostic, Inc., supra; Med. Serv. Ctr. of Fla., supra.

64.     By extension, insurers such as GEICO are not required to make any payments of PIP Benefits to clinics and other health care providers that operate in violation of the Anti-

Kickback Statute, whether or not the underlying health care services were medically necessary or actually provided. See, e.g., Med. Serv. Ctr. of Fla., supra; Silver Star Health & Rehab, Inc., supra.

**F.     No-Fault Reimbursement and Independent Contractors**

65.     Under Florida law, a healthcare clinic may only recover PIP benefits for services rendered by the clinic or its employees. See Fla. Stat. 627.736(5)(a).

66.     Specifically, Fla. Stat. 627.736(5)(a) provides that only a "physician, hospital, clinic, or other person lawfully rendering treatment to an injured person…may charge only a reasonable amount for the services and supplies rendered…." Fla. Stat. 627.736(5)(a) (emphasis added).

67.     A healthcare clinic does not "render" healthcare services through its hiring of an independent contractor to perform the services. See, e.g., Prosper Diagnostic Centers, Inc. v. Allstate Ins. Co., 964 So. 2d 763, 765 (Fla. 4th DCA 2007).

68.     Concomitantly, a healthcare clinic may not recover PIP benefits for services rendered solely by independent contractors. See, id.

69.     Therefore, charges submitted to an insurer by a healthcare clinic for services not rendered by the clinic – i.e., services rendered by independent contractors – are noncompensable and unenforceable under Florida law.

**G.     No-Fault Reimbursement and Medical Necessity**

70.     Pursuant to the No-Fault Law, insurers such as GEICO are only required to pay PIP Benefits for medically necessary services. See Fla. Stat. § 627.736. Concomitantly, a health care services provider, including a clinic organized under the Clinic Act, is only eligible to receive PIP Benefits for medically necessary services. Id.

71.     Pursuant to the No-Fault Law, "medically necessary" means:

a medical service or supply that a prudent physician would provide for the purpose of preventing, diagnosing, or treating an illness, injury, disease, or symptom in a manner that is:

>   (a) In accordance with generally accepted standards of medical practice;
>
>   (b) Clinically appropriate in terms of type, frequency, extent, site, and duration; and
>
>   (c) Not primarily for the convenience of the patient, physician, or other health care provider.

See Fla. Stat. § 627.732.

**H.      No-Fault Reimbursement, Massage Therapy, and Massage Therapists**

72.     Prior to January 1, 2013, the No-Fault Law permitted health care services providers, including clinics organized under the Clinic Act, to collect PIP Benefits for massage therapy, so long as – among other things – the massage therapy was "provided, supervised, ordered, or prescribed" by a licensed physician, chiropractor, or dentist, or was provided in a properly licensed or accredited institutional setting. See 2012 Fla. ALS 197.

73.     However, the No-Fault Law was amended, effective January 1, 2013, to prohibit PIP reimbursement for massage or for services provided by massage therapists. See 2012 Fla. ALS 197; see also Fla. Stat. § 627.736(1)(a)(5)("Medical benefits [that are reimbursable under the No-Fault Law] do not include massage …, regardless of the person, entity, or licensee providing massage …, and a licensed massage therapist … may not be reimbursed for medical benefits under this section.").

74.     The No-Fault Law was amended to prohibit PIP reimbursement for massage or for services provided by massage therapists in response to widespread PIP fraud involving massage services and massage therapists. See, e.g., Florida House of Representatives Staff

Analysis for House Bill 119 (amending the No-Fault Law), noting that "PIP fraud remains rampant", and citing dramatic increases in PIP claims for massage therapy as a significant part of the problem.

75.     Pursuant to Fla. Stat. § 486.028, massage therapists may not practice physical therapy, or hold themselves out as being able to practice physical therapy, unless they have an actual license to practice physical therapy, as opposed to massage therapy.

**I.     No-Fault Billing and No-Fault Reimbursement**

76.     Pursuant to the No-Fault Law, insurers such as GEICO are not required to pay PIP Benefits:

    (i)     For any service or treatment that was not lawful at the time rendered;

    (ii)    To any person who knowingly submits a false or misleading statement relating to the claim or charges; or

    (iii)   With respect to a bill or statement that does not substantially meet the billing requirements set forth in the No-Fault Law.

See Fla. Stat. § 627.736.

77.     The No-Fault Law's billing requirements provide – among other things – that all PIP billing must, to the extent applicable, comply with the instructions promulgated by the Centers for Medicare & Medicaid Services for the completion of HCFA-1500 forms, as well as the guidelines promulgated by the American Medical Association ("AMA") in connection with the use of current procedural terminology ("CPT") codes. See Fla. Stat. § 627.736.

**II.     The Defendants' Fraudulent Scheme**

**A.     The Antecedents of the Defendants' Fraudulent Scheme**

78.     Prior to owning and operating Quality Diagnostic, Martinez – along with his putative "marketing/consulting" entity, JM Marketing Consulting Group, Inc. ("JM Marketing") –

secretly and unlawfully served as an undisclosed owner and operator of a health care clinic named Benefica Health Center, Corp. ("Benefica").

79.     Between at least 2011 and 2016, Martinez, JM Marketing, and several others used Benefica in a virtually identical manner as Quality Diagnostic, to submit massive amounts of fraudulent no-fault billing through Benefica to insurers in Florida, including GEICO.

80.     Garcia was employed by Martinez and Benefica as the putative "office manager" at Benefica, and in that capacity was responsible for the submission of fraudulent no-fault billing through Benefica to insurers in Florida, including GEICO.

81.     Much like Quality Diagnostic, Benefica purported to provide initial examinations, follow-up examinations, and physical therapy services to Florida automobile accident victims.

82.     Much like Quality Diagnostic, Benefica operated without a legitimate medical director in violation of the Clinic Act, and instead installed a pliable physician to falsely pose as Benefica's phony "medical director". However, the operations, putative health care services, and billing practices at Benefica were always dictated by Martinez and his non-physician associates, without any legitimate oversight by any legitimate medical director.

83.     As would later be the case at Quality Diagnostic, the putative health care services provided through Benefica were almost exclusively performed by unsupervised massage therapists, and then were billed to GEICO and other insurers in direct contravention of Florida law.

84.     Aware of this fact, Martinez and his associates sought to conceal the identities of the individuals who actually performed health care services at Benefica. Toward that end, Martinez, JM Marketing, Benefica, and their associates submitted hundreds of bills to GEICO, virtually all of which falsely represented that a licensed physician – namely, Benefica's phony

18

"medical director" – had performed or at least directly supervised the underlying physical therapy services, when in fact those services were virtually always performed by unsupervised massage therapists.

85.     By the fall of 2016, Benefica's volume of billing and pattern of fraudulent charges and had come under scrutiny by GEICO.

86.     In October 2016 – shortly after GEICO began to obtain affidavits from Insureds who treated at Benefica, to the effect that Benefica was billing for services it had not rendered – Benefica, Martinez, and their associates learned of GEICO's investigation and grew concerned that their efforts to conceal their fraudulent scheme were unravelling.

87.     Accordingly, Benefica, Martinez, and their associates attempted to thwart GEICO's investigation.

88.     For example, on October 25, 2016, GEICO was contacted by an attorney named Christian Carrazana, Esq., who advised GEICO that he – somehow, through some unspecified means – purportedly had "been retained as legal counsel for all patients of Benefica Health Center Corp." Mr. Carrazana then demanded that all future communications between GEICO and his putative "clients" – i.e., every single Insured who purported to receive treatment at Benefica –be directed to his attention.

89.     However, Mr. Carrazana did not, in fact, represent "all patients of Benefica Health Center Corp." Instead, Benefica and its owners and operators – including Martinez – retained Mr. Carrazana in an attempt to thwart the investigation of, and conceal and perpetuate, the fraudulent scheme at Benefica.

90.     In late 2016, as GEICO became aware of Benefica's fraudulent practices, Benefica, Martinez, and their associates knew that GEICO's investigation would hinder their ability to submit a high volume of fraudulent no-fault billing through Benefica to GEICO.

91.     Accordingly, Martinez and his associates sought out a means by which they could continue to submit a high volume of fraudulent billing to GEICO and other insurers.

92.     Toward that end, on November 8, 2016, just two weeks after Mr. Carrazana's communications with GEICO, Martinez – who, along with JM Marketing, held a secret and unlawful undisclosed ownership interest in Benefica – caused Quality Diagnostic to be incorporated.

93.     Then, on January 12, 2017, GEICO commenced a racketeering lawsuit in the United States District Court for the Southern District of Florida (the "Benefica Action") against Benefica, its purported sole owner of record, Otto El Coro ("El Coro"), its putative medical director, Carlos Camilo Perez, M.D. ("Perez"), and two licensed massage therapists who purported to perform virtually all of the health care services that were billed through Benefica to GEICO, Augustin De Cardenas Sanchez, LMT ("Sanchez") and Mercedes N. Alonso, LMT ("Alonso").

94.     Initially, GEICO did not name Martinez and JM Marketing as Defendants in the Benefica Action, because – as set forth below – Martinez and JM Marketing had unlawfully concealed their ownership interests in Benefica. However, and as set forth below, GEICO later amended its Complaint in the Benefica Action to name Martinez and JM Marketing as Defendants, after it learned through discovery of their secret and unlawful ownership interests in Benefica.

**1.  The Unlawful Concealment of Martinez's Ownership Interest in Benefica**

95.     Pursuant to the Clinic Act, a license issued by the Florida Agency for Health Care Administration ("AHCA") is required to operate a clinic in Florida. <u>See</u>, <u>e.g.</u>, Fla. Stat. § 400.991.

96.     Pursuant to the Clinic Act, applicants for a clinic license must submit an application for licensure to AHCA that, among other things, identifies each individual owner, corporation, partnership, firm, business, association, or other entity that owns or controls, directly or indirectly, 5 percent or more of an interest in the clinic. <u>See</u>, <u>e.g.</u>, Fla. Stat. §§ 400.9905 and 408.806.

97.     Pursuant to the Clinic Act, changes in ownership of a clinic must be reported to AHCA no later than the date when the changes become effective. <u>See</u>, <u>e.g.</u>, Fla. Stat. §§ 400.991, 408.810.

98.      Pursuant to the Florida law, any person who files a false or misleading clinic license or license renewal application or who submits false or misleading information related to such application, commits a felony of the third degree. <u>See</u>, <u>e.g.</u>, Fla. Stat. § 408.8065.

99.     Though El Coro falsely purported to be the sole owner and shareholder of Benefica, in actuality El Coro conspired with Martinez and JM Marketing to conceal the fact that – since at least 2011 – Martinez and JM Marketing, among others, secretly and unlawfully held undisclosed ownership interests in Benefica.

100.    For example, all of Benefica's clinic licensing applications to AHCA, including Benefica's 2013 licensing application and 2015 licensing application, listed El Coro as the sole owner of Benefica.

101.    None of Benefica's clinic licensing applications disclosed the fact that Martinez, JM Marketing, or anyone else held any direct or indirect ownership interests in Benefica.

102.    Furthermore, all of Benefica's clinic licensing applications to AHCA represented that El Coro was the sole board member and officer of Benefica, and that Benefica did not use the services of any outside management companies.

103.    Moreover, at no point did Benefica, El Coro, Martinez, or JM Marketing advise AHCA that Martinez or JM Marketing held any direct or indirect ownership interests in Benefica.

104.    In fact, in sworn responses to interrogatories in the Benefica Action, dated June 15, 2017, Benefica and El Coro falsely represented – among other things – that:

(i)     El Coro was the "100% shareholder/owner" of Benefica;

(ii)    Benefica maintained its bank account at one bank – Regions Bank;

(iii)   Aside from El Coro, Benefica had no employees other than Perez, Sanchez, Alonso, and Garcia; and

(iv)    Benefica did not use the services of any marketing, management, or consulting companies of any type.

105.    Following Benefica's service of its sworn responses to GEICO's interrogatories, GEICO issued a subpoena to Regions Bank for Benefica's bank records. These records contradicted Benefica's sworn interrogatory responses in several respects. For instance, the Benefica Regions Bank records revealed that:

(i)     the Regions Bank account was not opened until late 2016, despite the fact that Benefica had been incorporated in and operational since 2004; and

(ii)    prior to late 2016, Benefica held at least one additional bank account, with Wells Fargo.

106.     Aside from revealing the existence – and Benefica's concealment – of a second Benefica bank account, Benefica's Regions Bank records from November 2016 through July 2017 also indicated, among other things, that although Benefica had represented in sworn interrogatory responses that El Coro was the sole owner of Benefica:

(i)     Martinez was a signatory on Benefica's bank account.

(ii)     Martinez received massive direct and indirect distributions from Benefica over the eight month period between November 2016 and July 2017 alone, including at least $57,500.00 that was paid by Benefica to Martinez directly, and at least an additional $263,129.50 that was paid to JM Marketing – which was owned and controlled by Martinez – despite the fact that Benefica represented that Martinez was not employed by Benefica, that Martinez did not hold any financial interest in Benefica, and that Benefica did not use the services of any marketing, management, billing, or consulting companies of any type.

(iii)     Many of the checks that were issued from Benefica to Martinez and JM Marketing were signed by Martinez, himself, in his capacity as a signatory on Benefica's bank account.

107.     In keeping with the fact that Martinez and JM Marketing secretly and unlawfully held undisclosed ownership interests in Benefica, the distributions they received from Benefica between November 2016 and July 2017 either were commensurate with, or far outstripped, the distributions that Benefica made during the same period to El Coro, Benefica's purported "100% shareholder/owner", and Perez, Benefica's purported "medical director".

108.     In keeping with the fact that Benefica was owned by Martinez, Benefica's 2016 tax returns indicated that Martinez owned 50 percent of Benefica.

109.     In further keeping with the fact that Martinez and JM Marketing held unlawful, undisclosed ownership interests in Benefica, Benefica's Wells Fargo bank records indicated that Martinez received massive direct and indirect distributions from Benefica beginning in at least 2011, continuing until Benefica's opening of the Regions Bank bank account in November 2016.

110.     For example:

(i)     In 2011, Benefica paid $63,455 to Martinez directly, and $328,750.00 to JM Marketing, for a total of $392.205.00 paid to Martinez and JM Marketing;

(ii)    In 2012, Benefica paid $7,700.00 to Martinez directly, and $252,877.00 to JM Marketing, for a total of $260,577.00 paid to Martinez and JM Marketing;

(iii)   In 2013, Benefica paid $13,500.00 to Martinez directly, and $176,890.00 to JM Marketing, for a total of $190,390.00 paid to Martinez and JM Marketing;

(iv)    In 2014, Benefica paid $3,000.00 to Martinez directly, and $81,250.00 to JM Marketing, for a total of $84,250.00 paid to Martinez and JM Marketing;

(v)     In 2015, Benefica paid $46,760.00 to Martinez directly, and $144,300.00 to JM Marketing, for a total of $191.060.00 paid to Martinez and JM Marketing; and

(vi)    Between January and November 2016, Benefica paid $206,500.00 to Martinez directly, and paid $510,105.82 to JM Marketing, for a total of $716,605.82 paid to Martinez and JM Marketing.

111.    All told, between January 2011 and November 2016 Benefica paid Martinez and JM Marketing a total of $1,831,287.82, despite the fact that Benefica represented that Martinez was not employed by Benefica, that Martinez did not hold any financial interest in Benefica, and that Benefica did not use the services of any marketing, management, billing, or consulting companies of any type.

112.    As set forth above, because El Coro and Benefica had concealed Martinez and JM Marketing's ownership interests in Benefica, Martinez and JM Marketing were not named as defendants in the original Complaint in the Benefica Action.

113.    However, shortly after GEICO obtained discovery demonstrating Martinez and JM Marketing's secret and unlawful undisclosed ownership interests in Benefica, GEICO moved to amend its Complaint in the Benefica Action to name Martinez and JM Marketing, among others, as Defendants in the Benefica Action.

114.    On September 6, 2017, the Court in the Benefica Action granted GEICO's motion to amend the Complaint in the Benefica Action to name Martinez and JM Marketing, among others, as Defendants in the Benefica Action.

115.    Almost immediately thereafter, in September 2017, Martinez, JM Marketing, and Benefica – among others – entered into a settlement agreement with GEICO in the Benefica Action whereby, among other things, they agreed to release all outstanding Benefica billing, and to pay GEICO $250,000.00 in restitution.

116.    Moreover, pursuant to the settlement in the Benefica Action, Martinez agreed that – for a period of five years – he would not submit any billing to GEICO through Benefica or any other entities that he directly or indirectly owned, managed, operated, or controlled.

## 2.    Martinez's Incorporation of Quality Diagnostic and the Perpetuation of the Fraudulent Scheme

117.    As set forth above, in October 2016 – shortly after GEICO began to obtain affidavits from Insureds who treated at Benefica, to the effect that the Benefica was billing for services it had not rendered – Benefica, Martinez, and their associates learned of GEICO's investigation and sought out an alternative means by which they could continue to submit fraudulent billing to GEICO.

118.    Toward that end, and as set forth above, Martinez, Acebo Martinez, and Garcia caused Quality Diagnostic to be incorporated in Florida on November 8, 2016.

119.    Like Benefica, Quality Diagnostic purported to provide initial examinations, follow-up examinations, and physical therapy services to Florida automobile accident victims.

120.    Like Benefica, Quality Diagnostic operated without a legitimate medical director, and instead installed a pliable physician to pose as Quality Diagnostic's phony "medical director". However, the operations, putative health care services, and billing practices at Quality

Diagnostic were always dictated by Martinez, Acebo Martinez, Garcia, and their non-physician associates, without any legitimate oversight by any legitimate medical director.

121. Like Benefica, the putative health care services provided through Quality Diagnostic were almost exclusively performed by an unsupervised massage therapist – namely Viera – and then were billed to GEICO in direct contravention of Florida law.

**B.    The Unlawful Concealment of Martinez's Ownership Interest in Quality Diagnostic**

122. As set forth above, pursuant to the Clinic Act, clinics and their owners must disclose their ownership interests in a clinic as part of the clinic licensing application process, and clinic owners must submit to background screening if they hold more than a 5 percent ownership interest in a clinic. See, e.g., Fla. Stat. §§ 400.991, 408.806; 59A-33.002, F.A.C.

123. At the time of its incorporation in November 2016, Quality Diagnostic listed Martinez as its sole owner and "president" in filings with the Florida Division of Corporations.

124. Similarly, all of Quality Diagnostic's initial clinic licensing applications to AHCA listed Martinez as the sole owner of Quality Diagnostic.

125. However, on August 24, 2017 – the very same day GEICO's counsel inquired whether Benefica's attorney, Mr. Carrazana, would consent to GEICO's filing of an amended complaint in the Benefica Action (which would have added Martinez as a defendant) – Quality Diagnostic filed an amended report with the Florida Secretary of State listing Acebo Martinez as "president" and Martinez as "vice president" of Quality Diagnostic.

126. Then, on August 30, 2017, Quality Diagnostic filed yet another amended report with the Florida Secretary of State, this version listing only Acebo Martinez as "president" and omitting any reference to Martinez at all.

127.   Thereafter, Quality Diagnostic reported to AHCA that Acebo Martinez was the sole owner and officer of Quality Diagnostic.

128.   However, since September 2017, Martinez has maintained a secret and unlawful ownership interest.

129.   In keeping with the fact that Martinez has maintained a secret and unlawful ownership interest in Quality Diagnostic, Martinez continued to receive ownership distributions from Quality Diagnostic following Quality Diagnostic's reporting to the Florida Secretary of State and AHCA that only Acebo Martinez held an ownership interest in Quality Diagnostic.

130.   Though Quality Diagnostic had represented otherwise, Quality Diagnostic issued Martinez four checks – totaling $75,000.00 – between September and November 2017, despite the fact that Martinez had supposedly divested himself of his ownership interest in Quality Diagnostic.

131.   Specifically:

(i)   On September 21, 2017 – nearly one month after Martinez had supposedly divested himself of his ownership interest in Quality Diagnostic – Quality Diagnostic issued Martinez a check in the amount of $25,000.00.

(ii)   On October 11, 2017 – more than one month after Martinez had supposedly divested himself of his ownership interest in Quality Diagnostic – Quality Diagnostic issued Martinez a check in the amount of $15,000.00.

(iii)   On October 30, 2017 – two months after Martinez had supposedly divested himself of his ownership interest in Quality Diagnostic – Quality Diagnostic issued Martinez a check in the amount of $25,000.00. The "memo" line on the October 30, 2017 check read "Distribution".

(iv)   On November 7, 2017 – more than two months after Martinez had supposedly divested himself of his ownership interest in Quality Diagnostic – Quality Diagnostic issued Martinez a check in the amount of $10,000.00. The "memo" line on the October 30, 2017 check read "Distribution".

132.    As set forth above, clinics that operate in violation of the Clinic Act's licensing or operating requirements, including the Clinic Act's ownership disclosure requirements, are not entitled to collect PIP Benefits.

133.    Since September 2017, Quality Diagnostic has not been in compliance with the Clinic Act's licensing and operating requirements, and has not been entitled to collect PIP Benefits, because Martinez unlawfully failed to disclose the direct and indirect ownership interests in Quality Diagnostic to AHCA.

**C.      The Violations of the Patient Brokering Act and the Anti-Kickback Statute**

134.    As set forth above, the Patient Brokering Act broadly prohibits any person from offering, paying soliciting, or receiving any commission, bonus, rebate, kickback, or bribe – directly or indirectly, in cash or in kind – or from engaging in any fee-splitting arrangement of any type whatsoever, to either induce a patient referral or in exchange for a patient referral.

135.    What is more – and again, set forth above, the Patient Brokering Act makes it unlawful for any person to "aid, abet, advise, or otherwise participate" in such conduct.

136.    Moreover, the Anti-Kickback Statute prohibits any health care provider from offering, paying, soliciting, or receiving a kickback, directly or indirectly, overtly or covertly, in cash or in kind, for referring or soliciting patients.

137.    As set forth above, violations of the Anti-Kickback Statute also constitute violations of the Patient Brokering Act.

138.    Quality Diagnostic's fraudulent business depended on Quality Diagnostic's ability to gain access to patients who were willing to report for "treatment" at Quality Diagnostic, regardless of whether those services were medically necessary.

139.    As such, Quality Diagnostic, Garcia, Martinez, and Acebo Martinez sought out a means by which they could convince patients to receive large amounts of medically unnecessary physical therapy "treatments" at Quality Diagnostic which would, in turn, allow the Defendants to submit a high volume of fraudulent billing through Quality Diagnostic.

140.    Toward that end, Quality Diagnostic, Garcia, Martinez, and Acebo Martinez caused cash kickback payments to be offered and paid to patients, in exchange for receiving medically unnecessary and illusory "treatment" at Quality Diagnostic, and in exchange for referring others for medically unnecessary and illusory "treatment" at Quality Diagnostic.

141.    In order to facilitate the cash kickback payments, Quality Diagnostic, Garcia, Martinez, and Acebo Martinez caused large amounts of money to be illegitimately paid to Garcia, who then immediately converted that money into cash to be used for kickback payments.

142.    In keeping with the fact that Garcia immediately converted the payments from Quality Diagnostic into cash, Garcia cashed a large number of the checks issued to her by Quality Diagnostic on the same day the checks were issued.

143.    Then, Garcia used the laundered cash to offer and pay unlawful kickbacks to patients in exchange for the patients' returning to Quality Diagnostic for medically unnecessary and illusory "treatment".

144.    Moreover, Garcia used the laundered cash to offer and pay unlawful kickbacks to patients in exchange for those patients referring other putative automobile accident victims to Quality Diagnostic for medically unnecessary and illusory "treatment".

145.    In keeping with the fact that the payments from Quality Diagnostic to Garcia were to facilitate the unlawful kickback payments made by Garcia to Quality Diagnostic patients,

Garcia often received a series of checks from Quality Diagnostic on consecutive days or within just a few days of one another.

146.    Moreover, Garcia did not cash <u>every</u> check issued to her by Quality Diagnostic, but only those in amounts between $3,000.00 and $7,500.00. Checks issued to Garcia is smaller amounts were deposited into Garcia's personal checking account.

147.    All of the checks issued to Garcia by Quality Diagnostic were for amounts less than $10,000, but often collectively exceeded $10,000, in an apparent attempt to avoid bank reporting requirements.

148.    Garcia then immediately converted these checks into cash in order to facilitate the unlawful kickbacks offered and paid to patients by and on behalf of Quality Diagnostic.

149.    For example:

(i)     On August 4, 2017, Quality Diagnostic, Garcia, Martinez, and Acebo Martinez caused a check in the amount of $3,000.00 to be issued to Garcia, who converted the check into cash that same day. Then, on August 7, 2017 – just three days later – Quality Diagnostic, Garcia, Martinez, and Acebo Martinez caused another check in the amount of $6,000.00 to be issued to Garcia, who again immediately converted the check into cash.

(ii)    On August 14, 2017, Quality Diagnostic, Garcia, Martinez, and Acebo Martinez caused a check in the amount of $5,100.00 to be issued to Garcia, who converted the check into cash that same day. The, on August 18, 2017 – just four days later – Quality Diagnostic, Garcia, Martinez, and Acebo Martinez caused another check in the amount of $5,000.00 to be issued to Garcia, who again converted the check into cash that same day.

(iii)   On September 29, 2017, Quality Diagnostic, Garcia, Martinez, and Acebo Martinez caused a check in the amount of $3,500.00 to be issued to Garcia, who converted the check into cash that same day.

(iv)    On October 12, 2017, Quality Diagnostic, Garcia, Martinez, and Acebo Martinez caused a check in the amount of $5,000.00 to be issued to Garcia, who converted the check into cash that same day. The, on October 13, 2017 – the very next day – Quality Diagnostic, Garcia, Martinez, and Acebo Martinez caused another check in the amount of $6,100.00 to Garcia, who again converted the check into cash that same day.

(v)     On November 22, 2017, Quality Diagnostic, Garcia, Martinez, and Acebo Martinez caused a check in the amount of $2,300.00 to be issued to Garcia, who converted the check into cash that same day.

(vi)    On December 5, 2017, Quality Diagnostic, Garcia, Martinez, and Acebo Martinez caused a check in the amount of $6,200.00 to be issued to Garcia, who converted the check into cash that same day. Then, on December 6, 2017 – the very next day – Quality Diagnostic, Garcia, Martinez, and Acebo Martinez caused another check in the amount of $5,000.00 to be issued to Garcia, who converted the check into cash that same day. Then, on December 7, 2017, Quality Diagnostic, Garcia, Martinez, and Acebo Martinez caused yet another check in the amount of $7,500.00 to be issued to Garcia, who again converted the check into cash that same day. Then, on December 8, 2017, Quality Diagnostic, Garcia, Martinez, and Acebo Martinez caused yet another check in the amount of $4,500.00 to be issued to Garcia, who again converted the check into cash the same day.

150.    All told, and in order to facilitate the unlawful cash kickback payments, Garcia converted at least $59,200.00 in Quality Diagnostic checks into cash at or around the same time when they were issued to her.

151.    Because Quality Diagnostic, Garcia, Martinez, and Acebo Martinez knew that the cash kickbacks offered and paid by Garcia and Quality Diagnostic to patients were unlawful, Quality Diagnostic, Garcia, Martinez, and Acebo Martinez took steps to conceal the existence of these payments.

152.    For instance, at the conclusion of the 2017 tax year, Garcia was issued an IRS Form 1099 from Quality Diagnostic, which indicated that Garcia had received just $43,900.00 as compensation from Quality Diagnostic in 2017.

153.    However, and in keeping with the fact that Quality Diagnostic, Garcia, Martinez, and Acebo Martinez issued checks to Garcia to facilitate Garcia and Quality Diagnostic's payment of kickbacks to patients, Quality Diagnostic's bank records indicated that Garcia was actually paid at least $72,700.00 by Quality Diagnostic in 2017.

154.    In other words, Garcia received at least $28,800.00 from Quality Diagnostic that was <u>not</u> characterized by Quality Diagnostic as Garcia's compensation.

155.    Moreover, Quality Diagnostic, Garcia, Martinez, and Acebo Martinez laundered money through Garcia – who simply converted the checks issued to her into cash – in order to conceal the nature and existence of the unlawful kickback payments.

156.    In keeping with the fact that Garcia offered and paid kickbacks to patients in exchange for those patients receiving treatment at – and for referring other patients to – Quality Diagnostic, as set forth above, Garcia was arrested for, among other things, offering and paying kickbacks to a patient in exchange for that patient agreeing to undergo a course of "treatment" at Quality Diagnostic.

157.    In keeping with the fact that Garcia offered and paid kickbacks to patients in exchange for those patients referring other automobile accident victims to Quality Diagnostic, as set forth above, Garcia was arrested for, among other things, offering a cash kickback to a patient in exchange for that patient referring other automobile accident victims to Quality Diagnostic.

158.    In the claims identified in Exhibit "1", Quality Diagnostic, Garcia, Martinez, and Acebo Martinez routinely falsely represented that the underlying health care services were lawfully provided and reimbursable, when in fact they were neither lawfully provided nor reimbursable because they were provided – to the extent that they were provided at all – pursuant to the Defendants' illegal patient brokering and kickback scheme.

**D.    The Fraudulent Operation of Quality Diagnostic Without a Legitimate Medical Director**

159.    Because Quality Diagnostic falsely appeared to be a clinic that was properly licensed and organized under the Clinic Act, Martinez, Acebo Martinez, and Garcia were able to

use Quality Diagnostic as a vehicle to submit a large volume of fraudulent PIP billing to GEICO and other insurers.

160.     However, because Quality Diagnostic was subject to the Clinic Act, Martinez, Acebo Martinez, and Garcia could not lawfully operate Quality Diagnostic, or use Quality Diagnostic as a vehicle to submit PIP billing to GEICO and other insurers, unless they recruited and retained a licensed physician to serve as Quality Diagnostic's medical director. See Fla. Stat. §§ 400.9905, 440.9935.

161.     However, if Martinez, Acebo Martinez, and Garcia recruited and retained a legitimate physician to serve as a legitimate medical director at Quality Diagnostic, the physician actually would be obligated to fulfill the statutory requirements applicable to a clinic medical director. See, e.g., Fla. Stat. § 400.9935(1).  By extension, any such legitimate medical director would impede Martinez, Acebo Martinez, and Garcia's ability to use Quality Diagnostic as a vehicle to submit a large amount of fraudulent PIP billing to GEICO and other Florida automobile insurers.

162.     Accordingly, Martinez, Acebo Martinez, and Garcia required a pliable physician willing to falsely pose as the "medical director" at Quality Diagnostic, but who – in actuality – would not even attempt to fulfill the statutory requirements applicable to a clinic medical director, and thereby would permit Martinez, Acebo Martinez, and Garcia to use Quality Diagnostic as a vehicle to submit a large amount of fraudulent PIP billing to GEICO and other insurers.

1.      **Queral Never Fulfilled His Statutory Role as Medical Director**

163.    Thereafter, in late 2016, Martinez and Garcia recruited Queral, a licensed physician who was willing to falsely pose as the legitimate medical director of Quality Diagnostic.

164.    Upon information and belief, Queral was receptive to Martinez and Garcia's offer because his advanced age made it difficult for him to obtain legitimate, sufficiently-remunerative employment as a physician.

165.    For example, Queral was approximately 69 years old in November 2016, when he first began to falsely purport to serve as Quality Diagnostic's "medical director".

166.    In order to circumvent Florida law and induce the Florida Agency for Health Care Administration to maintain Quality Diagnostic's licensure and to permit Quality Diagnostic to operate as a clinic, Quality Diagnostic, Martinez, Acebo Martinez, and Garcia entered into a secret scheme with Queral. In exchange for a designated salary from Quality Diagnostic, Queral agreed to falsely represent, to the AHCA, to the Insureds who sought treatment at Quality Diagnostic, and to the insurers including GEICO that received PIP claims from Quality Diagnostic, that he was the true medical director at Quality Diagnostic, and that he truly fulfilled the statutory requirements applicable to clinic medical directors at Quality Diagnostic.

167.    However, Queral never genuinely served as medical director at Quality Diagnostic. Instead, from the beginning of his association with Quality Diagnostic as its phony "medical director", Queral ceded all day-to-day decision-making and oversight regarding health care services at Quality Diagnostic, and the resulting billing, to Martinez, Acebo Martinez, and Garcia.

168.    Queral never legitimately served as medical director at Quality Diagnostic, inasmuch as he never ensured that all health care practitioners at the clinic had active appropriate certification or licensure for the level of care being provided, never conducted systematic reviews of Quality Diagnostic's billing to ensure that the billing was not fraudulent or unlawful, and never even made any attempt to discover the unlawful charges submitted through Quality Diagnostic, much less take any immediate corrective action. See Fla. Stat. § 400.9935(1).

169.    Rather, true authority over the provision of health care services through Quality Diagnostic, and the resulting billing – including the authority that would, at a legitimate clinic, be vested in the medical director – was held at all times by Martinez, Acebo Martinez, and Garcia, and by Garcia, who worked under the direction of Martinez, Acebo Martinez, and Garcia.

170.    In keeping with the fact that Queral never legitimately served as medical director at Quality Diagnostic, Queral simultaneously purported to serve as medical director for at least four other clinics, namely Vida Rehab, Inc., Early Time Medical Center, Inc., YGJO Medical Center Corp., and Dynamic Physical Rehab, Inc.

171.    It is highly improbable – to the point of impossibility – that Queral, who was nearly 70 years old, could have simultaneously served as medical director at four other clinics while also fulfilling his putative "medical director" role at Quality Diagnostic.

172.    Martinez, Acebo Martinez, and Garcia used the façade of Queral's phony "appointment" as Quality Diagnostic's ersatz "medical director" to do indirectly what they were forbidden from doing directly – namely: (i) to operate a clinic without a legitimate medical director; (ii) to engage in unlicensed medical decision-making with respect to the Insureds who sought treatment at Quality Diagnostic; (iii) to permit health care services to be provided at

Quality Diagnostic by individuals who lacked the proper licensure to perform the services; and (iv) to use Quality Diagnostic as a vehicle to submit a massive amount of fraudulent PIP billing to GEICO and other insurers.

173.     Queral unlawfully permitted Martinez, Acebo Martinez, and Garcia to dictate every aspect of the manner in which Insureds would be treated at Quality Diagnostic, and to dictate every aspect of the manner in which health care services at Quality Diagnostic would be billed to GEICO and other insurers, because he sought to continue profiting from the Defendants' fraudulent scheme.

**2.     Keane Never Fulfilled His Statutory Role as Medical Director**

174.     On or about October 1, 2017, Keane replaced Queral as the phony "medical director" of Quality Diagnostic.

175.     Upon information and belief, Keane was receptive to accepting the role as Quality Diagnostic's medical director because his advanced age and history of being subjected to professional discipline made it difficult for him to obtain legitimate, sufficiently-remunerative employment as a physician.

176.     For instance, Keane was approximately 73 years old in October 2017, when he first began to falsely purport to serve as Quality Diagnostic's "medical director".

177.     Moreover, as set forth above, Keane had – on two separate occasions – been publically reprimanded, fined, ordered to complete community service, and placed on probation by the Florida State Board of Medicine as punishment for professional misconduct, all of which was a matter of public record.

178.     In order to circumvent Florida law and induce the Florida Agency for Health Care Administration to maintain Quality Diagnostic's licensure and to permit Quality Diagnostic to

operate as a clinic, Quality Diagnostic, Martinez, Acebo Martinez, and Garcia entered into a secret scheme with Keane whereby Keane agreed to falsely represent, to the AHCA, to the Insureds who sought treatment at Quality Diagnostic, and to the insurers including GEICO that received PIP claims from Quality Diagnostic, that he was the true medical director at Quality Diagnostic, and that he truly fulfilled the statutory requirements applicable to clinic medical directors at Quality Diagnostic.

179.    However, Keane never genuinely served as medical director at Quality Diagnostic. Instead, from the beginning of his association with Quality Diagnostic as its phony "medical director", Keane ceded all day-to-day decision-making and oversight regarding health care services at Quality Diagnostic, and the resulting billing, to Martinez, Acebo Martinez, and Garcia.

180.    Keane never legitimately served as medical director at Quality Diagnostic, inasmuch as he never ensured that all health care practitioners at the clinic had active appropriate certification or licensure for the level of care being provided, never conducted systematic reviews of Quality Diagnostic's billing to ensure that the billing was not fraudulent or unlawful, and never even made any attempt to discover the unlawful charges submitted through Quality Diagnostic, much less take any immediate corrective action. See Fla. Stat. § 400.9935(1).

181.    In keeping with the fact that Keane never ensured that all health care practitioners at the clinic had active appropriate certification or licensure for the level of care provided, Keane's testimony during a July 16, 2018 deposition indicated that Keane did not even know the name of the individual purporting to provide physical therapy services at Quality Diagnostic, and therefore did not ensure that this individual had active appropriate certification or licensure for the level of care provided.

182.     In keeping with the fact that Keane never conducted a systematic review of Quality Diagnostic's billing to ensure that the billing was not fraudulent or unlawful, and never even made any attempt to discover the unlawful charges submitted through Quality Diagnostic, Keane's testimony during his July 16, 2018 deposition indicated that the first time Keane learned that he had been listed as having performed hundreds of hours of physical therapy services at Quality Diagnostic was at or around the time of the filing of GEICO's original Complaint in this action in January 2018.

183.     In further keeping with the fact that Keane never legitimately served as medical director at Quality Diagnostic, both Keane and Garcia were arrested for, among other things, engaging in a felonious scheme to defraud an automobile insurer during Keane's putative "tenure" as medical director.

184.     In reality, true authority over the provision of health care services through Quality Diagnostic, and the resulting billing – including the authority that would, at a legitimate clinic, be vested in the medical director – was held at all times by Martinez, Acebo Martinez, and Garcia, and by Garcia.

185.     In keeping with the fact that Keane never legitimately served as medical director at Quality Diagnostic, simultaneous to his putative service as medical director of Quality Diagnostic, Keane purported to serve as the medical director at at least three other healthcare clinics: Golden Medical Center, Inc. ("Golden Medical Center"), JO Medical Center, Inc. ("JO Medical Center"), and Vida Rehabilitation Corp. ("Vida Rehab").

186.     It is highly improbable – to the point of impossibility – that Keane, who was 73 years old, could have simultaneously served as medical director at three other clinics while also fulfilling his putative "medical director" role at Quality Diagnostic.

187.    Martinez, Acebo Martinez, and Garcia used the façade of Keane's phony "appointment" as Quality Diagnostic's ersatz "medical director" to do indirectly what they were forbidden from doing directly – namely: (i) to operate a clinic without a legitimate medical director; (ii) to engage in unlicensed medical decision-making with respect to the Insureds who sought treatment at Quality Diagnostic; (iii) to permit health care services to be provided at Quality Diagnostic by individuals who lacked the proper licensure to perform the services; and (iv) to use Quality Diagnostic as a vehicle to submit a massive amount of fraudulent PIP billing to GEICO and other insurers.

188.    Keane unlawfully permitted Martinez, Acebo Martinez, and Garcia to dictate every aspect of the manner in which Insureds would be treated at Quality Diagnostic, and to dictate every aspect of the manner in which health care services at Quality Diagnostic would be billed to GEICO and other insurers, because he sought to continue profiting from the Defendants' fraudulent scheme.

**E.      The Fraudulent Billing for Independent Contractor Services**

189.    As set forth above, under Florida law, a healthcare provider may not receiver PIP Benefits for services it does not render or for services rendered by an independent contractor on its behalf.

190.    However, to the extent that Quality Diagnostic's billed-for services in the claims identified in Exhibit "1" were rendered in the first instance, they were rendered exclusively by independent contractors.

191.    For instance, Viera – who secretly and unlawfully rendered virtually all of the physical therapy services in the claims identified in Exhibit "1" – was paid on a 1099 basis rather than a W-2.

192.    In keeping with the fact that Viera was an independent contractor rather than an actual employee of Quality Diagnostic, Quality Diagnostic failed to withhold federal or city taxes on Viera's behalf, and paid no employee benefits to or for Viera.

193.    Moreover, neither Garcia, Martinez, Acebo Martinez, Keane, Queral, nor any other individual associated with Quality Diagnostic ever provided Viera with any legitimate supervision or oversight in the course of Viera's purported duties at Quality Diagnostic.

194.    Similarly, Keane – who fraudulently purported to have performed virtually all of the billed-for services in the claims identified in Exhibit "1" – was never an actual employee of Quality Diagnostic.

195.    Instead, Keane was hired by, paid by, and reported to a staffing agency called Healthcare Staffing Associates, Inc. ("HSA").

196.    Keane was never paid directly by Quality Diagnostic. Instead, he was paid on an hourly basis by HSA.

197.    HSA was then paid $100.00 per hour for each hour Keane worked at Quality Diagnostic.

198.    Because neither Keane, who falsely purported to render virtually all of the services at Quality Diagnostic, nor Viera – who secretly and unlawfully rendered virtually all of the services at Quality Diagnostic, to the extent they were rendered at all – was an employee of Quality Diagnostic, Quality Diagnostic never had any right to bill for or collect PIP Benefits in connection with their purported services.

199.    All of the bills in the claims identified in Exhibit "1" falsely represented that the underlying services had been rendered by Quality Diagnostic, inasmuch as they falsely represented that Keane was an employee of Quality Diagnostic.

200.    In fact, neither Keane nor Viera were ever employees of Quality Diagnostic, and Quality Diagnostic was therefore ineligible to recover PIP benefits for services purportedly rendered by Keane or Viera.

**F.      The Fraudulent Misrepresentations Regarding the Identities of the Health Care Providers Rendering Services at Quality Diagnostic**

201.    In keeping with the fact that neither Queral nor Keane ever truly served as medical director at Quality Diagnostic, and never fulfilled the statutory obligations of a clinic medical director at Quality Diagnostic, Queral and Keane permitted Quality Diagnostic, Martinez, Acebo Martinez, and Garcia to routinely falsely represent the identities of the health care providers who rendered services at Quality Diagnostic, in order to obtain payment for the Fraudulent Services to which they otherwise would not be entitled.

202.    The Defendants billed for a limited range of health care services through Quality Diagnostic, specifically: (i) purported initial patient examinations; (ii) purported follow-up patient examinations; and (iii) purported physical therapy services.

203.    As set forth in Exhibit "1", the purported physical therapy services constituted the vast majority of the services that the Defendants billed through Quality Diagnostic to GEICO.

204.    Keane only occasionally was physically present at Quality Diagnostic, and did not personally perform – or even supervise – the physical therapy services that Quality Diagnostic purported to provide to Insureds.

205.    All of the physical therapy services that were billed through Quality Diagnostic to GEICO were performed – to the extent that they were performed at all – by Viera, who was a completely unsupervised massage therapist, not a physical therapist.

206.    As set forth above, prior to January 1, 2013, the No-Fault Law permitted health care services providers, including clinics, to collect PIP Benefits for massage therapy, so long as

– among other things – the massage therapy was "provided, supervised, ordered, or prescribed" by a licensed physician, chiropractor, or dentist, or was provided in a properly licensed or accredited institutional setting. See 2012 Fla. ALS 197.

207.   However – and again, as set forth above – in response to rampant PIP fraud involving massage therapists and massage, the No-Fault Law was amended, effective January 1, 2013, to prohibit PIP reimbursement for massage or for services provided by unsupervised massage therapists. See 2012 Fla. ALS 197; see also Fla. Stat. § 627.736(1)(a)(5).

208.   As a result, with respect to insurance policies issued after January 1, 2013, the No-Fault Law has prohibited Quality Diagnostic from recovering PIP Benefits for services – including but not limited to physical therapy services – provided by unsupervised massage therapists such as Viera.

209.   What is more, and as set forth above, massage therapists may not practice physical therapy, or hold themselves out as being able to practice physical therapy, unless they have an actual license to practice physical therapy, as opposed to massage therapy. See Fla. Stat. § 486.028.

210.   Viera was licensed as a massage therapist. He never was licensed as a physical therapist.

211.   The Defendants were well-aware of the fact that Quality Diagnostic could not legally recover PIP Benefits for services provided by massage therapists such as Viera.

212.   For example, the amendments to the No-Fault Law prohibiting PIP reimbursement for massage or for services provided by massage therapists were widely reported, as was the preceding legal struggle by various massage therapists and massage trade organizations to fight the amendments.

213.    Therefore, the Defendants listed Keane as the treating provider for <u>almost every single service </u>that they purported to provide through Quality Diagnostic, <u>including almost every individual physical therapy service</u> that was billed through Quality Diagnostic to GEICO.

214.    In fact, Keane was only occasionally physically present at Quality Diagnostic, and did not personally perform – or even supervise – the physical therapy services that Quality Diagnostic purported to provide to Insureds.

215.    In keeping with the fact that Keane was physically present at Quality Diagnostic for only a few hours each week, and as set forth above, simultaneous to his "employment" at Quality Diagnostic, Keane also purported to serve as medical director at at least three additional health care clinics, including Golden Medical Center, JO Medical Center, and Vida Rehab.

216.    What is more, simultaneous to his "employment" at Quality Diagnostic, Keane also purported to personally perform a massive number of health care services at not only Golden Medical Center, JO Medical Center, and Vida Rehab, but also at yet another health care clinic, Gonzalez Pain Center, Inc. ("Gonzalez Pain Center").

217.    Quality Diagnostic, Golden Medical Center, JO Medical Center, Gonzalez Pain Center, and Vida Rehab were separate health care clinics located in distinct facilities throughout the greater Miami area.

218.    Between January 2017 and August 2017 – the same period when he was purporting to personally perform or directly supervise a massive number of health care services at Quality Diagnostic, and also to serve as "medical director" of Golden Medical Center, JO Medical Center, and Vida Rehab – Keane purported to personally perform hundreds of thousands of dollars' worth of health care services that were billed to GEICO through Gonzalez Pain Center, JO Medical Center, and Vida Rehab, including:

(i)     More than 300 hours of physical therapy services at Gonzalez Pain Center, which accounted for more than $93,000.00 in billing to GEICO alone, and <u>represented all of the billing</u> submitted by Gonzalez Pain Center to GEICO between January 2017 and August 2017.

(ii)    More than 400 hours of physical therapy services at JO Medical Center, which accounted for more than $139,000.00 in billing, and represented <u>more than a third of all the billing</u> submitted by JO Medical Center to GEICO between January 2017 and August 2017.

(iii)   More than 250 hours of physical therapy services at Vida Rehab, which accounted for more than $146,000.00 in billing, and represented <u>more than 70% of all the billing</u> submitted by Vida Rehab to GEICO between January 2017 and August 2017.

219.    Altogether, between January 2017 and August 2017, GEICO received more than $378,000.00 in billing for services purportedly performed by Keane at Gonzalez Pain Center, JO Medical Center, and Vida Rehab, all while he was simultaneously purporting to perform or directly supervise thousands of hours of physical therapy services at Quality Diagnostic, and while he was simultaneously purporting to serve as "medical director" of Golden Medical Center, JO Medical Center, and Vida Rehab.

220.    What is more, between January 2017 and August 2017, Keane purported to personally perform – or at least directly supervise – more than 1,200 hours of physical therapy services billed to GEICO through Quality Diagnostic – <u>more than 98% of all the billing</u> submitted by Quality Diagnostic to GEICO.

221.    Even so, the Defendants submitted thousands of physical therapy charges to GEICO which falsely contended that Keane had performed or at least directly supervised the underlying physical therapy services, despite the fact that Keane could not possibly have performed or even directly supervised the physical therapy.

222.    In fact, neither Keane nor any other physician or licensed physical therapist purportedly associated with Quality Diagnostic performed or even directly supervised any of the

physical therapy services that were billed through Quality Diagnostic to GEICO and other insurers.

223.    Instead, the underlying physical therapy services were unlawfully provided by Viera – who was a massage therapist, not a physical therapist – without any legitimate supervision by any licensed physician or physical therapist.

224.    In keeping with the fact that the underlying physical therapy services were unlawfully provided by Viera (to the extent that they were provided at all), without any legitimate supervision by Keane or any other licensed physician or physical therapist, Keane would often be listed as having personally performed or directly supervised an impossible amount of physical therapy services in a given week at Quality Diagnostic, JO Medical Center, and Gonzalez Pain Center.

225.    For example:

(i)     Between Monday, June 5, 2017 and Friday, June 9, 2017, the Defendants purported to provide 298 physical therapy treatments to 13 individual Insureds, and falsely contended in the resulting bills to GEICO that Keane personally performed or at least directly supervised every one of the treatments. In all, the Defendants billed GEICO for more than 74 hours of physical therapy services they purported to provide between June 5, 2017 and June 9, 2017, and falsely contended that Keane personally performed or at least directly supervised all of them. In reality, all of the underlying physical therapy services were performed – to the extent they were performed at all – by Viera. In keeping with the fact that Keane did not personally perform all of the physical therapy services, Keane was also listed as the treating provider for more than 44 hours of physical therapy services billed to GEICO through JO Medical Center, and more than 9 hours of physical therapy services billed to GEICO through Gonzalez Pain Center, all for services purportedly provided or at least directly supervised by Keane between June 5, 2017 and June 9, 2017. In all, Keane purported to personally perform or at least directly supervise 127 hours of physical therapy services within a single week, between June 5, 2017 and June 9, 2017.

(ii)    Between Monday, June 12, 2017 and Friday, June 16, 2017, the Defendants purported to provide 374 physical therapy treatments to 19 individual Insureds, and falsely contended in the resulting bills to GEICO that Keane personally performed or at least directly supervised every one of the treatments. In all, the

45

Defendants billed GEICO for more than <u>93 hours of physical therapy services</u> they purported to provide between June 12, 2017 and June 16, 2017, and falsely contended that Keane personally performed or at least directly supervised all of them. In reality, all of the underlying physical therapy services were performed – to the extent they were performed at all – by Viera. In keeping with the fact that Keane did not personally perform all of the physical therapy services, Keane was also listed as the treating provider for more than 48 hours of physical therapy services billed to GEICO through JO Medical Center, and more than 24 hours of physical therapy services billed to GEICO through Gonzalez Pain Center, all for services purportedly provided or at least directly supervised by Keane between June 12, 2017 and June 16, 2017. In all, Keane purported to personally perform or at least directly supervise <u>165 hours</u> of physical therapy services within a single week, between June 12, 2017 and June 16, 2017.

(iii)   Between Monday, June 19, 2017 and Friday, June 23, 2017, the Defendants purported to provide 527 physical therapy treatments to 22 individual Insureds, and falsely contended in the resulting bills to GEICO that Keane personally performed or at least directly supervised every one of the treatments. In all, the Defendants billed GEICO for more than <u>131 hours of physical therapy services</u> they purported to provide between June 19, 2017 and June 23, 2017, and falsely contended that Keane personally performed or at least directly supervised all of them. In reality, all of the underlying physical therapy services were performed – to the extent they were performed at all – by Viera. In keeping with the fact that Keane did not personally perform all of the physical therapy services, Keane was also listed as the treating provider for more than 40 hours of physical therapy services billed to GEICO through JO Medical Center, and more than 23 hours of physical therapy services billed to GEICO through Gonzalez Pain Center, all for services purportedly provided or at least directly supervised by Keane between June 19, 2017 and June 23, 2017. In all, Keane purported to personally perform or at least directly supervise <u>165 hours</u> of physical therapy services within a single week, between June 19, 2017 and June 23, 2017.

(iv)   Between Monday, June 26, 2017 and Friday, June 30, 2017, the Defendants purported to provide 542 physical therapy treatments to 22 individual Insureds, and falsely contended in the resulting bills to GEICO that Keane personally performed or at least directly supervised every one of the treatments. In all, the Defendants billed GEICO for more than <u>135 hours of physical therapy services</u> they purported to provide between June 26, 2017 and June 30, 2017, and falsely contended that Keane personally performed or at least directly supervised all of them. In reality, all of the underlying physical therapy services were performed – to the extent they were performed at all – by Viera. In keeping with the fact that Keane did not personally perform all of the physical therapy services, Keane was also listed as the treating provider for more than 42 hours of physical therapy services billed to GEICO through JO Medical Center, and more than 32 hours of physical therapy services billed to GEICO through Gonzalez Pain Center, all for services purportedly provided or at least directly supervised by Keane between

June 26, 2017 and June 30, 2017. In all, Keane purported to personally perform or at least directly supervise <u>209 hours</u> of physical therapy services within a single week, between June 26, 2017 and June 30, 2017.

(v)     Between Monday, July 10, 2017 and Friday, July 14, 2017, the Defendants purported to provide 560 physical therapy treatments to 27 individual Insureds, and falsely contended in the resulting bills to GEICO that Keane personally performed or at least directly supervised every one of the treatments. In all, the Defendants billed GEICO for more than <u>140 hours of physical therapy services</u> they purported to provide between July 10, 2017 and July 14, 2017, and falsely contended that Keane personally performed or at least directly supervised all of them. In reality, all of the underlying physical therapy services were performed – to the extent they were performed at all – by Viera. In keeping with the fact that Keane did not personally perform all of the physical therapy services, Keane was also listed as the treating provider for more than 54 hours of physical therapy services billed to GEICO through JO Medical Center, and more than 33 hours of physical therapy services billed to GEICO through Gonzalez Pain Center, all for services purportedly provided or at least directly supervised by Keane between July 10, 2017 and July 14, 2017. In all, Keane purported to personally perform or at least directly supervise <u>227 hours</u> of physical therapy services within a single week, between July 10, 2017 and July 14, 2017.

(vi)    Between Monday, July 17, 2017 and Friday, July 21, 2017, the Defendants purported to provide 550 physical therapy treatments to 26 individual Insureds, and falsely contended in the resulting bills to GEICO that Keane personally performed or at least directly supervised every one of the treatments. In all, the Defendants billed GEICO for more than <u>137 hours of physical therapy services</u> they purported to provide between July 17, 2017 and July 21, 2017, and falsely contended that Keane personally performed or at least directly supervised all of them. In reality, all of the underlying physical therapy services were performed – to the extent they were performed at all – by Viera. In keeping with the fact that Keane did not personally perform or even directly supervise all of the physical therapy services, Keane was also listed as the treating provider for more than 55 hours of physical therapy services billed to GEICO through JO Medical Center, and more than 14 hours of physical therapy services billed to GEICO through Gonzalez Pain Center, all for services purportedly provided or at least directly supervised by Keane between July 17, 2017 and July 21, 2017. In all, Keane purported to personally perform or at least directly supervise <u>206 hours</u> of physical therapy services within a single week, between July 17, 2017 and July 21, 2017.

(vii)   Between Monday, July 24, 2017 and Friday, July 28, 2017, the Defendants purported to provide 589 physical therapy treatments to 30 individual Insureds, and falsely contended in the resulting bills to GEICO that Keane personally performed or at least directly supervised every one of the treatments. In all, the Defendants billed GEICO for more than <u>147 hours of physical therapy services</u>

they purported to provide between July 24, 2017 and July 28, 2017, and falsely contended that Keane personally performed or at least directly supervised all of them. In reality, all of the underlying physical therapy services were performed – to the extent they were performed at all – by Viera. In keeping with the fact that Keane did not personally perform or even directly supervise all of the physical therapy services, Keane was also listed as the treating provider for more than 35 hours of physical therapy services billed to GEICO through JO Medical Center, and more than 3 hours of physical therapy services billed to GEICO through Gonzalez Pain Center, all for services purportedly provided or at least directly supervised by Keane between July 24, 2017 and July 28, 2017. In all, Keane purported to personally perform or at least directly supervise 185 hours of physical therapy services within a single week, between July 24, 2017 and July 28, 2017.

(viii)   Between Monday, July 31, 2017 and Friday, August 4, 2017, the Defendants purported to provide 441 physical therapy treatments to 27 individual Insureds, and falsely contended in the resulting bills to GEICO that Keane personally performed or at least directly supervised every one of the treatments. In all, the Defendants billed GEICO for more than 110 hours of physical therapy services they purported to provide between July 31, 2017 and August 4, 2017, and falsely contended that Keane personally performed or at least directly supervised all of them. In reality, all of the underlying physical therapy services were performed – to the extent they were performed at all – by Viera. In keeping with the fact that Keane did not personally perform or even directly supervise all of the physical therapy services, Keane was also listed as the treating provider for more than 33 hours of physical therapy services billed to GEICO through JO Medical Center, all for services purportedly provided or at least directly supervised by Keane between July 31, 2017 and August 4, 2017. In all, Keane purported to personally perform or at least directly supervise 143 hours of physical therapy services within a single week, between July 31, 2017 and August 4, 2017.

226.   These are only representative examples. In the claims for physical therapy services that are identified in Exhibit "1", the Defendants routinely falsely represented that Keane had performed – or at least directly supervised – between 75 and 100 hours of physical therapy services in a single week in which Keane was also listed as having performed – or at least directly supervised – many more hours of physical therapy services at JO Medical Center and Gonzalez Pain Center.

227.   It is improbable, to the point of impossibility, that Keane routinely performed or directly supervised such a high volume of physical therapy services in individual weeks.

228.   In keeping with the fact that Keane could not have personally performed – or at least directly supervised – all of the physical therapy services billed to GEICO through Quality Diagnostic, Keane would often purport to personally perform – or at least directly supervise – an impossible number of hours of physical therapy services in a given day.

229.   For instance:

(i)   On June 13, 2017, Garcia – at the direction of her co-Defendants – falsely listed Keane as having performed – or at least directly supervised – more than 18 hours of physical therapy services to 13 individual Insureds at Quality Diagnostic. That same day, Keane was listed as having performed, or at least directly supervised: (a) more than 13 hours of physical therapy services at JO Medical Center; and (b) more than five hours of physical therapy services at Gonzalez Pain Center. In all, Keane was falsely listed as having performed – or at least directly supervised – more than 36 hours of physical therapy services, at three different locations, in a single day.

(ii)   On June 21, 2017, Garcia – at the direction of her co-Defendants – falsely listed Keane was listed as having performed – or at least directly supervised – more than 20 hours of physical therapy services to 20 individual Insureds. That same day, Keane was listed as having performed, or at least directly supervised: (a) more than seven hours of physical therapy services at JO Medical Center; and (b) five hours of physical therapy services at Gonzalez Pain Center. In all, Keane was falsely listed as having performed – or at least directly supervised – more than 32 hours of physical therapy services, at three different locations, in a single day.

(iii)   On June 22, 2017, Garcia – at the direction of her co-Defendants – falsely listed Keane was listed as having performed – or at least directly supervised – more than 28 hours of physical therapy services to 19 individual Insureds. That same day, Keane was listed as having performed, or at least directly supervised: (a) 12 hours of physical therapy services at JO Medical Center; and (b) five hours of physical therapy services at Gonzalez Pain Center. In all, Keane was falsely listed as having performed – or at least directly supervised – more than 45 hours of physical therapy services, at three different locations, in a single day.

(iv)   On June 28, 2017, Garcia – at the direction of her co-Defendants – falsely listed Keane was listed as having performed – or at least directly supervised – more than 29 hours of physical therapy services to 19 individual Insureds. That same day, Keane was listed as having performed, or at least directly supervised: (a) more than 10 hours of physical therapy services at JO Medical Center; and (b) more than seven hours of physical therapy services at Gonzalez Pain Center. In all, Keane was falsely listed as having performed – or at least directly supervised –

more than 46 hours of physical therapy services, at three different locations, in a single day.

(v)    On July 5, 2017, Garcia – at the direction of her co-Defendants – falsely listed Keane was listed as having performed – or at least directly supervised – more than 31 hours of physical therapy services to 22 individual Insureds. That same day, Keane was listed as having performed, or at least directly supervised: (a) nine hours of physical therapy services at JO Medical Center; and (b) nine hours of physical therapy services at Gonzalez Pain Center. In all, Keane was falsely listed as having performed – or at least directly supervised – more than 49 hours of physical therapy services, at three different locations, in a single day.

(vi)    On July 6, 2017, Garcia – at the direction of her co-Defendants – falsely listed Keane was listed as having performed – or at least directly supervised – 30 hours of physical therapy services to 22 individual Insureds. That same day, Keane was listed as having performed, or at least directly supervised: (a) nine hours of physical therapy services at JO Medical Center; and (b) nine hours of physical therapy services at Gonzalez Pain Center. In all, Keane was falsely listed as having performed – or at least directly supervised – more than 49 hours of physical therapy services, at three different locations, in a single day.

(vii)    On July 7, 2017, Garcia – at the direction of her co-Defendants – falsely listed Keane as having performed – or at least directly supervised – more than 31 hours of physical therapy services to 21 individual Insureds at Quality Diagnostic. That same day, Keane was listed as having performed, or at least directly supervised: (a) 11 hours of physical therapy services at JO Medical Center; and (b) six hours of physical therapy services at Gonzalez Pain Center. In all, Keane was falsely listed as having performed – or at least directly supervised – more than 48 hours of physical therapy services, at three different locations, in a single day.

(viii)    On July 10, 2017, Garcia – at the direction of her co-Defendants – falsely listed Keane as having performed – or at least directly supervised – more than 30 hours of physical therapy services to 21 individual insureds at Quality Diagnostic. That same day, Keane was listed as having performed, or at least directly supervised: (a) more than 10 hours of physical therapy services at JO Medical Center; and (b) more than eight hours of physical therapy services at Gonzalez Pain Center. In all, Keane was falsely listed as having performed – or at least directly supervised – more than 48 hours of physical therapy services, at three different locations, in a single day.

(ix)    On July 13, 2017, Garcia – at the direction of her co-Defendants – falsely listed Keane as having performed – or at least directly supervised – more than 31 hours of physical therapy services to 23 individual insureds at Quality Diagnostic. That same day, Keane was listed as having performed, or at least directly supervised: (a) more than 10 hours of physical therapy services at JO Medical Center; and (b) more than five hours of physical therapy services at Gonzalez Pain Center. In all,

50

Keane was falsely listed as having performed – or at least directly supervised – more than 46 hours of physical therapy services, at three different locations, in a single day.

(x)     On July 17, 2017, Garcia – at the direction of her co-Defendants – falsely listed Keane as having performed - or at least directly supervised – more than 30 hours of physical therapy services to 22 individual Insureds at Quality Diagnostic. That same day, Keane was listed as having performed, or at least directly supervised: (a) more than 13 hours of physical therapy services at JO Medical Center; and (b) more than two hours of physical therapy services at Gonzalez Pain Center. In all, Keane was falsely listed as having performed – or at least directly supervised – more than 45 hours of physical therapy services, at three different locations, in a single day.

230.    These are only representative examples. Keane routinely purported to personally perform – or at least directly supervise –an impossible number of hours of physical therapy services, at three separate locations, on individual dates.

231.    Upon information and belief, the fraudulent billing for physical therapy services that the Defendants submitted or caused to be submitted through Quality Diagnostic to GEICO constituted only a fraction of the total fraudulent billing for physical therapy services that the Defendants submitted through Quality Diagnostic to all of the automobile insurers in the Florida automobile insurance market.

232.    Similarly, upon information and belief, the billing for physical therapy services submitted through JO Medical Center and Gonzalez Pain Center constituted only a fraction of the total billing for physical therapy services submitted through JO Medical Center and Gonzalez Pain Center to all of the automobile insurers in the Florida automobile insurance market.

233.    GEICO is only one of the automobile insurance companies doing business in the Florida automobile insurance market.

234.    It is extremely improbable, to the point of impossibility, that the Defendants, JO Medical Center, and Gonzalez Pain Center only submitted fraudulent billing to GEICO, and did not simultaneously bill other automobile insurers.

235.    Thus, upon information and belief, the massive, impossible number of physical therapy services that Keane purported to directly supervise or provide to GEICO Insureds on individual dates of service, including the dates of service identified above, constituted only a fraction of the total number of physical therapy services that Keane purported to directly supervise or provide, including to individuals insured by companies other than GEICO, on those same dates of service.

236.    In fact, Keane did not perform or directly supervise any of the physical therapy services that were billed through Quality Diagnostic to GEICO.

237.    What is more, Quality Diagnostic did not actually provide any legitimate physical therapy services to GEICO Insureds.

238.    Rather: (i) all of the putative "physical therapy" services that the Defendants purported to provide through Quality Diagnostic to Insureds were performed, to the extent that they were performed at all, by Viera, rather than by Keane; (ii) Keane did not even legitimately supervise the putative "physical therapy" services that were billed through Quality Diagnostic to GEICO; and (iii) none of the putative "physical therapy" services that were billed through Quality Diagnostic to GEICO actually constituted physical therapy, because Viera is not and never has been licensed as a physical therapist.

239.    As set forth above, the No-Fault Law's billing requirements provide – among other things – that all PIP billing must comply with the instructions promulgated by the Centers

for Medicare & Medicaid Services for the completion of HCFA-1500 forms. See Fla. Stat. § 627.736.

240.    All of the billing that the Defendants submitted through Quality Diagnostic to GEICO, including the billing for putative physical therapy services, was submitted on HCFA-1500 forms.

241.    Pursuant to the instructions promulgated by the Centers for Medicare & Medicaid Services for the completion of HCFA-1500 forms, the name of the health care provider who actually rendered or directly supervised the underlying physical therapy treatment must be listed on the HCFA-1500 form. See, e.g., Medicare Claims Processing Manual, Chapter 26 – Completing and Processing Form CMS-1500 Data Set.

242.    To "directly supervise" a physical therapy treatment, a physician "must be present in the office suite and immediately available to furnish assistance and direction throughout the performance of the procedure. It does not mean that the physician must be present in the room when the procedure is performed." See, e.g., Medicare Claims Processing Manual, Chapter 26 – Completing and Processing Form CMS-1500 Data Set, citing 42 C.F.R. 410.32.

243.    Pursuant to the instructions promulgated by the Centers for Medicare & Medicaid Services for the completion of HCFA-1500 forms, to the extent that a physician is not actually "directly supervising" a physical therapy treatment, then the actual name of the person who is actually performing the physical therapy treatment must be listed on the HCFA-1500 form. See, e.g., Medicare Claims Processing Manual, Chapter 26 – Completing and Processing Form CMS-1500 Data Set.

244.    The Defendants were well-aware of the fact that – because Viera was an unsupervised massage therapist, rather than a physical therapist – Quality Diagnostic could not recover PIP Benefits for any services that Viera purported to provide.

245.    As a result, and in order to conceal the fact that Viera provided –without any legitimate supervision by Keane – all of the "physical therapy" services that were unlawfully billed through Quality Diagnostic to GEICO, the Defendants deliberately omitted any reference to Viera on the HCFA-1500 forms that they used to bill for the putative physical therapy services.

246.    Instead, in the claims for physical therapy services identified in Exhibit "1", the Defendants falsely listed Keane on the HCFA-1500 forms as the supposed provider or direct supervisor of the physical therapy services.

247.    For example:

(i)     On or about June 12, 2017, the Defendants submitted 13 HCFA-1500 forms to GEICO, constituting bills for physical therapy services that purportedly were provided through Quality Diagnostic to an Insured named EA on various dates of service in May-June 2017. All of these HCFA-1500 forms falsely represented that Keane performed, or at least directly supervised, the pertinent physical therapy services, and the Defendants deliberately omitted any reference to Viera from the HCFA-1500 forms.

(ii)    On or about June 12, 2017, the Defendants submitted 11 HCFA-1500 forms to GEICO, constituting bills for physical therapy services that purportedly were provided through Quality Diagnostic to an Insured named CM on various dates of service in May-June 2017. All of these HCFA-1500 forms falsely represented that Keane performed, or at least directly supervised, the pertinent physical therapy services, and the Defendants deliberately omitted any reference to Viera from the HCFA-1500 forms.

(iii)   On or about June 12, 2017, the Defendants submitted 13 HCFA-1500 forms to GEICO, constituting bills for physical therapy services that purportedly were provided through Quality Diagnostic to an Insured named MB on various dates of service in May-June 2017. All of these HCFA-1500 forms falsely represented that Keane performed, or at least directly supervised, the pertinent physical therapy

services, and the Defendants deliberately omitted any reference to Viera from the HCFA-1500 forms.

(iv)     On or about June 26, 2017, the Defendants submitted 13 HCFA-1500 forms to GEICO, constituting bills for physical therapy services that purportedly were provided through Quality Diagnostic to an Insured named JR on various dates of service in June 2017. All of these HCFA-1500 forms falsely represented that Keane performed, or at least directly supervised, the pertinent physical therapy services, and the Defendants deliberately omitted any reference to Viera from the HCFA-1500 forms.

(v)      On or about July 3, 2017, the Defendants submitted 12 HCFA-1500 forms to GEICO, constituting bills for physical therapy services that purportedly were provided through Quality Diagnostic to an Insured named RE on various dates of service in July 2017. All of these HCFA-1500 forms falsely represented that Keane performed, or at least directly supervised, the pertinent physical therapy services, and the Defendants deliberately omitted any reference to Viera from the HCFA-1500 forms.

(vi)     On or about July 5, 2017, the Defendants submitted 14 HCFA-1500 forms to GEICO, constituting bills for physical therapy services that purportedly were provided through Quality Diagnostic to an Insured named YO on various dates of service in July 2017. All of these HCFA-1500 forms falsely represented that Keane performed, or at least directly supervised, the pertinent physical therapy services, and the Defendants deliberately omitted any reference to Viera from the HCFA-1500 forms.

(vii)    On or about July 10, 2017, the Defendants submitted 11 HCFA-1500 forms to GEICO, constituting bills for physical therapy services that purportedly were provided through Quality Diagnostic to an Insured named AO on various dates of service in June-July 2017. All of these HCFA-1500 forms falsely represented that Keane performed, or at least directly supervised, the pertinent physical therapy services, and the Defendants deliberately omitted any reference to Viera from the HCFA-1500 forms.

(viii)   On or about July 10, 2017, the Defendants submitted 14 HCFA-1500 forms to GEICO, constituting bills for physical therapy services that purportedly were provided through Quality Diagnostic to an Insured named IB on various dates of service in June-July 2017. All of these HCFA-1500 forms falsely represented that Keane performed, or at least directly supervised, the pertinent physical therapy services, and the Defendants deliberately omitted any reference to Viera from the HCFA-1500 forms.

(ix)     On or about July 10, 2017, the Defendants submitted nine HCFA-1500 forms to GEICO, constituting bills for physical therapy services that purportedly were provided through Quality Diagnostic to an Insured named YL on various dates of

service in June-July 2017. All of these HCFA-1500 forms falsely represented that Keane performed, or at least directly supervised, the pertinent physical therapy services, and the Defendants deliberately omitted any reference to Viera from the HCFA-1500 forms.

(x)     On or about July 14, 2017, the Defendants submitted 13 HCFA-1500 forms to GEICO, constituting bills for physical therapy services that purportedly were provided through Quality Diagnostic to an Insured named RR on various dates of service in June-July 2017. All of these HCFA-1500 forms falsely represented that Keane performed, or at least directly supervised, the pertinent physical therapy services, and the Defendants deliberately omitted any reference to Viera from the HCFA-1500 forms.

(xi)    On or about July 21, 2017, the Defendants submitted 12 HCFA-1500 forms to GEICO, constituting bills for physical therapy services that purportedly were provided through Quality Diagnostic to an Insured named MR on various dates of service in June-July 2017. All of these HCFA-1500 forms falsely represented that Keane performed, or at least directly supervised, the pertinent physical therapy services, and the Defendants deliberately omitted any reference to Viera from the HCFA-1500 forms.

(xii)   On or about July 31, 2017, the Defendants submitted 13 HCFA-1500 forms to GEICO, constituting bills for physical therapy services that purportedly were provided through Quality Diagnostic to an Insured named OC on various dates of service in July 2017. All of these HCFA-1500 forms falsely represented that Keane performed, or at least directly supervised, the pertinent physical therapy services, and the Defendants deliberately omitted any reference to Viera from the HCFA-1500 forms.

(xiii)  On or about August 4, 2017, the Defendants submitted 13 HCFA-1500 forms to GEICO, constituting bills for physical therapy services that purportedly were provided through Quality Diagnostic to an Insured named JR on various dates of service in July 2017. All of these HCFA-1500 forms falsely represented that Keane performed, or at least directly supervised, the pertinent physical therapy services, and the Defendants deliberately omitted any reference to Viera from the HCFA-1500 forms.

(xiv)   On or about August 7, 2017, the Defendants submitted 12 HCFA-1500 forms to GEICO, constituting bills for physical therapy services that purportedly were provided through Quality Diagnostic to an Insured named DA on various dates of service in July-August 2017. All of these HCFA-1500 forms falsely represented that Keane performed, or at least directly supervised, the pertinent physical therapy services, and the Defendants deliberately omitted any reference to Viera from the HCFA-1500 forms.

(xv)   On or about August 14, 2017, the Defendants submitted 10 HCFA-1500 forms to GEICO, constituting bills for physical therapy services that purportedly were provided through Quality Diagnostic to an Insured named JP on various dates of service in July-August 2017. All of these HCFA-1500 forms falsely represented that Keane performed, or at least directly supervised, the pertinent physical therapy services, and the Defendants deliberately omitted any reference to Viera from the HCFA-1500 forms.

248.   These are only representative examples. In all of the claims for physical therapy services that are identified in Exhibit "1", the Defendants falsely represented in the HCFA-1500 forms they submitted to GEICO that Keane had performed or at least directly supervised the underlying physical therapy services, when in fact the services were performed by Viera, to the extent that they were performed at all, without any legitimate supervision by Keane.

249.   Garcia knowingly prepared and submitted virtually all of the fraudulent billing that was submitted through Quality Diagnostic to GEICO, including the charges in the claims identified in Exhibit "1".

250.   For example, in sworn responses to interrogatories in the Benefica Action, dated June 15, 2017, Benefica and its putative owner, El Coro, stated that the only person who provided Benefica with billing services between 2008 and 2016 was Garcia, whom Benefica and El Coro identified as Benefica's full-time "office manager".

251.   Upon information and belief, and in keeping with the fact that the operations of Benefica and Quality Diagnostic were virtually identical, beginning in 2017, Garcia began to serve as the "office manager" and biller at Quality Diagnostic.

252.   It is improbable, to the point of impossibility, that – over the course of almost a combined decade as Benefica's and then Quality Diagnostic's putative full-time "office manager" and biller – Garcia was unaware of the fact that the pertinent services were performed

by unlicensed massage therapists, without any legitimate supervision by a medical doctor or licensed physical therapist.

253.    In the claims for physical therapy services identified in Exhibit "1", the Defendants routinely fraudulently misrepresented that the physical therapy services were lawfully provided and reimbursable, when in fact they were neither lawfully provided nor reimbursable, because:

(i)     the putative physical therapy services were illegally performed – to the extent they were performed at all – by Viera, a massage therapist, without any supervision by any licensed physicians or physical therapists, in contravention of Florida law;

(ii)    Quality Diagnostic could not lawfully recover PIP Benefits for the putative physical therapy services, because they were illegally performed without supervision by Viera, in contravention of Florida law; and

(iii)   the Defendants systematically fraudulently misrepresented and concealed the identities of the individuals who performed the putative physical therapy services in their billing for the putative "physical therapy" services.

254.    The Defendants routinely fraudulently misrepresented to GEICO that Keane had performed or at least directly supervised the underlying physical therapy services because they knew that, were they to accurately represent that the underlying physical therapy services had been performed unsupervised by Viera, the charges would have been unreimburseable and GEICO would not have remitted payment for these services.

255.    These fraudulent misrepresentations and acts of fraudulent concealment demonstrate that Quality Diagnostic was operated without a legitimate medical director.

256.    For instance, Queral and Keane – who at all relevant times purported to serve as the "medical directors" at Quality Diagnostic – did not, and could not have, "[c]onduct[ed] systematic reviews of clinic billings to ensure that the billings are not fraudulent or unlawful." See Fla. Stat. § 400.9935(1).

257.    Nor, for that matter, did Queral or Keane "[e]nsure that all practitioners providing health care services or supplies to patients maintain[ed] a current active and unencumbered Florida license", or "[e]nsure that all health care practitioners at the clinic [had] active appropriate certification or licensure for the level of care being provided." See Fla. Stat. § 400.9935(1).

258.    Had Queral or Keane actually fulfilled their statutory role as medical director at Quality Diagnostic, they would have noted – among other things – that the Defendants routinely fraudulently represented in Quality Diagnostic's billing that the physical therapy services were performed or at least directly supervised by Keane.

259.    Had Queral or Keane actually fulfilled their statutory role as medical director at Quality Diagnostic, they would have noted – among other things – that the Defendants routinely fraudulently concealed the fact that the physical therapy services were provided without any legitimate supervision – to the extent that they were provided at all – by Viera, who was a massage therapist and not a physical therapist, and therefore were unreimbursable under the No-Fault Law.

260.    Had Queral or Keane actually fulfilled their statutory role as medical director at Quality Diagnostic, they would have noted – among other things – that all of the individuals providing physical therapy services had active appropriate licensure to perform physical therapy services.

261.    Queral and Keane did none of these things, because they never actually served as a legitimate medical director at Quality Diagnostic in the first instance, rendering Quality Diagnostic ineligible to collect PIP Benefits in the first instance.

**C.      The Defendants' Fraudulent Treatment and Billing Protocol**

262.    In the claims identified in Exhibit "1", virtually all of the Insureds whom the Defendants purported to treat at Quality Diagnostic were involved in minor, low-speed, low-impact "fender-bender" accidents, to the extent that they were involved in any actual accidents at all.

263.    Concomitantly, in the claims identified in Exhibit "1", almost none of the Insureds whom the Defendants purported to treat at Quality Diagnostic suffered from any significant injuries or health problems as a result of the relatively minor accidents they experienced or purported to experience.

264.    Even so, in the claims identified in Exhibit "1", the Defendants purported to subject virtually every Insured to a medically unnecessary course of "treatment" that was provided pursuant to a pre-determined, fraudulent protocol designed to maximize the billing that they could submit to insurers, including GEICO, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to it.

265.    The Defendants purported to provide their pre-determined fraudulent treatment protocol to the Insureds in the claims identified in Exhibit "1" without regard for the Insureds' individual symptoms or presentment, or – in most cases – the total absence of any actual medical problems arising from any actual automobile accidents.

266.    Each step in the Defendants' fraudulent treatment protocol was designed to falsely reinforce the rationale for the previous step and provide a false justification for the subsequent step, and thereby permit the Defendants to generate and falsely justify the maximum amount of fraudulent PIP billing for each Insured.

267.    No legitimate physician, physical therapist, clinic, or other health care provider would permit the fraudulent treatment and billing protocol described below to proceed under his, her, or its auspices.

268.    The Defendants permitted the fraudulent treatment and billing protocol described below to proceed under their auspices because: (i) Quality Diagnostic was, at all relevant times, operating in violation of the Clinic Act, without a legitimate medical director who legitimately fulfilled his statutory duties as medical director; (ii) all decision-making with respect to medical care and billing at Quality Diagnostic was, at all relevant times, vested entirely with Martinez, Acebo Martinez, and Garcia in violation of Florida law; (iii) virtually all of the putative "physical therapy" services that purportedly were provided to Insureds at Quality Diagnostic were provided – to the extent that they were provided at all – by Viera, a massage therapist without legitimate oversight and supervision, rather than by licensed physical therapists, in further violation of Florida law; and (iv)  the Defendants sought to profit from the fraudulent billing they submitted to GEICO and other insurers.

**1.    The Fraudulent Charges for Initial Examinations**

269.    As an initial step in the Defendants' fraudulent treatment and billing protocol, Quality Diagnostic, Queral, Keane, Martinez, and Acebo Martinez purported to provide each of the Insureds in the claims identified in Exhibit "1" with a putative initial examination.

270.    Keane purported to personally perform virtually all of the initial examinations in the claims identified in Exhibit "1".

271.    As set forth in Exhibit "1", Garcia, Martinez, Acebo Martinez, Queral, Keane, and Quality Diagnostic then billed the initial examinations to GEICO under CPT code 99203, resulting in charges of $250.00 for each initial examination that Keane purported to perform.

272.     In the claims for initial examinations identified in Exhibit "1", the charges for the initial examinations were fraudulent in that they misrepresented Quality Diagnostic's eligibility to collect PIP Benefits in the first instance.

273.     In fact, and as set forth above, Quality Diagnostic never was eligible to collect PIP Benefits, inasmuch as it was operated in violation of the licensing and operating requirements set forth in the Clinic Act.

274.     As set forth below, the charges for the initial examinations identified in Exhibit "1" also were fraudulent in that they misrepresented the nature and extent of the initial examinations.

**a.      Misrepresentations Regarding the Severity of the Insureds' Presenting Problems**

275.     As set forth above, the No-Fault Law's billing requirements provide that all PIP billing must – among other things – comply with the guidelines promulgated by the American Medical Association ("AMA") in connection with the use of current procedural terminology, or CPT, codes. See Fla. Stat. § 627.736.

276.     The primary guidelines promulgated by the AMA for the use of CPT codes are contained in the AMA's CPT Assistant.

277.     Pursuant to the CPT Assistant, the use of CPT code 99203 to bill for an initial patient examination represents that the Insured presented with problems of moderate severity.

278.     The CPT Assistant provides various clinical examples of the types of presenting problems that qualify as moderately severe, and thereby justify the use of CPT code 99203 to bill for an initial patient examination.

279.   For example, the CPT Assistant provides the following clinical examples of presenting problems that might support the use of CPT code 99203 to bill for an initial patient examination:

(i)   Office visit for initial evaluation of a 48-year-old man with recurrent low back pain radiating to the leg. (General Surgery)

(ii)   Initial office evaluation of 49-year-old male with nasal obstruction. Detailed exam with topical anesthesia. (Plastic Surgery)

(iii)   Initial office evaluation for diagnosis and management of painless gross hematuria in new patient, without cystoscopy. (Internal Medicine)

(iv)   Initial office visit for evaluation of 13-year-old female with progressive scoliosis. (Physical Medicine and Rehabilitation)

(v)   Initial office visit with couple for counseling concerning voluntary vasectomy for sterility. Spent 30 minutes discussing procedure, risks and benefits, and answering questions. (Urology)

280.   Thus, pursuant to the CPT Assistant, the moderately severe presenting problems that could support the use of CPT code 99203 to bill for an initial patient examination typically are either chronic and relatively serious problems, acute problems requiring immediate invasive treatment, or issues that legitimately require physician counseling.

281.   By contrast, to the extent that the Insureds in the claims identified in Exhibit "1" had any presenting problems at all as the result of their minor automobile accidents, the problems virtually always were low severity soft tissue injuries such as sprains and strains.

282.   For instance, and in keeping with the fact that the Insureds in the claims identified in Exhibit "1" either had no presenting problems at all as the result of their minor automobile accidents, or else problems of low severity, in the vast majority of the claims identified in Exhibit "1" the Insureds did not seek treatment at any hospital as the result of their accidents.

283.    Furthermore, in the vast majority of the claims identified in Exhibit "1", contemporaneous police reports indicated that the underlying accidents involved low-speed, low-impact collisions, that the Insureds' vehicles were drivable following the accidents, and that no one was injured in the accidents.

284.    Even so, in the claims for initial examinations identified in Exhibit "1", Garcia, Martinez, Acebo Martinez, Queral, Keane, and Quality Diagnostic routinely billed for the putative initial examinations using CPT code 99203, and thereby falsely represented that the Insureds presented with problems of moderate severity.

285.    For example:

(i)    On May 10, 2017, an Insured named NJ was involved in an automobile accident. The contemporaneous police report indicates that the accident was a low-speed, low-impact collision, and that NJ's vehicle was drivable following the accident. The police report further indicated that NJ was not injured and did not complain of any pain at the scene. In keeping with the fact that NJ was not injured, she did not visit any hospital following the accident. To the extent that NJ experienced any health problems at all as the result of the minor accident, they were of low severity. Even so, following a purported initial examination on May 12, 2017, Garcia, Martinez, Acebo Martinez, Keane, Queral, and Quality Diagnostic billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that NJ presented with moderately severe health problems as the result of the minor accident.

(ii)    On May 10, 2017, an Insured named CL was involved in an automobile accident. The contemporaneous police report indicates that the accident was a low-speed, low-impact collision, and that CL's vehicle was drivable following the accident. The police report further indicated that CL was not injured and did not complain of any pain at the scene. In keeping with the fact that CL was not injured, he did not visit any hospital following the accident. To the extent that CL experienced any health problems at all as the result of the minor accident, they were of low severity. Even so, following a purported initial examination on May 12, 2017, Garcia, Martinez, Acebo Martinez, Keane, Queral, and Quality Diagnostic billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that CL presented with moderately severe health problems as the result of the minor accident.

(iii)    On May 15, 2017, an Insured named SD was involved in an automobile accident. The contemporaneous police report indicates that the accident was a low-speed,

low-impact collision, and that SD's vehicle was drivable following the accident. The police report further indicated that SD was not injured and did not complain of any pain at the scene. In keeping with the fact that SD was not injured, she did not visit any hospital following the accident. To the extent that SD experienced any health problems at all as the result of the minor accident, they were of low severity. Even so, following a purported initial examination on May 17, 2017, Garcia, Martinez, Acebo Martinez, Keane, Queral, and Quality Diagnostic billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that SD presented with moderately severe health problems as the result of the minor accident.

(iv)    On May 15, 2017, an Insured named JL was involved in an automobile accident. The contemporaneous police report indicates that the accident was a low-speed, low-impact collision, and that JL's vehicle was drivable following the accident. The police report further indicated that JL was not injured and did not complain of any pain at the scene. In keeping with the fact that JL was not injured, he did not visit any hospital following the accident. To the extent that JL experienced any health problems at all as the result of the minor accident, they were of low severity. Even so, following a purported initial examination on May 17, 2017, Garcia, Martinez, Acebo Martinez, Keane, Queral, and Quality Diagnostic billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that JL presented with moderately severe health problems as the result of the minor accident.

(v)     On May 18, 2017, an Insured named MB was involved in an automobile accident. The contemporaneous police report indicates that the accident was a low-speed, low-impact collision, and that MB's vehicle was drivable following the accident. The police report further indicated that MB was not injured and did not complain of any pain at the scene. In keeping with the fact that MB was not injured, she did not visit any hospital following the accident. To the extent that MB experienced any health problems at all as the result of the minor accident, they were of low severity. Even so, following a purported initial examination on May 24, 2017, Garcia, Martinez, Acebo Martinez, Keane, Queral, and Quality Diagnostic billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that MB presented with moderately severe health problems as the result of the minor accident.

(vi)    On May 18, 2017, an Insured named CM was involved in an automobile accident. The contemporaneous police report indicates that the accident was a low-speed, low-impact collision, and that CM's vehicle was drivable following the accident. The police report further indicated that CM was not injured and did not complain of any pain at the scene. In keeping with the fact that CM was not injured, she did not visit any hospital following the accident. To the extent that CM experienced any health problems at all as the result of the minor accident, they were of low severity. Even so, following a purported initial examination on May 24, 2017, Garcia, Martinez, Acebo Martinez, Keane, Queral, and Quality Diagnostic billed

GEICO for the initial examination using CPT code 99203, and thereby falsely represented that CM presented with moderately severe health problems as the result of the minor accident.

(vii)    On June 4, 2017, an Insured named JC was involved in an automobile accident. The contemporaneous police report indicates that the accident was a low-speed, low-impact collision, and that JC's vehicle was drivable following the accident. The police report further indicated that JC was not injured and did not complain of any pain at the scene. In keeping with the fact that JC was not injured, she did not visit any hospital following the accident. To the extent that JC experienced any health problems at all as the result of the minor accident, they were of low severity. Even so, following a purported initial examination on June 5, 2017, Garcia, Martinez, Acebo Martinez, Keane, Queral, and Quality Diagnostic billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that JC presented with moderately severe health problems as the result of the minor accident.

(viii)   On June 4, 2017, an Insured named ML was involved in an automobile accident. The contemporaneous police report indicates that the accident was a low-speed, low-impact collision, and that ML's vehicle was drivable following the accident. The police report further indicated that ML was not injured and did not complain of any pain at the scene. In keeping with the fact that ML was not injured, he did not visit any hospital following the accident. To the extent that ML experienced any health problems at all as the result of the minor accident, they were of low severity. Even so, following a purported initial examination on June 5, 2017, Garcia, Martinez, Acebo Martinez, Keane, Queral, and Quality Diagnostic billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that ML presented with moderately severe health problems as the result of the minor accident.

(ix)    On June 5, 2017, an Insured named JR was involved in an automobile accident. The contemporaneous police report indicates that the accident was a low-speed, low-impact collision, and that JR's vehicle was drivable following the accident. The police report further indicated that JR was not injured and did not complain of any pain at the scene. In keeping with the fact that JR was not injured, he did not visit any hospital following the accident. To the extent that JR experienced any health problems at all as the result of the minor accident, they were of low severity. Even so, following a purported initial examination on June 7, 2017, Garcia, Martinez, Acebo Martinez, Keane, Queral, and Quality Diagnostic billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that JR presented with moderately severe health problems as the result of the minor accident.

(x)     On June 5, 2017, an Insured named LQ was involved in an automobile accident. The contemporaneous police report indicates that the accident was a low-speed, low-impact collision, and that LQ's vehicle was drivable following the accident.

The police report further indicates that LQ was not injured and did not complain of any pain at the scene. In keeping with the fact that LQ was not injured, he did not visit any hospital following the accident. To the extent that LQ experienced any health problems at all as the result of the minor accident, they were of low severity. Even so, following a purported initial examination on June 7, 2017, Garcia, Martinez, Acebo Martinez, Keane, Queral, and Quality Diagnostic billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that LQ presented with moderately severe health problems as the result of the minor accident.

(xi)    On June 13, 2017, an Insured named NC was involved in an automobile accident. The contemporaneous police report indicates that the accident was a low-speed, low-impact collision, and that NC's vehicle was drivable following the accident. The police report further indicated that NC was not injured and did not complain of any pain at the scene. In keeping with the fact that NC was not injured, she did not visit any hospital following the accident. To the extent that NC experienced any health problems at all as the result of the minor accident, they were of low severity. Even so, following a purported initial examination on June 14, 2017, Garcia, Martinez, Acebo Martinez, Keane, Queral, and Quality Diagnostic billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that NC presented with moderately severe health problems as the result of the minor accident.

(xii)    On June 13, 2017, an Insured named YO was involved in an automobile accident. The contemporaneous police report indicates that the accident was a low-speed, low-impact collision, and that YO's vehicle was drivable following the accident. The police report further indicated that YO was not injured and did not complain of any pain at the scene. In keeping with the fact that YO was not injured, she did not visit any hospital following the accident. To the extent that YO experienced any health problems at all as the result of the minor accident, they were of low severity. Even so, following a purported initial examination on June 14, 2017, Garcia, Martinez, Acebo Martinez, Keane, Queral, and Quality Diagnostic billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that YO presented with moderately severe health problems as the result of the minor accident.

(xiii)    On June 14, 2017, an Insured named IB was involved in an automobile accident. The contemporaneous police report indicates that the accident was a low-speed, low-impact collision, and that IB's vehicle was drivable following the accident. The police report further indicated that IB was not injured and did not complain of any pain at the scene. In keeping with the fact that IB was not injured, he did not visit any hospital following the accident. To the extent that IB experienced any health problems at all as the result of the minor accident, they were of low severity. Even so, following a purported initial examination on June 16, 2017, Garcia, Martinez, Acebo Martinez, Keane, Queral, and Quality Diagnostic billed GEICO for the initial examination using CPT code 99203, and thereby falsely

represented that IB presented with moderately severe health problems as the result of the minor accident.

(xiv)   On June 20, 2017, an Insured named RR was involved in an automobile accident. The contemporaneous police report indicates that the accident was a low-speed, low-impact collision, and that RR's vehicle was drivable following the accident. The police report further indicated that RR was not injured and did not complain of any pain at the scene. In keeping with the fact that RR was not injured, he did not visit any hospital following the accident. To the extent that RR experienced any health problems at all as the result of the minor accident, they were of low severity. Even so, following a purported initial examination on June 23, 2017, Garcia, Martinez, Acebo Martinez, Keane, Queral, and Quality Diagnostic billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that RR presented with moderately severe health problems as the result of the minor accident.

(xv)   On June 28, 2017, an Insured named MR was involved in an automobile accident. The contemporaneous police report indicates that the accident was a low-speed, low-impact collision, and that MR's vehicle was drivable following the accident. The police report further indicated that MR was not injured and did not complain of any pain at the scene. In keeping with the fact that MR was not injured, she did not visit any hospital following the accident. To the extent that MR experienced any health problems at all as the result of the minor accident, they were of low severity. Even so, following a purported initial examination on June 30, 2017, Garcia, Martinez, Acebo Martinez, Keane, Queral, and Quality Diagnostic billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that MR presented with moderately severe health problems as the result of the minor accident.

(xvi)   On July 4, 2017, an Insured named CC was involved in an automobile accident. The contemporaneous police report indicates that the accident was a low-speed, low-impact collision, and that CC's vehicle was drivable following the accident. The police report further indicated that CC was not injured and did not complain of any pain at the scene. In keeping with the fact that CC was not injured, he did not visit any hospital following the accident. To the extent that CC experienced any health problems at all as the result of the minor accident, they were of low severity. Even so, following a purported initial examination on July 5, 2017, Garcia, Martinez, Acebo Martinez, Keane, Queral, and Quality Diagnostic billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that CC presented with moderately severe health problems as the result of the minor accident.

(xvii)   On July 4, 2017, an Insured named GZ was involved in an automobile accident. The contemporaneous police report indicates that the accident was a low-speed, low-impact collision, and that GZ's vehicle was drivable following the accident. The police report further indicated that GZ was not injured and did not complain

of any pain at the scene. In keeping with the fact that GZ was not injured, she did not visit any hospital following the accident. To the extent that GZ experienced any health problems at all as the result of the minor accident, they were of low severity. Even so, following a purported initial examination on July 5, 2017, Garcia, Martinez, Acebo Martinez, Keane, Queral, and Quality Diagnostic billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that GZ presented with moderately severe health problems as the result of the minor accident.

(xviii)   On July 12, 2017, an Insured named JR was involved in an automobile accident. The contemporaneous police report indicates that the accident was a low-speed, low-impact collision, and that JR's vehicle was drivable following the accident. The police report further indicated that JR was not injured and did not complain of any pain at the scene. In keeping with the fact that JR was not injured, he did not visit any hospital following the accident. To the extent that JR experienced any health problems at all as the result of the minor accident, they were of low severity. Even so, following a purported initial examination on July 14, 2017, Garcia, Martinez, Acebo Martinez, Keane, Queral, and Quality Diagnostic billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that JR presented with moderately severe health problems as the result of the minor accident.

(xix)   On July 21, 2017, an Insured named JP was involved in an automobile accident. The contemporaneous police report indicates that the accident was a low-speed, low-impact collision, and that JP's vehicle was drivable following the accident. The police report further indicated that JP was not injured and did not complain of any pain at the scene. In keeping with the fact that JP was not injured, he did not visit any hospital following the accident. To the extent that JP experienced any health problems at all as the result of the minor accident, they were of low severity. Even so, following a purported initial examination on July 26, 2017, Garcia, Martinez, Acebo Martinez, Keane, Queral, and Quality Diagnostic billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that JP presented with moderately severe health problems as the result of the minor accident.

(xx)   On July 21, 2017, an Insured named JP was involved in an automobile accident. The contemporaneous police report indicates that the accident was a low-speed, low-impact collision, and that JP's vehicle was drivable following the accident. The police report further indicated that JP was not injured and did not complain of any pain at the scene. In keeping with the fact that JP was not injured, he did not visit any hospital following the accident. To the extent that JP experienced any health problems at all as the result of the minor accident, they were of low severity. Even so, following a purported initial examination on July 27, 2017, Garcia, Martinez, Acebo Martinez, Keane, Queral, and Quality Diagnostic billed GEICO for the initial examination using CPT code 99203, and thereby falsely

represented that JP presented with moderately severe health problems as the result of the minor accident.

286.   These are only representative examples. In all of the claims for initial examinations identified in Exhibit "1", Quality Diagnostic, Queral, Keane, Martinez, Acebo Martinez, and Garcia falsely represented that the Insureds presented with problems of moderate severity, when in fact the Insureds' problems were low-severity soft tissue injuries such as sprains and strains, to the limited extent that they had any presenting problems at all.

287.   In the claims for initial examinations identified in Exhibit "1", Quality Diagnostic, Queral, Keane, Martinez, Acebo Martinez, and Garcia routinely falsely represented that the Insureds presented with problems of moderate severity in order to create a false basis for their charges for the examinations under CPT code 99203, because examinations billable under CPT code 99203 are reimbursable at higher rates than examinations involving presenting problems of low severity, or no severity.

288.   In the claims for initial examinations identified in Exhibit "1", Quality Diagnostic, Queral, Keane, Martinez, Acebo Martinez, and Garcia also routinely falsely represented that the Insureds presented with problems of moderate severity in order to create a false basis for the laundry list of other Fraudulent Services that the Defendants purported to provide to the Insureds, including medically unnecessary follow-up examinations and physical therapy services.

**b.    Misrepresentations Regarding the Amount of Time Spent on the Initial Examinations**

289.   What is more, in every claim identified in Exhibit "1" for initial examinations under CPT code 99203, Quality Diagnostic, Queral, Keane, Martinez, Acebo Martinez, and Garcia misrepresented and exaggerated the amount of face-to-face time that the examining

physician – purportedly Keane – spent with the Insureds or the Insureds' families.

290.    Pursuant to the CPT Assistant, the use of CPT code 99203 to bill for a patient examination represents that the physician who conducted the examination spent at least 30 minutes of face-to-face time with the patient or the patient's family.

291.    As set forth in Exhibit "1", Quality Diagnostic, Queral, Keane, Martinez, Acebo Martinez, and Garcia virtually always billed for the putative initial examinations using CPT code 99203, and thereby represented that the physician who purported to conduct the examinations – namely Keane – spent at least 30 minutes of face-to-face time with the Insureds or their families during the examinations.

292.    In fact, in the initial examinations identified in Exhibit "1", Keane never spent more 15 minutes of face-to-face time with the Insureds or their families when purporting to conduct the examinations, much less 30 minutes.

293.    In keeping with the fact that the initial examinations in the claims identified in Exhibit "1" did not involve more than 15 minutes of face-to-face time between Keane, the Insureds, or the Insureds' families, to the extent that they were provided at all, Keane used template forms in purporting to conduct the examinations.

294.    All that was required to complete the template forms was a brief patient interview and a perfunctory physical examination of the Insureds, consisting of a check of some of the Insureds' vital signs, and basic range of motion and muscle strength testing.

295.    These interviews and examinations did not require Keane to spend more than 15 minutes of face-to-face time with the Insureds during the putative initial examinations.

296.    In keeping with the fact that Keane did not spend more than 15 minutes of face-to-face time with the Insureds or their families during the putative initial examinations, Keane

did not even personally complete the checklist examination forms.

297.    Instead, upon information and belief, the putative "initial examinations" at Quality Diagnostic were conducted by personnel at Quality Diagnostic who were not licensed as physicians – including Viera – and then the resulting, purported "examination reports" simply were signed by Keane, often electronically, to create the false appearance that he actually had some legitimate role in performing the examinations.

298.    Indeed, Keane could not legitimately have personally performed the initial examinations at Quality Diagnostic, or even directly supervised them, much less have spent at least 30 minutes of face-to-face time with the Insureds or their families during the examinations.

299.    For example:

(i)     On June 5, 2017, Garcia, Martinez, Acebo Martinez, Keane, Queral, and Quality Diagnostic billed GEICO under CPT code 99203 for two initial examinations that Keane falsely purported to perform on Insureds named JC and ML. On that same day, Keane also purported to personally provide or directly supervise more than 11 hours of physical therapy services to seven individual Insureds at Quality Diagnostic, all of which were billed to GEICO. What is more, on that same date Keane also purported to personally provide or directly supervise more than 10 hours of physical therapy services which were billed to GEICO through JO Medical Center.

(ii)    On June 7, 2017, Garcia, Martinez, Acebo Martinez, Keane, Queral, and Quality Diagnostic billed GEICO under CPT code 99203 for two initial examinations that Keane falsely purported to perform on Insureds named JO and LV. On that same day, Keane also purported to personally provide or directly supervise more than 15 hours of physical therapy services to seven individual Insureds at Quality Diagnostic, all of which were billed to GEICO. What is more, on that same date Keane also purported to personally provide or directly supervise more than eight hours of physical therapy services which were billed to GEICO through JO Medical Center, and an additional two hours of physical therapy services billed to GEICO through Gonzalez Pain Center.

(iii)   On June 14, 2017, Garcia, Martinez, Acebo Martinez, Keane, Queral, and Quality Diagnostic billed GEICO under CPT code 99203 for four initial examinations that Keane falsely purported to perform on Insureds named MP, AP, NC, and YO. On that same day, Keane also purported to personally provide or directly supervise more than 17 hours of physical therapy services to 11 individual Insureds at

Quality Diagnostic, all of which were billed to GEICO. What is more, on that same date Keane also purported to personally provide or directly supervise more than six hours of physical therapy services which were billed to GEICO through JO Medical Center, and an additional six hours of physical therapy services billed to GEICO through Gonzalez Pain Center.

(iv)     On June 19, 2017, Garcia, Martinez, Acebo Martinez, Keane, Queral, and Quality Diagnostic billed GEICO under CPT code 99203 for two initial examinations that Keane falsely purported to perform on Insureds named YG and CF. On that same day, Keane also purported to personally provide or directly supervise more than 19 hours of physical therapy services to 13 individual Insureds at Quality Diagnostic, all of which were billed to GEICO. What is more, on that same date Keane also purported to personally provide or directly supervise more than seven hours of physical therapy services which were billed to GEICO through JO Medical Center, and an additional five hours of physical therapy services billed to GEICO through Gonzalez Pain Center.

(v)     On July 5, 2017, Garcia, Martinez, Acebo Martinez, Keane, Queral, and Quality Diagnostic billed GEICO under CPT code 99203 for two initial examinations that Keane falsely purported to perform on Insureds named CC and GZ. On that same day, Keane also purported to personally provide or directly supervise more than 30 hours of physical therapy services to 20 individual Insureds at Quality Diagnostic, all of which were billed to GEICO. What is more, on that same date Keane also purported to personally provide or directly supervise more than nine hours of physical therapy services which were billed to GEICO through JO Medical Center, and an additional nine hours of physical therapy services billed to GEICO through Gonzalez Pain Center.

(vi)     On July 26, 2017, Garcia, Martinez, Acebo Martinez, Keane, Queral, and Quality Diagnostic billed GEICO under CPT code 99203 for two initial examinations that Keane falsely purported to perform on Insureds named JP and JC. On that same day, Keane also purported to personally provide or directly supervise more than 37 hours of physical therapy services to 28 individual Insureds at Quality Diagnostic, all of which were billed to GEICO. What is more, on that same date Keane also purported to personally provide or directly supervise more than four hours of physical therapy services which were billed to GEICO through JO Medical Center.

300.     These are only representative examples. In the claims for initial examinations services that are identified in Exhibit "1", Quality Diagnostic, Queral, Keane, Martinez, Acebo Martinez, and Garcia routinely falsely represented that Keane had spent at least 30 minutes of face-to-face time with the Insureds or their families during the examinations, despite the fact that

– on those same dates – Keane also purported to personally perform a massive amount of physical therapy services to large numbers of Insureds at as many as three different health care clinics.

301.     What is more, and as set forth above, GEICO is only one of the automobile insurance companies doing business in the Florida automobile insurance market.

302.     It is extremely improbable, to the point of impossibility, that the Defendants only submitted fraudulent billing to GEICO, and that the Defendants did not simultaneously bill other automobile insurers.

303.     Thus, upon information and belief, the massive, impossible number of examination and physical therapy services that Keane purported to directly supervise or provide to GEICO Insureds on individual dates of service, including the dates of service identified above, constituted only a fraction of the <u>total</u> number of examination and physical therapy services that Keane purported to directly supervise or provide, including to individuals insured by companies other than GEICO, on those same dates of service.

304.     Quality Diagnostic, Queral, Keane, Martinez, Acebo Martinez, and Garcia routinely misrepresented the amount of time that was spent in conducting the initial examinations because lengthier examinations that are billable under CPT code 99203 are reimbursable at higher rates than examinations that take less time to perform.

**c.      Misrepresentations Regarding "Detailed" Physical Examinations**

305.     Moreover, in every claim identified in Exhibit "1" for initial examinations under CPT code 99203, Quality Diagnostic, Queral, Keane, Martinez, Acebo Martinez, and Garcia falsely represented the extent of the underlying physical examinations.

306.    Pursuant to the CPT Assistant, the use of CPT code 99203 to bill for a patient examination represents that the physician who performed the examination conducted a "detailed" physical examination.

307.    As set forth in Exhibit "1", Garcia, Martinez, Acebo Martinez, Queral, Keane, and Quality Diagnostic virtually always billed for Keane's putative initial examinations using CPT code 99203, and thereby represented that the physician who purported to conduct the examinations – namely Keane – conducted detailed physical examinations of the Insureds who purportedly received the examinations.

308.    Pursuant to the CPT Assistant, a "detailed" physical examination requires – among other things – that the physician performing the examination conduct an extended examination of the affected body areas and other symptomatic or related organ systems.

309.    To the extent that the Insureds in the claims identified in Exhibit "1" had any actual complaints at all as the result of their minor automobile accidents, the complaints were limited to minor musculoskeletal complaints, specifically sprains and strains.

310.    Pursuant to the CPT Assistant, in the context of patient examinations, a physician has not conducted an extended examination of a patient's musculoskeletal organ system unless the physician has documented findings with respect to the following:

(i)     measurement of any three of the following seven vital signs: (a) sitting or standing blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; (g) weight;

(ii)    general appearance of patient (e.g., development, nutrition, body habitus, deformities, attention to grooming);

(iii)   examination of peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(iv)    palpation of lymph nodes in neck, axillae, groin and/or other location;

(v)     brief assessment of mental status;

(vi)    examination of gait and station;

(vii)   inspection and/or palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café au-lait spots, ulcers) in four of the following six areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and (f) left lower extremity;

(viii)  coordination;

(ix)    examination of deep tendon reflexes and/or nerve stretch test with notation of pathological reflexes; and

(x)     examination of sensation.

311.   In the claims for initial examinations identified in Exhibit "1", when Garcia, Martinez, Acebo Martinez, Queral, Keane, and Quality Diagnostic billed for the initial examinations under CPT codes 99203, they falsely represented that Keane performed "detailed" patient examinations on the Insureds he purported to treat during the initial examinations.

312.   In fact, with respect to the claims for initial examinations under CPT code 99203 that are identified in Exhibit "1", Keane never conducted an extended examination of the Insureds' musculoskeletal systems.

313.   For instance, in each of the claims under CPT code 99203 identified in Exhibit "1", Keane did not conduct an extended examination of the Insureds' musculoskeletal systems, inasmuch as he did not document findings with respect to the following:

(i)     measurement of any three of the following seven vital signs: (a) sitting or standing blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; (g) weight;

(ii)    general appearance of patient (e.g., development, nutrition, body habitus, deformities, attention to grooming);

(iii)   examination of peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(iv)     brief assessment of mental status;

(v)      examination of gait and station;

(vi)     inspection and/or palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café au-lait spots, ulcers) in four of the following six areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and (f) left lower extremity;

(vii)    coordination;

(viii)   examination of deep tendon reflexes and/or nerve stretch test with notation of pathological reflexes; and/or

(ix)     examination of sensation.

314.   For example:

(i)      On or about May 12, 2017, Garcia, Martinez, Acebo Martinez, Queral, Keane, and Quality Diagnostic billed GEICO under CPT code 99203 for an initial examination that Keane purported to perform on an Insured named NJ, and thereby represented that Keane had provided a "detailed" physical examination to NJ. However, Keane did not document an extended examination of NJ's musculoskeletal system, despite the fact that – to the extent NJ had any complaints at all as the result of the underlying automobile accident – they were limited to minor musculoskeletal complaints.

(ii)     On or about May 12, 2017, Garcia, Martinez, Acebo Martinez, Queral, Keane, and Quality Diagnostic billed GEICO under CPT code 99203 for an initial examination that Keane purported to perform on an Insured named CL, and thereby represented that Keane had provided a "detailed" physical examination to CL. However, Keane did not document an extended examination of CL's musculoskeletal system, despite the fact that – to the extent CL had any complaints at all as the result of the automobile accident – they were limited to minor musculoskeletal complaints.

(iii)    On or about May 17, 2017, Garcia, Martinez, Acebo Martinez, Queral, Keane, and Quality Diagnostic billed GEICO under CPT code 99203 for an initial examination that Keane purported to perform on an Insured named SD, and thereby represented that Keane had provided a "detailed" physical examination to SD. However, Keane did not document an extended examination of SD's musculoskeletal system, despite the fact that – to the extent SD had any complaints at all as the result of the underlying automobile accident – they were limited to minor musculoskeletal complaints.

(iv)     On or about May 17, 2017, Garcia, Martinez, Acebo Martinez, Queral, Keane,

and Quality Diagnostic billed GEICO under CPT code 99203 for an initial examination that Keane purported to perform on an Insured named JL, and thereby represented that Keane had provided a "detailed" physical examination to JL. However, Keane did not document an extended examination of JL's musculoskeletal system, despite the fact that – to the extent JL had any complaints at all as the result of the underlying automobile accident – they were limited to minor musculoskeletal complaints.

(v)  On or about May 22, 2017, Garcia, Martinez, Acebo Martinez, Queral, Keane, and Quality Diagnostic billed GEICO under CPT code 99203 for an initial examination that Keane purported to perform on an Insured named EA, and thereby represented that Keane had provided a "detailed" physical examination to EA. However, Keane did not document an extended examination of EA's musculoskeletal system, despite the fact that – to the extent EA had any complaints at all as the result of the underlying automobile accident – they were limited to minor musculoskeletal complaints.

(vi)  On or about May 24, 2017, Garcia, Martinez, Acebo Martinez, Queral, Keane, and Quality Diagnostic billed GEICO under CPT code 99203 for an initial examination that Keane purported to perform on an Insured named MB, and thereby represented that Keane had provided a "detailed" physical examination to MB. However, Keane did not document an extended examination of MB's musculoskeletal system, despite the fact that – to the extent MB had any complaints at all as the result of the automobile accident – they were limited to minor musculoskeletal complaints.

(vii)  On or about May 24, 2017, Garcia, Martinez, Acebo Martinez, Queral, Keane, and Quality Diagnostic billed GEICO under CPT code 99203 for an initial examination that Keane purported to perform on an Insured named CM, and thereby represented that Keane had provided a "detailed" physical examination to CM. However, Keane did not document an extended examination of CM's musculoskeletal system, despite the fact that – to the extent CM had any complaints at all as the result of the underlying automobile accident – they were limited to minor musculoskeletal complaints.

(viii)  On or about June 5, 2017, Garcia, Martinez, Acebo Martinez, Queral, Keane, and Quality Diagnostic billed GEICO under CPT code 99203 for an initial examination that Keane purported to perform on an Insured named JC, and thereby represented that Keane had provided a "detailed" physical examination to JC. However, Keane did not document an extended examination of JC's musculoskeletal system, despite the fact that – to the extent JC had any complaints at all as the result of the underlying automobile accident – they were limited to minor musculoskeletal complaints.

(ix)  On or about June 5, 2017, Garcia, Martinez, Acebo Martinez, Queral, Keane, and Quality Diagnostic billed GEICO under CPT code 99203 for an initial

examination that Keane purported to perform on an Insured named ML, and thereby represented that Keane had provided a "detailed" physical examination to ML. However, Keane did not document an extended examination of ML's musculoskeletal system, despite the fact that – to the extent ML had any complaints at all as the result of the underlying automobile accident – they were limited to minor musculoskeletal complaints.

(x)     On or about June 13, 2017, Garcia, Martinez, Acebo Martinez, Queral, Keane, and Quality Diagnostic billed GEICO under CPT code 99203 for an initial examination that Keane purported to perform on an Insured named RE, and thereby represented that Keane had provided a "detailed" physical examination to RE. However, Keane did not document an extended examination of RE's musculoskeletal system, despite the fact that – to the extent RE had any complaints at all as the result of the underlying automobile accident – they were limited to minor musculoskeletal complaints.

(xi)    On or about June 14, 2017, Garcia, Martinez, Acebo Martinez, Queral, Keane, and Quality Diagnostic billed GEICO under CPT code 99203 for an initial examination that Keane purported to perform on an Insured named NC, and thereby represented that Keane had provided a "detailed" physical examination to NC. However, Keane did not document an extended examination of NC's musculoskeletal system, despite the fact that – to the extent NC had any complaints at all as the result of the underlying automobile accident – they were limited to minor musculoskeletal complaints.

(xii)   On or about June 14, 2017, Garcia, Martinez, Acebo Martinez, Queral, Keane, and Quality Diagnostic billed GEICO under CPT code 99203 for an initial examination that Keane purported to perform on an Insured named YO, and thereby represented that Keane had provided a "detailed" physical examination to YO. However, Keane did not document an extended examination of YO's musculoskeletal system, despite the fact that – to the extent YO had any complaints at all as the result of the underlying automobile accident – they were limited to minor musculoskeletal complaints.

(xiii)  On or about June 14, 2017, Garcia, Martinez, Acebo Martinez, Queral, Keane, and Quality Diagnostic billed GEICO under CPT code 99203 for an initial examination that Keane purported to perform on an Insured named AP, and thereby represented that Keane had provided a "detailed" physical examination to AP. However, Keane did not document an extended examination of AP's musculoskeletal system, despite the fact that – to the extent AP had any complaints at all as the result of the underlying automobile accident – they were limited to minor musculoskeletal complaints.

(xiv)   On or about June 16, 2017, Garcia, Martinez, Acebo Martinez, Queral, Keane, and Quality Diagnostic billed GEICO under CPT code 99203 for an initial examination that Keane purported to perform on an Insured named IB, and

thereby represented that Keane had provided a "detailed" physical examination to IB. However, Keane did not document an extended examination of IB's musculoskeletal system, despite the fact that – to the extent IB had any complaints at all as the result of the underlying automobile accident – they were limited to minor musculoskeletal complaints.

(xv)     On or about June 21, 2017, Garcia, Martinez, Acebo Martinez, Queral, Keane, and Quality Diagnostic billed GEICO under CPT code 99203 for an initial examination that Keane purported to perform on an Insured named AO, and thereby represented that Keane had provided a "detailed" physical examination to AO. However, Keane did not document an extended examination of AO's musculoskeletal system, despite the fact that – to the extent AO had any complaints at all as the result of the underlying automobile accident – they were limited to minor musculoskeletal complaints.

(xvi)    On or about June 23, 2017, Garcia, Martinez, Acebo Martinez, Queral, Keane, and Quality Diagnostic billed GEICO under CPT code 99203 for an initial examination that Keane purported to perform on an Insured named RG, and thereby represented that Keane had provided a "detailed" physical examination to RG. However, Keane did not document an extended examination of RG's musculoskeletal system, despite the fact that – to the extent RG had any complaints at all as the result of the underlying automobile accident – they were limited to minor musculoskeletal complaints.

(xvii)   On or about July 5, 2017, Garcia, Martinez, Acebo Martinez, Queral, Keane, and Quality Diagnostic billed GEICO under CPT code 99203 for an initial examination that Keane purported to perform on an Insured named GZ, and thereby represented that Keane had provided a "detailed" physical examination to GZ. However, Keane did not document an extended examination of GZ's musculoskeletal system, despite the fact that – to the extent GZ had any complaints at all as the result of the underlying automobile accident – they were limited to minor musculoskeletal complaints.

(xviii)  On or about July 14, 2017, Garcia, Martinez, Acebo Martinez, Queral, Keane, and Quality Diagnostic billed GEICO under CPT code 99203 for an initial examination that Keane purported to perform on an Insured named JR, and thereby represented that Keane had provided a "detailed" physical examination to JR. However, Keane did not document an extended examination of JR's musculoskeletal system, despite the fact that – to the extent JR had any complaints at all as the result of the underlying automobile accident – they were limited to minor musculoskeletal complaints.

(xix)    On or about July 19, 2017, Garcia, Martinez, Acebo Martinez, Queral, Keane, and Quality Diagnostic billed GEICO under CPT code 99203 for an initial examination that Keane purported to perform on an Insured named DA, and thereby represented that Keane had provided a "detailed" physical examination to

DA. However, Keane did not document an extended examination of DA's musculoskeletal system, despite the fact that – to the extent DA had any complaints at all as the result of the underlying automobile accident – they were limited to minor musculoskeletal complaints.

(xx)   On or about July 26, 2017, Garcia, Martinez, Acebo Martinez, Queral, Keane, and Quality Diagnostic billed GEICO under CPT code 99203 for an initial examination that Keane purported to perform on an Insured named JP, and thereby represented that Keane had provided a "detailed" physical examination to JP. However, Keane did not document an extended examination of JP's musculoskeletal system, despite the fact that – to the extent JP had any complaints at all as the result of the underlying automobile accident – they were limited to minor musculoskeletal complaints.

315.   These are only representative examples. In all of the claims for initial examinations under CPT code 99203 that are identified in Exhibit "1", Quality Diagnostic, Queral, Keane, Martinez, Acebo Martinez, and Garcia falsely represented that Keane and Quality Diagnostic had provided "detailed" physical examinations. In fact, they had not provided detailed physical examinations because Keane had not documented an extended examination of the affected body areas and other symptomatic or related organ systems.

316.   In the claims for initial examinations under CPT code 99203 that are identified in Exhibit "1", Quality Diagnostic, Queral, Keane, Martinez, Acebo Martinez, and Garcia falsely represented that Keane and Quality Diagnostic had provided "detailed" physical examinations to the Insureds in order to create a false basis for their charges for the examinations under CPT code 99203, because examinations billable under CPT code 99203 are reimbursable at higher rates than examinations that do not require the examining physician to provide "detailed" physical examinations.

**d.     Misrepresentations Regarding the Extent of Medical Decision-Making**

317.    Furthermore, pursuant to the CPT Assistant, the use of CPT code 99203 to bill for a patient examination represents that the physician who performed the examination engaged in "low complexity" medical decision-making.

318.    In addition, pursuant to the CPT Assistant, the complexity of medical decision-making is measured by: (i) the number of diagnoses and/or the number of management options to be considered; (ii) the amount and/or complexity of medical records, diagnostic tests, and other information that must be retrieved, reviewed, and analyzed; and (iii) the risk of significant complications, morbidity, mortality, as well as co-morbidities associated with the patient's presenting problems, the diagnostic procedures, and/or the possible management options.

319.    As set forth above, and in Exhibit "1", Garcia, Martinez, Acebo Martinez, Queral, Keane, and Quality Diagnostic billed for all of Quality Diagnostic and Keane's putative initial patient examinations using CPT code 99203, and thereby represented that Keane engaged in some genuine, low-complexity medical decision-making during the initial examinations.

320.    In actuality, however, the purported initial examinations did not involve any legitimate medical decision-making at all.

321.    First, in the claims for initial examinations identified in Exhibit "1", the initial examinations did not involve the retrieval, review, or analysis of any medical records, diagnostic tests, or other information.

322.    When the Insureds in the claims identified in Exhibit "1" presented to Quality Diagnostic for "treatment", they did not arrive with any medical records.

323.    Furthermore, prior to the initial examinations, Quality Diagnostic and Keane neither requested any medical records from any other providers, nor conducted any diagnostic tests.

324.    Second, in the claims for initial examinations identified in Exhibit "1",  there was no risk of significant complications or morbidity – much less mortality – from the Insureds' minor soft-tissue injury complaints, to the extent that they ever had any complaints arising from automobile accidents at all.

325.    Nor, by extension, was there any risk of significant complications, morbidity, or mortality from the diagnostic procedures or treatment options provided by the Defendants, to the extent that the Defendants provided any such diagnostic procedures or treatment options in the first instance.

326.    In virtually every one of the claims identified in Exhibit "1", any diagnostic procedures and "treatments" that the Defendants actually provided were limited to a series of medically unnecessary follow-up examinations and purported "physical therapy" treatments, none of which was health- or life-threatening if properly administered.

327.    Third, in the claims for initial examinations identified in Exhibit "1", Keane did not consider any significant number of diagnoses or treatment options for Insureds during the initial examinations.

328.    Rather, to the extent that the initial examinations were conducted in the first instance, Quality Diagnostic, Queral, and Keane – at the direction of Martinez, Acebo Martinez, and Garcia – provided a nearly identical, pre-determined "diagnosis" for every Insured, and prescribed a virtually identical course of treatment for every Insured.

329.     Specifically, in almost every instance in the claims identified in Exhibit "1", during the initial examinations the Insureds did not report any continuing medical problems that legitimately could be traced to an underlying automobile accident.

330.     Even so, Quality Diagnostic, Queral, Keane, Martinez, Acebo Martinez, and Garcia prepared initial examination reports in which they provided phony, boilerplate sprain/strain "diagnoses" to virtually every Insured.

331.     Then, based upon these phony "diagnoses", Quality Diagnostic, Queral, and Keane – at the direction of Martinez, Acebo Martinez, and Garcia – directed virtually every Insured to return to Quality Diagnostic for regimen of medically unnecessary "physical therapy" services, regardless of the Insured's individual circumstances or true symptoms.

332.     For example:

(i)      On May 10, 2017, an Insured named NJ was involved in an automobile accident. The contemporaneous police report indicates that the accident was a low-speed, low-impact collision, and that NJ's vehicle was drivable following the accident. The police report further indicated that NJ was not injured and did not complain of any pain at the scene. In keeping with the fact that NJ was not injured, she did not visit any hospital following the accident. On May 12, 2017, Keane purported to perform an initial examination of NJ at Quality Diagnostic. To the extent that Keane performed the examination in the first instance, Keane did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the initial examination. Moreover, Keane did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Keane provided NJ with the same, phony, boilerplate neck and back sprain "diagnoses" that he provided to virtually every other Insured. Furthermore, neither NJ's presenting problems, nor the treatment plan provided to NJ at Martinez, Acebo Martinez, and Garcia's direction by Keane, Queral, and Quality Diagnostic presented any risk of significant complications, morbidity, or mortality. To the contrary, NJ did not need any treatment at all as the result of the minor accident, and the treatment plan provided at Martinez, Acebo Martinez, and Garcia's direction by Keane, Queral, and Quality Diagnostic consisted of medically unnecessary "physical therapy" services, none of which posed the least bit of risk to NJ. Even so, Quality Diagnostic, Keane, Queral, Martinez, Acebo Martinez, and Garcia billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Keane engaged in some legitimate medical decision-making during the

purported examination.

(ii)     On May 10, 2017, an Insured named CL was involved in an automobile accident. The contemporaneous police report indicates that the accident was a low-speed, low-impact collision, and that CL's vehicle was drivable following the accident. The police report further indicated that CL was not injured and did not complain of any pain at the scene. In keeping with the fact that CL was not injured, he did not visit any hospital following the accident. On May 12, 2017, Keane purported to perform an initial examination of CL at Quality Diagnostic. To the extent that Keane performed the examination in the first instance, Keane did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the initial examination. Moreover, Keane did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Keane provided CL with the same, phony, boilerplate neck and back sprain "diagnoses" that he provided to virtually every other Insured. Furthermore, neither CL's presenting problems, nor the treatment plan provided to CL at Martinez, Acebo Martinez, and Garcia's direction by Keane, Queral, and Quality Diagnostic presented any risk of significant complications, morbidity, or mortality. To the contrary, CL did not need any treatment at all as the result of the minor accident, and the treatment plan provided at Martinez, Acebo Martinez, and Garcia's direction by Keane, Queral, and Quality Diagnostic consisted of medically unnecessary "physical therapy" services, none of which posed the least bit of risk to CL. Even so, Quality Diagnostic, Keane, Queral, Martinez, Acebo Martinez, and Garcia billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Keane engaged in some legitimate medical decision-making during the purported examination.

(iii)    On May 15, 2017, an Insured named SD was involved in an automobile accident. The contemporaneous police report indicates that the accident was a low-speed, low-impact collision, and that SD's vehicle was drivable following the accident. The police report further indicated that SD was not injured and did not complain of any pain at the scene. In keeping with the fact that SD was not injured, she did not visit any hospital following the accident. On May 17, 2017, Keane purported to perform an initial examination of SD at Quality Diagnostic. To the extent that Keane performed the examination in the first instance, Keane did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the initial examination. Moreover, Keane did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Keane provided SD with the same, phony, boilerplate neck and back sprain "diagnoses" that he provided to virtually every other Insured. Furthermore, neither SD's presenting problems, nor the treatment plan provided to SD at Martinez, Acebo Martinez, and Garcia's direction by Keane, Queral, and Quality Diagnostic presented any risk of significant complications, morbidity, or mortality. To the contrary, SD did not need any treatment at all as the result of the minor accident, and the treatment

85

plan provided at Martinez, Acebo Martinez, and Garcia's direction by Keane, Queral, and Quality Diagnostic consisted of medically unnecessary "physical therapy" services, none of which posed the least bit of risk to SD. Even so, Quality Diagnostic, Keane, Queral, Martinez, Acebo Martinez, and Garcia billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Keane engaged in some legitimate medical decision-making during the purported examination.

(iv)     On May 15, 2017, an Insured named JL was involved in an automobile accident. The contemporaneous police report indicates that the accident was a low-speed, low-impact collision, and that JL's vehicle was drivable following the accident. The police report further indicated that JL was not injured and did not complain of any pain at the scene. In keeping with the fact that JL was not injured, he did not visit any hospital following the accident. On May 17, 2017, Keane purported to perform an initial examination of JL at Quality Diagnostic. To the extent that Keane performed the examination in the first instance, Keane did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the initial examination. Moreover, Keane did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Keane provided JL with the same, phony, boilerplate neck and back sprain "diagnoses" that he provided to virtually every other Insured. Furthermore, neither JL's presenting problems, nor the treatment plan provided to JL at Martinez, Acebo Martinez, and Garcia's direction by Keane, Queral, and Quality Diagnostic presented any risk of significant complications, morbidity, or mortality. To the contrary, JL did not need any treatment at all as the result of the minor accident, and the treatment plan provided at Martinez, Acebo Martinez, and Garcia's direction by Keane, Queral, and Quality Diagnostic consisted of medically unnecessary "physical therapy" services, none of which posed the least bit of risk to JL. Even so, Quality Diagnostic, Keane, Queral, Martinez, Acebo Martinez, and Garcia billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Keane engaged in some legitimate medical decision-making during the purported examination.

(v)     On May 18, 2017, an Insured named MB was involved in an automobile accident. The contemporaneous police report indicates that the accident was a low-speed, low-impact collision, and that MB's vehicle was drivable following the accident. The police report further indicated that MB was not injured and did not complain of any pain at the scene. In keeping with the fact that MB was not injured, she did not visit any hospital following the accident. On May 24, 2017, Keane purported to perform an initial examination of MB at Quality Diagnostic. To the extent that Keane performed the examination in the first instance, Keane did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the initial examination. Moreover, Keane did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Keane provided MB with the same,

phony, boilerplate neck and back sprain "diagnoses" that he provided to virtually every other Insured. Furthermore, neither MB's presenting problems, nor the treatment plan provided to MB at Martinez, Acebo Martinez, and Garcia's direction by Keane, Queral, and Quality Diagnostic presented any risk of significant complications, morbidity, or mortality. To the contrary, MB did not need any treatment at all as the result of the minor accident, and the treatment plan provided at Martinez, Acebo Martinez, and Garcia's direction by Keane, Queral, and Quality Diagnostic consisted of medically unnecessary "physical therapy" services, none of which posed the least bit of risk to MB. Even so, Quality Diagnostic, Keane, Queral, Martinez, Acebo Martinez, and Garcia billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Keane engaged in some legitimate medical decision-making during the purported examination.

(vi)    On May 18, 2017, an Insured named CM was involved in an automobile accident. The contemporaneous police report indicates that the accident was a low-speed, low-impact collision, and that CM's vehicle was drivable following the accident. The police report further indicated that CM was not injured and did not complain of any pain at the scene. In keeping with the fact that CM was not injured, she did not visit any hospital following the accident. On May 24, 2017, Keane purported to perform an initial examination of CM at Quality Diagnostic. To the extent that Keane performed the examination in the first instance, Keane did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the initial examination. Moreover, Keane did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Keane provided CM with the same, phony, boilerplate neck and back sprain "diagnoses" that he provided to virtually every other Insured. Furthermore, neither CM's presenting problems, nor the treatment plan provided to CM at Martinez, Acebo Martinez, and Garcia's direction by Keane, Queral, and Quality Diagnostic presented any risk of significant complications, morbidity, or mortality. To the contrary, CM did not need any treatment at all as the result of the minor accident, and the treatment plan provided at Martinez, Acebo Martinez, and Garcia's direction by Keane, Queral, and Quality Diagnostic consisted of medically unnecessary "physical therapy" services, none of which posed the least bit of risk to CM. Even so, Quality Diagnostic, Keane, Queral, Martinez, Acebo Martinez, and Garcia billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Keane engaged in some legitimate medical decision-making during the purported examination.

(vii)    On June 4, 2017, an Insured named JC was involved in an automobile accident. The contemporaneous police report indicates that the accident was a low-speed, low-impact collision, and that JC's vehicle was drivable following the accident. The police report further indicated that JC was not injured and did not complain of any pain at the scene. In keeping with the fact that JC was not injured, she did not visit any hospital following the accident.  On June 5, 2017, Keane purported

to perform an initial examination of JC at Quality Diagnostic. To the extent that Keane performed the examination in the first instance, Keane did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the initial examination. Moreover, Keane did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Keane provided JC with the same, phony, boilerplate neck and back sprain "diagnoses" that he provided to virtually every other Insured. Furthermore, neither JC's presenting problems, nor the treatment plan provided to JC at Martinez, Acebo Martinez, and Garcia's direction by Keane, Queral, and Quality Diagnostic presented any risk of significant complications, morbidity, or mortality. To the contrary, JC did not need any treatment at all as the result of the minor accident, and the treatment plan provided at Martinez, Acebo Martinez, and Garcia's direction by Keane, Queral, and Quality Diagnostic consisted of medically unnecessary "physical therapy" services, none of which posed the least bit of risk to JC. Even so, Quality Diagnostic, Keane, Queral, Martinez, Acebo Martinez, and Garcia billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Keane engaged in some legitimate medical decision-making during the purported examination.

(viii)   On June 4, 2017, an Insured named ML was involved in an automobile accident. The contemporaneous police report indicates that the accident was a low-speed, low-impact collision, and that ML's vehicle was drivable following the accident. The police report further indicated that ML was not injured and did not complain of any pain at the scene. In keeping with the fact that ML was not injured, he did not visit any hospital following the accident.  On June 5, 2017, Keane purported to perform an initial examination of ML at Quality Diagnostic. To the extent that Keane performed the examination in the first instance, Keane did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the initial examination. Moreover, Keane did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Keane provided ML with the same, phony, boilerplate neck and back sprain "diagnoses" that he provided to virtually every other Insured. Furthermore, neither ML's presenting problems, nor the treatment plan provided to ML at Martinez, Acebo Martinez, and Garcia's direction by Keane, Queral, and Quality Diagnostic presented any risk of significant complications, morbidity, or mortality. To the contrary, ML did not need any treatment at all as the result of the minor accident, and the treatment plan provided at Martinez, Acebo Martinez, and Garcia's direction by Keane, Queral, and Quality Diagnostic consisted of medically unnecessary "physical therapy" services, none of which posed the least bit of risk to ML. Even so, Quality Diagnostic, Keane, Queral, Martinez, Acebo Martinez, and Garcia billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Keane engaged in some legitimate medical decision-making during the purported examination.

(ix)    On June 5, 2017, an Insured named JR was involved in an automobile accident. The contemporaneous police report indicates that the accident was a low-speed, low-impact collision, and that JR's vehicle was drivable following the accident. The police report further indicated that JR was not injured and did not complain of any pain at the scene. In keeping with the fact that JR was not injured, he did not visit any hospital following the accident.  On June 7, 2017, Keane purported to perform an initial examination of JR at Quality Diagnostic. To the extent that Keane performed the examination in the first instance, Keane did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the initial examination. Moreover, Keane did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Keane provided JR with the same, phony, boilerplate neck and back sprain "diagnoses" that he provided to virtually every other Insured. Furthermore, neither JR's presenting problems, nor the treatment plan provided to JR at Martinez, Acebo Martinez, and Garcia's direction by Keane, Queral, and Quality Diagnostic presented any risk of significant complications, morbidity, or mortality. To the contrary, JR did not need any treatment at all as the result of the minor accident, and the treatment plan provided at Martinez, Acebo Martinez, and Garcia's direction by Keane, Queral, and Quality Diagnostic consisted of medically unnecessary "physical therapy" services, none of which posed the least bit of risk to JR. Even so, Quality Diagnostic, Keane, Queral, Martinez, Acebo Martinez, and Garcia billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Keane engaged in some legitimate medical decision-making during the purported examination.

(x)    On June 5, 2017, an Insured named LQ was involved in an automobile accident. The contemporaneous police report indicates that the accident was a low-speed, low-impact collision, and that LQ's vehicle was drivable following the accident. The police report further indicated that LQ was not injured and did not complain of any pain at the scene. In keeping with the fact that LQ was not injured, he did not visit any hospital following the accident.  On June 7, 2017, Keane purported to perform an initial examination of LQ at Quality Diagnostic. To the extent that Keane performed the examination in the first instance, Keane did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the initial examination. Moreover, Keane did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Keane provided LQ with the same, phony, boilerplate neck and back sprain "diagnoses" that he provided to virtually every other Insured. Furthermore, neither LQ's presenting problems, nor the treatment plan provided to LQ at Martinez, Acebo Martinez, and Garcia's direction by Keane, Queral, and Quality Diagnostic presented any risk of significant complications, morbidity, or mortality. To the contrary, LQ did not need any treatment at all as the result of the minor accident, and the treatment plan provided at Martinez, Acebo Martinez, and Garcia's direction by Keane, Queral, and Quality Diagnostic consisted of medically unnecessary "physical

therapy" services, none of which posed the least bit of risk to LQ. Even so, Quality Diagnostic, Keane, Queral, Martinez, Acebo Martinez, and Garcia billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Keane engaged in some legitimate medical decision-making during the purported examination.

(xi)     On June 13, 2017, an Insured named NC was involved in an automobile accident. The contemporaneous police report indicates that the accident was a low-speed, low-impact collision, and that NC's vehicle was drivable following the accident. The police report further indicated that NC was not injured and did not complain of any pain at the scene. In keeping with the fact that NC was not injured, she did not visit any hospital following the accident. On June 14, 2017, Keane purported to perform an initial examination of NC at Quality Diagnostic. To the extent that Keane performed the examination in the first instance, Keane did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the initial examination. Moreover, Keane did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Keane provided NC with the same, phony, boilerplate neck and back sprain "diagnoses" that he provided to virtually every other Insured. Furthermore, neither NC's presenting problems, nor the treatment plan provided to NC at Martinez, Acebo Martinez, and Garcia's direction by Keane, Queral, and Quality Diagnostic presented any risk of significant complications, morbidity, or mortality. To the contrary, NC did not need any treatment at all as the result of the minor accident, and the treatment plan provided at Martinez, Acebo Martinez, and Garcia's direction by Keane, Queral, and Quality Diagnostic consisted of medically unnecessary "physical therapy" services, none of which posed the least bit of risk to NC. Even so, Quality Diagnostic, Keane, Queral, Martinez, Acebo Martinez, and Garcia billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Keane engaged in some legitimate medical decision-making during the purported examination.

(xii)    On June 13, 2017, an Insured named YO was involved in an automobile accident. The contemporaneous police report indicates that the accident was a low-speed, low-impact collision, and that YO's vehicle was drivable following the accident. The police report further indicated that YO was not injured and did not complain of any pain at the scene. In keeping with the fact that YO was not injured, she did not visit any hospital following the accident. On June 14, 2017, Keane purported to perform an initial examination of YO at Quality Diagnostic. To the extent that Keane performed the examination in the first instance, Keane did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the initial examination. Moreover, Keane did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Keane provided YO with the same, phony, boilerplate neck and back sprain "diagnoses" that he provided to virtually every other Insured. Furthermore, neither YO's presenting problems, nor the

treatment plan provided to YO at Martinez, Acebo Martinez, and Garcia's direction by Keane, Queral, and Quality Diagnostic presented any risk of significant complications, morbidity, or mortality. To the contrary, YO did not need any treatment at all as the result of the minor accident, and the treatment plan provided at Martinez, Acebo Martinez, and Garcia's direction by Keane, Queral, and Quality Diagnostic consisted of medically unnecessary "physical therapy" services, none of which posed the least bit of risk to YO. Even so, Quality Diagnostic, Keane, Queral, Martinez, Acebo Martinez, and Garcia billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Keane engaged in some legitimate medical decision-making during the purported examination.

(xiii)   On June 14, 2017, an Insured named IB was involved in an automobile accident. The contemporaneous police report indicates that the accident was a low-speed, low-impact collision, and that IB's vehicle was drivable following the accident. The police report further indicated that IB was not injured and did not complain of any pain at the scene. In keeping with the fact that IB was not injured, he did not visit any hospital following the accident. On June 16, 2017, Keane purported to perform an initial examination of IB at Quality Diagnostic. To the extent that Keane performed the examination in the first instance, Keane did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the initial examination. Moreover, Keane did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Keane provided IB with the same, phony, boilerplate neck and back sprain "diagnoses" that he provided to virtually every other Insured. Furthermore, neither IB's presenting problems, nor the treatment plan provided to IB at Martinez, Acebo Martinez, and Garcia's direction by Keane, Queral, and Quality Diagnostic presented any risk of significant complications, morbidity, or mortality. To the contrary, IB did not need any treatment at all as the result of the minor accident, and the treatment plan provided at Martinez, Acebo Martinez, and Garcia's direction by Keane, Queral, and Quality Diagnostic consisted of medically unnecessary "physical therapy" services, none of which posed the least bit of risk to IB. Even so, Quality Diagnostic, Keane, Queral, Martinez, Acebo Martinez, and Garcia billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Keane engaged in some legitimate medical decision-making during the purported examination.

(xiv)   On June 20, 2017, an Insured named RR was involved in an automobile accident. The contemporaneous police report indicates that the accident was a low-speed, low-impact collision, and that RR's vehicle was drivable following the accident. The police report further indicated that RR was not injured and did not complain of any pain at the scene. In keeping with the fact that RR was not injured, he did not visit any hospital following the accident. On June 23, 2017, Keane purported to perform an initial examination of RR at Quality Diagnostic. To the extent that Keane performed the examination in the first instance, Keane did not retrieve,

review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the initial examination. Moreover, Keane did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Keane provided RR with the same, phony, boilerplate neck and back sprain "diagnoses" that he provided to virtually every other Insured. Furthermore, neither RR's presenting problems, nor the treatment plan provided to RR at Martinez, Acebo Martinez, and Garcia's direction by Keane, Queral, and Quality Diagnostic presented any risk of significant complications, morbidity, or mortality. To the contrary, RR did not need any treatment at all as the result of the minor accident, and the treatment plan provided at Martinez, Acebo Martinez, and Garcia's direction by Keane, Queral, and Quality Diagnostic consisted of medically unnecessary "physical therapy" services, none of which posed the least bit of risk to RR. Even so, Quality Diagnostic, Keane, Queral, Martinez, Acebo Martinez, and Garcia billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Keane engaged in some legitimate medical decision-making during the purported examination.

(xv)   On June 28, 2017, an Insured named MR was involved in an automobile accident. The contemporaneous police report indicates that the accident was a low-speed, low-impact collision, and that MR's vehicle was drivable following the accident. The police report further indicated that MR was not injured and did not complain of any pain at the scene. In keeping with the fact that MR was not injured, she did not visit any hospital following the accident. On June 30, 2017, Keane purported to perform an initial examination of MR at Quality Diagnostic. To the extent that Keane performed the examination in the first instance, Keane did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the initial examination. Moreover, Keane did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Keane provided MR with the same, phony, boilerplate neck and back sprain "diagnoses" that he provided to virtually every other Insured. Furthermore, neither MR's presenting problems, nor the treatment plan provided to MR at Martinez, Acebo Martinez, and Garcia's direction by Keane, Queral, and Quality Diagnostic presented any risk of significant complications, morbidity, or mortality. To the contrary, MR did not need any treatment at all as the result of the minor accident, and the treatment plan provided at Martinez, Acebo Martinez, and Garcia's direction by Keane, Queral, and Quality Diagnostic consisted of medically unnecessary "physical therapy" services, none of which posed the least bit of risk to MR. Even so, Quality Diagnostic, Keane, Queral, Martinez, Acebo Martinez, and Garcia billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Keane engaged in some legitimate medical decision-making during the purported examination.

(xvi)  On July 4, 2017, an Insured named CC was involved in an automobile accident. The contemporaneous police report indicates that the accident was a low-speed,

low-impact collision, and that CC's vehicle was drivable following the accident. The police report further indicated that CC was not injured and did not complain of any pain at the scene. In keeping with the fact that CC was not injured, he did not visit any hospital following the accident. On July 5, 2017, Keane purported to perform an initial examination of CC at Quality Diagnostic. To the extent that Keane performed the examination in the first instance, Keane did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the initial examination. Moreover, Keane did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Keane provided CC with the same, phony, boilerplate neck and back sprain "diagnoses" that he provided to virtually every other Insured. Furthermore, neither CC's presenting problems, nor the treatment plan provided to CC at Martinez, Acebo Martinez, and Garcia's direction by Keane, Queral, and Quality Diagnostic presented any risk of significant complications, morbidity, or mortality. To the contrary, CC did not need any treatment at all as the result of the minor accident, and the treatment plan provided at Martinez, Acebo Martinez, and Garcia's direction by Keane, Queral, and Quality Diagnostic consisted of medically unnecessary "physical therapy" services, none of which posed the least bit of risk to CC. Even so, Quality Diagnostic, Keane, Queral, Martinez, Acebo Martinez, and Garcia billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Keane engaged in some legitimate medical decision-making during the purported examination.

(xvii) On July 4, 2017, an Insured named GZ was involved in an automobile accident. The contemporaneous police report indicates that the accident was a low-speed, low-impact collision, and that GZ's vehicle was drivable following the accident. The police report further indicated that GZ was not injured and did not complain of any pain at the scene. In keeping with the fact that GZ was not injured, she did not visit any hospital following the accident. On July 5, 2017, Keane purported to perform an initial examination of GZ at Quality Diagnostic. To the extent that Keane performed the examination in the first instance, Keane did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the initial examination. Moreover, Keane did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Keane provided GZ with the same, phony, boilerplate neck and back sprain "diagnoses" that he provided to virtually every other Insured. Furthermore, neither GZ's presenting problems, nor the treatment plan provided to GZ at Martinez, Acebo Martinez, and Garcia's direction by Keane, Queral, and Quality Diagnostic presented any risk of significant complications, morbidity, or mortality. To the contrary, GZ did not need any treatment at all as the result of the minor accident, and the treatment plan provided at Martinez, Acebo Martinez, and Garcia's direction by Keane, Queral, and Quality Diagnostic consisted of medically unnecessary "physical therapy" services, none of which posed the least bit of risk to GZ. Even so, Quality Diagnostic, Keane, Queral, Martinez, Acebo Martinez, and Garcia billed

GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Keane engaged in some legitimate medical decision-making during the purported examination.

(xviii)  On July 12, 2017, an Insured named JR was involved in an automobile accident. The contemporaneous police report indicates that the accident was a low-speed, low-impact collision, and that JR's vehicle was drivable following the accident. The police report further indicated that JR was not injured and did not complain of any pain at the scene. In keeping with the fact that JR was not injured, he did not visit any hospital following the accident. On July 14, 2017, Keane purported to perform an initial examination of JR at Quality Diagnostic. To the extent that Keane performed the examination in the first instance, Keane did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the initial examination. Moreover, Keane did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Keane provided JR with the same, phony, boilerplate neck and back sprain "diagnoses" that he provided to virtually every other Insured. Furthermore, neither JR's presenting problems, nor the treatment plan provided to JR at Martinez, Acebo Martinez, and Garcia's direction by Keane, Queral, and Quality Diagnostic presented any risk of significant complications, morbidity, or mortality. To the contrary, JR did not need any treatment at all as the result of the minor accident, and the treatment plan provided at Martinez, Acebo Martinez, and Garcia's direction by Keane, Queral, and Quality Diagnostic consisted of medically unnecessary "physical therapy" services, none of which posed the least bit of risk to JR. Even so, Quality Diagnostic, Keane, Queral, Martinez, Acebo Martinez, and Garcia billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Keane engaged in some legitimate medical decision-making during the purported examination.

(xix)  On July 21, 2017, an Insured named JP was involved in an automobile accident. The contemporaneous police report indicates that the accident was a low-speed, low-impact collision, and that JP's vehicle was drivable following the accident. The police report further indicated that JP was not injured and did not complain of any pain at the scene. In keeping with the fact that JP was not injured, he did not visit any hospital following the accident. On July 26, 2017, Keane purported to perform an initial examination of JP at Quality Diagnostic. To the extent that Keane performed the examination in the first instance, Keane did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the initial examination. Moreover, Keane did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Keane provided JP with the same, phony, boilerplate neck and back sprain "diagnoses" that he provided to virtually every other Insured. Furthermore, neither JP's presenting problems, nor the treatment plan provided to JP at Martinez, Acebo Martinez, and Garcia's direction by Keane, Queral, and Quality Diagnostic presented any risk of significant

complications, morbidity, or mortality. To the contrary, JP did not need any treatment at all as the result of the minor accident, and the treatment plan provided at Martinez, Acebo Martinez, and Garcia's direction by Keane, Queral, and Quality Diagnostic consisted of medically unnecessary "physical therapy" services, none of which posed the least bit of risk to JP. Even so, Quality Diagnostic, Keane, Queral, Martinez, Acebo Martinez, and Garcia billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Keane engaged in some legitimate medical decision-making during the purported examination.

(xx)    On July 21, 2017, an Insured named JP was involved in an automobile accident. The contemporaneous police report indicates that the accident was a low-speed, low-impact collision, and that JP's vehicle was drivable following the accident. The police report further indicated that JP was not injured and did not complain of any pain at the scene. In keeping with the fact that JP was not injured, he did not visit any hospital following the accident. On July 27, 2017, Keane purported to perform an initial examination of JP at Quality Diagnostic. To the extent that Keane performed the examination in the first instance, Keane did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the initial examination. Moreover, Keane did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Keane provided JP with the same, phony, boilerplate neck and back sprain "diagnoses" that he provided to virtually every other Insured. Furthermore, neither JP's presenting problems, nor the treatment plan provided to JP at Martinez, Acebo Martinez, and Garcia's direction by Keane, Queral, and Quality Diagnostic presented any risk of significant complications, morbidity, or mortality. To the contrary, JP did not need any treatment at all as the result of the minor accident, and the treatment plan provided at Martinez, Acebo Martinez, and Garcia's direction by Keane, Queral, and Quality Diagnostic consisted of medically unnecessary "physical therapy" services, none of which posed the least bit of risk to JP. Even so, Quality Diagnostic, Keane, Queral, Martinez, Acebo Martinez, and Garcia billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Keane engaged in some legitimate medical decision-making during the purported examination.

333.    There are a substantial number of variables that can affect whether, how, and to what extent an individual is injured in a given automobile accident.

334.    An individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact all will affect whether, how, and to what extent an individual is injured in a given automobile accident.

335.    As set forth above, in the claims identified in Exhibit "1", virtually all of the Insureds whom the Defendants purported to treat were involved in relatively minor, "fender-bender" accidents, to the extent that they were involved in any actual accidents at all.

336.    It is extremely improbable that any two or more Insureds involved in any one of the minor automobile accidents in the claims identified in Exhibit "1" would suffer substantially identical injuries as the result of their accidents, or require a substantially identical course of treatment.

337.    It is even more improbable – to the point of impossibility – that this would occur over and over again.

338.    It likewise is improbable – to the point of impossibility – that any two or more Insureds involved in any one of the minor automobile accidents in the claims identified in Exhibit "1" would present for an initial examination with substantially identical symptoms, and receive substantially identical diagnoses, on the <u>exact same date</u> after their underlying automobile accident.

339.    Even so, in keeping with the fact that the putative "diagnoses" were phony, and in keeping with the fact that their putative initial examinations involved no actual medical decision-making at all, Quality Diagnostic, Queral, and Keane – at the direction of Martinez, Acebo Martinez, and Garcia – frequently issued substantially identical, phony "diagnoses", on the same date, to more than one Insured involved in a single accident, and recommended a substantially identical course of medically unnecessary "treatment" to the Insureds.

340.    For example:

(i)     On May 10, 2017, two Insureds – NJ and CL – were involved in the same minor motor vehicle accident. Thereafter – incredibly – both NJ and CL presented at Quality Diagnostic for initial examinations by Keane on the exact same date, May 12, 2017. NJ and CL were different ages, in different physical conditions, located

in different positions in the vehicle, and experienced the minor impact from different positions in the vehicle. To the extent that NJ and CL suffered any injuries at all in their minor accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Quality Diagnostic, Queral, and Keane – at the direction of Martinez, Acebo Martinez, and Garcia – provided NJ and CL with substantially identical sprain/strain "diagnoses", and recommended a substantially identical course of treatment to both of them.

(ii)     On May 15, 2017, two Insureds – JL and SD – were involved in the same minor motor vehicle accident. Thereafter – incredibly – both JL and SD presented at Quality Diagnostic for initial examinations by Keane on the exact same date, May 17, 2017. JL and SD were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the minor impact from different positions in the vehicle. To the extent that JL and SD suffered any injuries at all in their minor accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Quality Diagnostic, Queral, and Keane – at the direction of Martinez, Acebo Martinez, and Garcia – provided JL and SD with substantially identical sprain/strain "diagnoses", and recommended a substantially identical course of treatment to both of them.

(iii)    On May 18, 2017, two Insureds – CM and MB – were involved in the same minor motor vehicle accident. Thereafter – incredibly – both CM and MB presented at Quality Diagnostic for initial examinations by Keane on the exact same date, May 24, 2017. CM and MB were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the minor impact from different positions in the vehicle. To the extent that CM and MB suffered any injuries at all in their minor accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Quality Diagnostic, Queral, and Keane – at the direction of Martinez, Acebo Martinez, and Garcia – provided CM and MB with substantially identical sprain/strain "diagnoses", and recommended a substantially identical course of treatment to both of them.

(iv)     On May 19, 2017, two Insureds – YO and EA – were involved in the same minor motor vehicle accident. Thereafter – incredibly – both YO and EA presented at Quality Diagnostic for initial examinations by Keane on the exact same date, May 22, 2017. YO and EA were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the minor impact from different positions in the vehicle. To the extent that YO and EA suffered any injuries at all in their minor accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Quality Diagnostic, Queral, and Keane – at the direction of Martinez, Acebo Martinez, and Garcia – provided YO and EA with substantially identical sprain/strain "diagnoses", and recommended a substantially identical course of treatment to both of them.

(v)      On June 4, 2017, two Insureds – JC and ML – were involved in the same minor motor vehicle accident. Thereafter – incredibly – both JC and ML presented at

Quality Diagnostic for initial examinations by Keane on the exact same date, June 5, 2017. JC and ML were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the minor impact from different positions in the vehicle. To the extent that JC and ML suffered any injuries at all in their minor accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Quality Diagnostic, Queral, and Keane – at the direction of Martinez, Acebo Martinez, and Garcia – provided JC and ML with substantially identical sprain/strain "diagnoses", and recommended a substantially identical course of treatment to both of them.

(vi)     On June 5, 2017, two Insureds – JO and LV – were involved in the same minor motor vehicle accident. Thereafter – incredibly – both JO and LV presented at Quality Diagnostic for initial examinations by Keane on the exact same date, June 7, 2017. JO and LV were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the minor impact from different positions in the vehicle. To the extent that JO and LV suffered any injuries at all in their minor accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Quality Diagnostic, Queral, and Keane – at the direction of Martinez, Acebo Martinez, and Garcia – provided JO and LV with substantially identical sprain/strain "diagnoses", and recommended a substantially identical course of treatment to both of them.

(vii)    On June 12, 2017, two Insureds – MP and AP – were involved in the same minor motor vehicle accident. Thereafter – incredibly – both MP and AP presented at Quality Diagnostic for initial examinations by Keane on the exact same date, June 14, 2017. MP and AP were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the minor impact from different positions in the vehicle. To the extent that MP and AP suffered any injuries at all in their minor accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Quality Diagnostic, Queral, and Keane – at the direction of Martinez, Acebo Martinez, and Garcia – provided MP and AP with substantially identical sprain/strain "diagnoses", and recommended a substantially identical course of treatment to both of them.

(viii)   On June 13, 2017, two Insureds – NC and YO – were involved in the same minor motor vehicle accident. Thereafter – incredibly – both NC and YO presented at Quality Diagnostic for initial examinations by Keane on the exact same date, June 14, 2017. NC and YO were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the minor impact from different positions in the vehicle. To the extent that NC and YO suffered any injuries at all in their minor accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Quality Diagnostic, Queral, and Keane – at the direction of Martinez, Acebo Martinez, and Garcia – provided NC and YO with substantially identical sprain/strain "diagnoses", and recommended a substantially identical course of treatment to both of them.

(ix)   On June 17, 2017, two Insureds – YG and CF – were involved in the same minor motor vehicle accident. Thereafter – incredibly – both YG and CF presented at Quality Diagnostic for initial examinations by Keane on the exact same date, June 19, 2017. YG and CF were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the minor impact from different positions in the vehicle. To the extent that YG and CF suffered any injuries at all in their minor accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Quality Diagnostic, Queral,  and Keane – at the direction of Martinez, Acebo Martinez, and Garcia – provided YG and CF with substantially identical sprain/strain "diagnoses", and recommended a substantially identical course of treatment to both of them.

(x)   On July 4, 2017, two Insureds – JC and GZ – were involved in the same minor motor vehicle accident. Thereafter – incredibly – both JC and GZ presented at Quality Diagnostic for initial examinations by Keane on the exact same date, July 5, 2017. JC and GZ were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the minor impact from different positions in the vehicle. To the extent that JC and GZ suffered any injuries at all in their minor accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Quality Diagnostic, Queral,  and Keane – at the direction of Martinez, Acebo Martinez, and Garcia – provided JC and GZ with substantially identical sprain/strain "diagnoses", and recommended a substantially identical course of treatment to both of them.

(xi)   On July 21, 2017, two Insureds – JP and JC – were involved in the same minor motor vehicle accident. Thereafter – incredibly – both JP and JC presented at Quality Diagnostic for initial examinations by Keane on the exact same date, July 26, 2017. JP and JC were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the minor impact from different positions in the vehicle. To the extent that JP and JC suffered any injuries at all in their minor accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Quality Diagnostic, Queral,  and Keane – at the direction of Martinez, Acebo Martinez, and Garcia – provided JP and JC with substantially identical sprain/strain "diagnoses", and recommended a substantially identical course of treatment to both of them.

341.   Quality Diagnostic, Queral, and Keane – at Martinez, Acebo Martinez, and Garcia's direction – routinely inserted these false "diagnoses" in their initial examination reports in order to create the false impression that the initial examinations required some legitimate medical decision-making, and in order to create a false justification for the other Fraudulent

Services that the Defendants purported to provide to the Insureds, including medically unnecessary follow-up examinations and physical therapy services.

342.  In the claims for initial examinations identified in Exhibit "1", Quality Diagnostic, Queral, Keane, Martinez, Acebo Martinez, and Garcia routinely fraudulently misrepresented that the examinations were lawfully provided and reimbursable, when in fact they were neither lawfully provided nor reimbursable, because:

    (i)    the putative examinations were illusory, with outcomes that were pre-determined to result in substantially-identical, phony "diagnoses" and treatment recommendations, regardless of the Insureds' true individual circumstances and presentment;

    (ii)    the charges for the putative examinations misrepresented the nature and extent of the examinations; and

    (iii)    Quality Diagnostic never was eligible to collect PIP Benefits in connection with the examinations in the first instance, inasmuch as it unlawfully was operated without a legitimate medical director.

343.  In this context, Queral – who at all relevant times purported to serve as the "medical director" at Quality Diagnostic – did not, and could not have, "[c]onduct[ed] systematic reviews of clinic billings to ensure that the billings are not fraudulent or unlawful." See Fla. Stat. § 400.9935(1).

344.  Had Queral or Keane actually fulfilled their statutory role as medical director at Quality Diagnostic, they would have noted – among other things – that the Defendants routinely fraudulently represented in Quality Diagnostic's billing that the putative initial examinations were legitimately and lawfully performed.

345.  Queral and Keane failed to do so, because they never actually served as a legitimate medical director at Quality Diagnostic in the first instance.

**e.    Misrepresentations Regarding Whether the Initial Examinations Were Conducted At All**

346.    In addition to the misrepresentations regarding the extent of medical decision-making, the amount of time spent with Insureds and their families, the extent of the physical examinations, and the severity of the Insureds' presenting problems, the Defendants routinely falsely represented that the putative initial examinations were conducted in the first instance.

347.    In fact, the Defendants routinely manufactured phony examination reports, and the supposed "subjective complaints" of the patients to whom the examinations were purportedly provided, out of whole cloth.

348.    In virtually all of the claims for initial examinations identified in Exhibit "1" Quality Diagnostic, Queral, Keane, Martinez, Acebo Martinez, and Garcia's phony "diagnoses", and the medically unnecessary treatment plans they recommended based on those bogus "diagnoses", were predicated on phony "subjective complaints" – i.e., complaints that were communicated to Quality Diagnostic, Queral, Keane, Martinez, Acebo Martinez, and Garcia by patients – that Quality Diagnostic, Queral, Keane, Martinez, Acebo Martinez, and Garcia included in their initial examination reports.

349.    As set forth above, there are a substantial number of variables that can affect whether, how, and to what extent an individual is injured in a given automobile accident.

350.    An individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact all will affect whether, how, and to what extent an individual is injured in a given automobile accident.

351.    In the claims identified in Exhibit "1", virtually all of the Insureds whom the Defendants purported to treat were involved in relatively minor, "fender-bender" accidents, to the extent that they were involved in any actual accidents at all.

352.     It is extremely improbable that any two or more Insureds involved in any one of the minor automobile accidents in the claims identified in Exhibit "1" would suffer substantially identical injuries as the result of their accidents, or require a substantially identical course of treatment.

353.     It is even more improbable – to the point of impossibility – that this would occur over and over again.

354.     As set forth above, when Quality Diagnostic, Queral, Keane, Martinez, Acebo Martinez, and Garcia purported to record the results of their initial examinations, they included notations based on the supposed "subjective complaints" of the individual patients to whom they provided initial examinations.

355.     In actuality, however, Quality Diagnostic, Queral, Keane, Martinez, Acebo Martinez, and Garcia simply fabricated these supposed "subjective complaints" and included them in the initial examination reports in order to create the appearance of genuine injuries, where none actually existed.

356.     It is simply impossible that virtually all of the Insureds purported to have been examined by Quality Diagnostic, Queral, Keane, Martinez, Acebo Martinez, and Garcia in the claims identified in Exhibit "1" would have reported the following identical subjective complaints to Quality Diagnostic, Queral, Keane, Martinez, Acebo Martinez, and Garcia:

(i)     pain in the neck, bilaterally, which occurred between one half and three fourths of the time, and which causes some diminution in the patient's capacity to carry out daily activities;

(ii)     pain in the mid back, bilaterally, which occurred between one half and three fourths of the time, and which causes some diminution in the patient's capacity to carry out daily activities; and

(iii)    pain in the low back, bilaterally, which occurred between one half and three fourths of the time, and which causes some diminution in the patient's capacity to carry out daily activities.

357.    However, because the examinations were never legitimately conducted in the first instance, Quality Diagnostic, Queral, Keane, Martinez, Acebo Martinez, and Garcia simply reported that almost every patient complained of identical neck, mid back, and low back pain.

358.    Specifically, virtually every initial examination report purported to have been completed by Quality Diagnostic, Queral, Keane, Martinez, Acebo Martinez, and Garcia contained the following underlined notations regarding the Insureds' purported "subjective complaints":

(i)    a notation that each Insured suffered from "pain in the neck bilaterally. It occurs between one half and three fourths of the time when [he/she] is aware, is tolerated, but does cause some diminution in [his/her] capacity to carry out daily activities";

(ii)    a notation that each Insured suffered from "burning pain in the mid back bilaterally. It occurs between one half and three fourths of the time when [he/she] is aware, is tolerated, but does cause some diminution in [his/her] capacity to carry out daily activities"; and

(iii)    a notation that each Insured suffered from "burning pain in the low back bilaterally. It occurs between one half and three fourths of the time when [he/she] is aware, is tolerated, but does cause some diminution in [his/her] capacity to carry out daily activities".

359.    These identical, phony "subject complaints" were reported in practically every initial examination report generated by Quality Diagnostic, Queral, Keane, Martinez, Acebo Martinez, and Garcia, including but not limited to the initial examination reports for the following Insureds on the following dates:

(i)    NJ, on May 12, 2017;

(ii)    CL, on May 12, 2017;

(iii)    SD, on May 17, 2017;

(iv)    JL, on May 17, 2017;

(v)    CM, on May 24, 2017;

(vi)    MB, on May 24, 2017;

(vii)    JC, on June 5, 2017;

(viii)    ML, on June 5, 2017;

(ix)    JR, on June 7, 2017;

(x)    LQ, on June 7, 2017;

(xi)    RE, on June 13, 2017;

(xii)    IB, on June 16, 2017;

(xiii)    MR, on June 30, 2017;

(xiv)    GZ, on July 5, 2017;

(xv)    CC, on July 5, 2017;

(xvi)    OC, on July 12, 2017;

(xvii)    JR, on July 14, 2017;

(xviii)    DA, on July 19, 2017;

(xix)    JP, on July 26, 2017; and

(xx)    JC, on July 26, 2017.

360.    These are only representative examples. Quality Diagnostic, Queral, Keane, Martinez, Acebo Martinez, and Garcia falsely reported virtually identical "subjective complaints" in practically every one of their putative initial examination reports.

361.    Quality Diagnostic, Queral, Keane, Martinez, Acebo Martinez, and Garcia routinely falsified the "subjective complaints" in their putative initial examination reports order to falsely represent that the initial examinations were performed in the first instance, and to

create a false justification for their charges for the initial examinations and the other Fraudulent Services that the Defendants purported to provide.

362.    In keeping with the fact that the putative initial examination reports were fabricated, Keane was arrested and charged with several felonies for, among other things, fabricating the results of an examination at Quality Diagnostic.

363.    In further keeping with the fact that the putative initial examination reports were fabricated, when asked during a July 16, 2018 deposition whether he had ever fabricated a medical record at Quality Diagnostic, Keane invoked his Fifth Amendment privilege against self-incrimination.

364.    In this context, Queral and Keane – who both purported to serve as the "medical director" at Quality Diagnostic – did not, and could not have, "[c]onduct[ed] systematic reviews of clinic billings to ensure that the billings are not fraudulent or unlawful." See Fla. Stat. § 400.9935(1).

365.    Had Queral actually fulfilled his statutory role as medical director at Quality Diagnostic, he would have noted – among other things – that the Defendants routinely fraudulently reported identical, phony "subjective complaints" in practically every initial examination report generated at Quality Diagnostic.

366.    Queral failed to do so, because he never actually served as a legitimate medical director at Quality Diagnostic in the first instance.

367.    Similarly, Keane did not – and, in fact, could not -  have legitimately fulfilled his statutory role as medical director of Quality Diagnostic, as he purported to generate the fabricated initial examination reports and, eventually, was arrested for his so doing.

2.      **The Fraudulent Charges for Follow-Up Examinations**

368.     In addition to their fraudulent initial examinations, Quality Diagnostic, Queral, and Keane – at the direction of Martinez, Acebo Martinez, and Garcia – virtually always purported to subject each of the Insureds in the claims identified in Exhibit "1" to multiple, fraudulent follow-up examinations during the course of their fraudulent treatment and billing protocol.

369.     Keane purported to personally perform virtually all of the follow-up examinations in the claims identified in Exhibit "1".

370.     As set forth in Exhibit "1", Garcia, Martinez, Acebo Martinez, Queral, Keane, and Quality Diagnostic then billed the follow-up examinations to GEICO under CPT code 99213, resulting in charges of $150.00 for each follow-up examination that they purported to provide.

371.     In the claims for follow-up examinations identified in Exhibit "1", the charges for the follow-up examinations were fraudulent in that they misrepresented Quality Diagnostic's eligibility to collect PIP Benefits in the first instance.

372.     In fact, and as set forth above, Quality Diagnostic never was eligible to collect PIP Benefits, inasmuch as it was operated in violation of the licensing requirements set forth in the Clinic Act.

373.     As set forth below, the charges for the follow-up examinations identified in Exhibit "1" also were fraudulent in that they misrepresented the nature and extent of the initial examinations.

a.      **Misrepresentations Regarding the Severity of the Insureds' Presenting Problems**

374.     Pursuant to the CPT Assistant, the use of CPT code 99213 to bill for a follow-up examination typically requires that the patient present with problems of low to moderate severity.

375.    The CPT Assistant provides various clinical examples of the types of presenting problems that qualify as problems of low to moderate severity, and thereby justify the use of CPT code 99213 to bill for a follow-up patient examination.

376.    For example, the CPT Assistant provides the following clinical examples of presenting problems that might qualify as problems of low to moderate severity, and therefore support the use of CPT code 99213 to bill for a follow-up patient examination:

   (i)     Follow-up visit with 55-year-old male for management of hypertension, mild fatigue, on beta blocker/thiazide regimen. (Family Medicine/Internal Medicine)

   (ii)    Follow-up office visit for an established patient with stable cirrhosis of the liver. (Gastroenterology)

   (iii)   Outpatient visit with 37-year-old male, established patient, who is 3 years post total colectomy for chronic ulcerative colitis, presents for increased irritation at his stoma. (General Surgery)

   (iv)    Routine, follow-up office evaluation at a three-month interval for a 77-year-old female with nodular small cleaved-cell lymphoma. (Hematology/Oncology)

   (v)     Follow-up visit for a 70-year-old diabetic hypertensive patient with recent change in insulin requirement. (Internal Medicine/Nephrology)

   (vi)    Quarterly follow-up office visit for a 45-year-old male, with stable chronic asthma, on steroid and bronchodilator therapy. (Pulmonary Medicine)

   (vii)   Office visit with 80-year-old female established patient, for follow-up osteoporosis, status-post compression fractures. (Rheumatology)

377.    Accordingly, pursuant to the CPT Assistant, the low to moderate severity presenting problems that could support the use of CPT code 99213 to bill for a follow-up patient examination typically are problems that pose some ongoing, real threat to the patient's health.

378.    By contrast, and as set forth above, to the limited extent that the Insureds in the claims identified in Exhibit "1" suffered any injuries at all in their minor automobile accidents,

the injuries were garden-variety soft tissue injuries such as sprains and strains, which were not severe at all.

379.   In keeping with the fact that the Insureds in the claims identified in Exhibit "1" almost never suffered any injuries more serious than garden-variety soft tissue injuries such as sprains and strains, in the vast majority of the claims identified in Exhibit "1" the Insureds did not seek treatment at any hospital as the result of their accidents.

380.   To the limited extent that the Insureds did report to a hospital after their accidents, they virtually always were briefly observed on an outpatient basis and then sent on their way after a few hours with, at most, a minor sprain or strain diagnosis.

381.   Furthermore, in the vast majority of cases, contemporaneous police reports indicated that the underlying accidents involved low-speed, low-impact collisions, that the Insureds' vehicles were drivable following the accidents, and that no one was seriously injured in the underlying accidents, or injured at all.

382.   Ordinary strains and sprains virtually always resolve after a short course of conservative treatment such as rest, ice, compression, and elevation, or no treatment at all.

383.   By the time the Insureds in the claims identified in Exhibit "1" presented at Quality Diagnostic for the putative follow-up examinations, the Insureds either did not have any genuine presenting problems at all as the result of their minor automobile accidents, or their presenting problems were minimal.

384.   Even so, in the claims for follow-up examinations identified in Exhibit "1", Garcia, Martinez, Acebo Martinez, Queral, Keane, and Quality Diagnostic routinely billed for their putative follow-up examinations under CPT code 99213, and thereby falsely represented that the Insureds continued to suffer from presenting problems of low to moderate severity.

385.    For example:

(i)    On May 10, 2017, an Insured named NJ was involved in an automobile accident. The contemporaneous police report indicates that the accident was a low-speed, low-impact collision, and that NJ's vehicle was drivable following the accident. The police report further indicated that NJ was not injured and did not complain of any pain at the scene. In keeping with the fact that NJ was not injured, she did not visit any hospital following the accident. To the extent that NJ experienced any health problems at all as the result of the minor accident, they they were of low severity at the outset, and had completely resolved within a few weeks of the minor accident. Even so, following a purported follow-up examination of NJ on June 1, 2017, Garcia, Martinez, Acebo Martinez, Queral, Keane, and Quality Diagnostic billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented that NJ presented with problems of low to moderate severity.

(ii)    On May 10, 2017, an Insured named CL was involved in an automobile accident. The contemporaneous police report indicates that the accident was a low-speed, low-impact collision, and that CL's vehicle was drivable following the accident. The police report further indicated that CL was not injured and did not complain of any pain at the scene. In keeping with the fact that CL was not injured, he did not visit any hospital following the accident. To the extent that CL experienced any health problems at all as the result of the minor accident, they they were of low severity at the outset, and had completely resolved within a few weeks of the minor accident. Even so, following a purported follow-up examination of CL on June 2, 2017, Garcia, Martinez, Acebo Martinez, Queral, Keane, and Quality Diagnostic billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented that CL presented with problems of low to moderate severity.

(iii)    On May 15, 2017, an Insured named SD was involved in an automobile accident. The contemporaneous police report indicates that the accident was a low-speed, low-impact collision, and that SD's vehicle was drivable following the accident. The police report further indicated that SD was not injured and did not complain of any pain at the scene. In keeping with the fact that SD was not injured, she did not visit any hospital following the accident. To the extent that SD experienced any health problems at all as the result of the minor accident, they they were of low severity at the outset, and had completely resolved within a few weeks of the minor accident. Even so, following a purported follow-up examination of SD on June 9, 2017, Garcia, Martinez, Acebo Martinez, Queral, Keane, and Quality Diagnostic billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented that SD presented with problems of low to moderate severity.

(iv)    On May 15, 2017, an Insured named JL was involved in an automobile accident. The contemporaneous police report indicates that the accident was a low-speed,

low-impact collision, and that JL's vehicle was drivable following the accident. The police report further indicated that JL was not injured and did not complain of any pain at the scene. In keeping with the fact that JL was not injured, she did not visit any hospital following the accident. To the extent that JL experienced any health problems at all as the result of the minor accident, they they were of low severity at the outset, and had completely resolved within a few weeks of the minor accident. Even so, following a purported follow-up examination of JL on June 9, 2017, Garcia, Martinez, Acebo Martinez, Queral, Keane, and Quality Diagnostic billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented that JL presented with problems of low to moderate severity.

(v)     On May 18, 2017, an Insured named CM was involved in an automobile accident. The contemporaneous police report indicates that the accident was a low-speed, low-impact collision, and that CM's vehicle was drivable following the accident. The police report further indicated that CM was not injured and did not complain of any pain at the scene. In keeping with the fact that CM was not injured, she did not visit any hospital following the accident. To the extent that CM experienced any health problems at all as the result of the minor accident, they were of low severity at the outset, and had completely resolved within a few weeks of the minor accident. Even so, following a purported follow-up examination of CM on June 19, 2017, Garcia, Martinez, Acebo Martinez, Queral, Keane, and Quality Diagnostic billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented that CM presented with problems of low to moderate severity.

(vi)    On June 4, 2017, an Insured named JC was involved in an automobile accident. The contemporaneous police report indicates that the accident was a low-speed, low-impact collision, and that JC's vehicle was drivable following the accident. The police report further indicated that JC was not injured and did not complain of any pain at the scene. In keeping with the fact that JC was not injured, she did not visit any hospital following the accident. To the extent that JC experienced any health problems at all as the result of the minor accident, they they were of low severity at the outset, and had completely resolved within a few weeks of the minor accident. Even so, following a purported follow-up examination of JC on June 26, 2017, Garcia, Martinez, Acebo Martinez, Queral, Keane, and Quality Diagnostic billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented that JC presented with problems of low to moderate severity.

(vii)   On June 4, 2017, an Insured named ML was involved in an automobile accident. The contemporaneous police report indicates that the accident was a low-speed, low-impact collision, and that ML's vehicle was drivable following the accident. The police report further indicated that ML was not injured and did not complain of any pain at the scene. In keeping with the fact that ML was not injured, he did not visit any hospital following the accident. To the extent that ML experienced

any health problems at all as the result of the minor accident, they they were of low severity at the outset, and had completely resolved within a few weeks of the minor accident. Even so, following a purported follow-up examination of ML on June 28, 2017, Garcia, Martinez, Acebo Martinez, Queral, Keane, and Quality Diagnostic billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented that ML presented with problems of low to moderate severity.

(viii)   On June 5, 2017, an Insured named JR was involved in an automobile accident. The contemporaneous police report indicates that the accident was a low-speed, low-impact collision, and that JR's vehicle was drivable following the accident. The police report further indicated that JR was not injured and did not complain of any pain at the scene. In keeping with the fact that JR was not injured, he did not visit any hospital following the accident. To the extent that JR experienced any health problems at all as the result of the minor accident, they they were of low severity at the outset, and had completely resolved within a few weeks of the minor accident. Even so, following a purported follow-up examination of JR on July 5, 2017, Garcia, Martinez, Acebo Martinez, Queral, Keane, and Quality Diagnostic billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented that JR presented with problems of low to moderate severity.

(ix)   On June 5, 2017, an Insured named LQ was involved in an automobile accident. The contemporaneous police report indicates that the accident was a low-speed, low-impact collision, and that LQ's vehicle was drivable following the accident. The police report further indicated that LQ was not injured and did not complain of any pain at the scene. In keeping with the fact that LQ was not injured, he did not visit any hospital following the accident. To the extent that LQ experienced any health problems at all as the result of the minor accident, they they were of low severity at the outset, and had completely resolved within a few weeks of the minor accident. Even so, following a purported follow-up examination of LQ on July 10, 2017, Garcia, Martinez, Acebo Martinez, Queral, Keane, and Quality Diagnostic billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented that LQ presented with problems of low to moderate severity.

(x)   On June 13, 2017, an Insured named NC was involved in an automobile accident. The contemporaneous police report indicates that the accident was a low-speed, low-impact collision, and that NC's vehicle was drivable following the accident. The police report further indicated that NC was not injured and did not complain of any pain at the scene. In keeping with the fact that NC was not injured, she did not visit any hospital following the accident. To the extent that NC experienced any health problems at all as the result of the minor accident, they they were of low severity at the outset, and had completely resolved within a few weeks of the minor accident. Even so, following a purported follow-up examination of NC on July 10, 2017, Garcia, Martinez, Acebo Martinez, Queral, Keane, and Quality

Diagnostic billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented that NC presented with problems of low to moderate severity.

(xi)    On June 13, 2017, an Insured named YO was involved in an automobile accident. The contemporaneous police report indicates that the accident was a low-speed, low-impact collision, and that YO's vehicle was drivable following the accident. The police report further indicated that YO was not injured and did not complain of any pain at the scene. In keeping with the fact that YO was not injured, she did not visit any hospital following the accident. To the extent that YO experienced any health problems at all as the result of the minor accident, they they were of low severity at the outset, and had completely resolved within a few weeks of the minor accident. Even so, following a purported follow-up examination of YO on July 10, 2017, Garcia, Martinez, Acebo Martinez, Queral, Keane, and Quality Diagnostic billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented that YO presented with problems of low to moderate severity.

(xii)    On June 14, 2017, an Insured named IB was involved in an automobile accident. The contemporaneous police report indicates that the accident was a low-speed, low-impact collision, and that IB's vehicle was drivable following the accident. The police report further indicated that IB was not injured and did not complain of any pain at the scene. In keeping with the fact that IB was not injured, he did not visit any hospital following the accident. To the extent that IB experienced any health problems at all as the result of the minor accident, they they were of low severity at the outset, and had completely resolved within a few weeks of the minor accident. Even so, following a purported follow-up examination of IB on July 12, 2017, Garcia, Martinez, Acebo Martinez, Queral, Keane, and Quality Diagnostic billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented that IB presented with problems of low to moderate severity.

(xiii)    On June 20, 2017, an Insured named RR was involved in an automobile accident. The contemporaneous police report indicates that the accident was a low-speed, low-impact collision, and that RR's vehicle was drivable following the accident. The police report further indicated that RR was not injured and did not complain of any pain at the scene. In keeping with the fact that RR was not injured, he did not visit any hospital following the accident. To the extent that RR experienced any health problems at all as the result of the minor accident, they they were of low severity at the outset, and had completely resolved within a few weeks of the minor accident. Even so, following a purported follow-up examination of RR on July 19, 2017, Garcia, Martinez, Acebo Martinez, Queral, Keane, and Quality Diagnostic billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented that RR presented with problems of low to moderate severity.

(xiv)   On June 28, 2017, an Insured named MR was involved in an automobile accident. The contemporaneous police report indicates that the accident was a low-speed, low-impact collision, and that MR's vehicle was drivable following the accident. The police report further indicated that MR was not injured and did not complain of any pain at the scene. In keeping with the fact that MR was not injured, she did not visit any hospital following the accident. To the extent that MR experienced any health problems at all as the result of the minor accident, they they were of low severity at the outset, and had completely resolved within a few weeks of the minor accident. Even so, following a purported follow-up examination of MR on July 26, 2017, Garcia, Martinez, Acebo Martinez, Queral, Keane, and Quality Diagnostic billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented that MR presented with problems of low to moderate severity.

(xv)   On July 4, 2017, an Insured named CC was involved in an automobile accident. The contemporaneous police report indicates that the accident was a low-speed, low-impact collision, and that CC's vehicle was drivable following the accident. The police report further indicated that CC was not injured and did not complain of any pain at the scene. In keeping with the fact that CC was not injured, he did not visit any hospital following the accident. To the extent that CC experienced any health problems at all as the result of the minor accident, they they were of low severity at the outset, and had completely resolved within a few weeks of the minor accident. Even so, following a purported follow-up examination of CC on July 26, 2017, Garcia, Martinez, Acebo Martinez, Queral, Keane, and Quality Diagnostic billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented that CC presented with problems of low to moderate severity.

386.   These are only representative examples. In all of the claims for follow-up examinations identified in Exhibit "1", Quality Diagnostic, Queral, Keane, Martinez, Acebo Martinez, and Garcia falsely represented that the Insureds presented with problems of low to moderate severity, when in fact the Insureds either did not have any genuine presenting problems at all as the result of their minor automobile accidents at the time of the follow-up examinations, or else their presenting problems were minimal.

387.   In the claims for initial examinations identified in Exhibit "1", Quality Diagnostic, Queral, Keane, Martinez, Acebo Martinez, and Garcia routinely falsely represented that the Insureds presented with problems of low to moderate severity in order to create a false

113

basis for their charges for the examinations under CPT code 99213, because follow-up examinations billable under CPT code 99213 are reimbursable at higher rates than examinations involving presenting problems of minimal severity, or no severity.

388.    In the claims for follow-up examinations identified in Exhibit "1", Quality Diagnostic, Queral, Keane, Martinez, Acebo Martinez, and Garcia also routinely falsely represented that the Insureds presented with problems of low to moderate severity in order to create a false basis for the other Fraudulent Services that the Defendants purported to provide to the Insureds, including additional, medically unnecessary follow-up examinations and physical therapy.

**b.    Misrepresentations Regarding the Results of the Follow-Up Examinations**

389.    What is more, pursuant to the CPT Assistant, when Quality Diagnostic, Queral, Keane, Martinez, Acebo Martinez, and Garcia billed for the putative follow-up examinations under CPT code 99213, they represented that Keane performed at least two of the following three components: (i) took an "expanded problem focused" patient history; (ii) conducted an "expanded problem focused physical examination"; and (iii) engaged in medical decision-making of "low complexity".

390.    In actuality, however, in the claims for follow-up examinations identified in Exhibit "1", Keane did not take any legitimate patient histories, conduct any legitimate physical examinations, or engage in any legitimate medical decision-making at all.

391.    Rather, following their purported follow-up examinations, Quality Diagnostic, Queral, and Keane – at the direction of Martinez, Acebo Martinez, and Garcia – simply: (i) reiterated the false, boilerplate "diagnoses" from the Insureds' initial examinations; and either (ii) referred the Insureds back to Quality Diagnostic for even more medically unnecessary

114

physical therapy services, despite the fact that the Insureds purportedly already had received extensive physical therapy services from Quality Diagnostic that supposedly had not been successful in resolving their purported pain symptoms; or (iii) discharged the Insureds from "treatment", to the extent that their PIP Benefits had been exhausted.

392.    In a legitimate clinical setting, each individual patient's physical therapy schedule, and the specific physical therapy modalities that will be used, must be tailored to the specific patient's circumstances, symptomatology, and presentment.

393.    In a legitimate clinical setting, the nature of, extent of, and schedule for physical therapy is constantly adjusted for each individual patient based on each patient's treatment progress, as assessed during each patient's follow-up examinations and on an ongoing basis as they receive the physical therapy.

394.    By contrast, at Quality Diagnostic, the nature and extent of the physical therapy that each Insured purportedly received was pre-determined, and had no legitimate connection to the Insureds' individual circumstances, presentment, or progress through the Defendants' fraudulent treatment and billing protocol.

395.    In the claims for follow-up examinations identified in Exhibit "1", Quality Diagnostic, Queral, Keane, Martinez, Acebo Martinez, and Garcia routinely fraudulently misrepresented that the examinations were lawfully provided and reimbursable, when in fact they were neither lawfully provided nor reimbursable, because:

    (i)    the putative examinations were illusory, with outcomes that were pre-determined to result in substantially-identical, phony "diagnoses" and treatment recommendations, regardless of the Insureds' true individual circumstances and presentment;

    (ii)    the charges for the putative examinations misrepresented the nature and extent of the examinations; and

(iii)     Quality Diagnostic never was eligible to collect PIP Benefits in connection with the examinations in the first instance, inasmuch as it unlawfully was operated without a legitimate medical director.

396.     In this context, Queral or Keane – who at all relevant times purported to serve as the "medical directors" at Quality Diagnostic – did not, and could not have, "[c]onduct[ed] systematic reviews of clinic billings to ensure that the billings are not fraudulent or unlawful." See Fla. Stat. § 400.9935(1).

397.     Had Queral or Keane actually fulfilled their statutory role as medical director at Quality Diagnostic, they would have noted – among other things – that the Defendants routinely fraudulently represented in Quality Diagnostic's billing that the putative follow-up examinations were legitimately and lawfully performed.

398.     Queral and Keane failed to do so, because they never actually served as a legitimate medical director at Quality Diagnostic in the first instance.

**3.     The Fraudulent Charges for Physical Therapy**

399.     In addition to the fraudulent initial examinations and follow-up examinations, the Defendants virtually always purported to subject each of the Insureds in the claims identified in Exhibit "1" to between two and three months of medically unnecessary physical therapy.

400.     As set forth above, though Keane falsely purported to personally perform or at least directly supervise virtually all of the physical therapy services in the claims identified in Exhibit "1", the physical therapy services actually were performed by Viera, without any legitimate supervision by Keane, to the extent that they were even provided at all.

401.     As set forth in Exhibit "1", Garcia, Martinez, Acebo Martinez, Queral, Keane, and Quality Diagnostic then billed the purported physical therapy services to GEICO under:

(i)     CPT code 97010, for putative hot/cold pack therapy, resulting in a charge of $30.00 for each round of hot/cold pack therapy they purported to provide;

116

(ii)     CPT code 97012, for putative traction therapy, resulting in a charge of $35.00 for each round of traction therapy they purported to provide;

(iii)    CPT code 97014, for putative electrical stimulation, resulting in a charge of $35.00 for each round of electrical stimulation they purported to provide;

(iv)    CPT code 97035, for putative ultrasound, resulting in a charge of $30.00 for each round of ultrasound they purported to provide;

(v)     CPT code 97110, for putative therapeutic exercises, resulting in a charge of $62.00 for each round of therapeutic exercises they purported to provide;

(vi)    CPT code 97112, for putative neuromuscular reeducation, resulting in a charge of $63.00 for each round of neuromuscular reeducation they purported to provide; and

(vii)   CPT code 97530 for putative therapeutic activities, resulting in a charge of $140.00 for each round of manual therapy they purported to provide.

402.    In the claims for physical therapy services identified in Exhibit "1", the charges for the physical therapy services were fraudulent in that they misrepresented Quality Diagnostic's eligibility to collect PIP Benefits in the first instance.

403.    In fact, and as set forth above, Quality Diagnostic never was eligible to collect PIP Benefits, inasmuch as it was operated in violation of the licensing and operating requirements set forth in the Clinic Act.

404.    What is more, and as set forth above, in the claims for physical therapy services identified in Exhibit "1", the Defendants falsely represented that the physical therapy services lawfully had been performed or at least directly supervised by Keane, when in fact they were unlawfully performed by Viera, who is not and never has been licensed as a physical therapist, without any legitimate supervision by Keane, much less direct supervision.

405.    As set forth above, prior to January 1, 2013, the No-Fault Law permitted health care services providers to collect PIP Benefits for massage therapy, so long as – among other

117

things – the massage therapy was "provided, supervised, ordered, or prescribed" by a licensed physician, chiropractor, or dentist, or was provided in a properly licensed or accredited institutional setting. See 2012 Fla. ALS 197.

406.    However – and again, as set forth above – in response to rampant PIP fraud involving massage therapists and massage, the No-Fault Law was amended, effective January 1, 2013, to prohibit PIP reimbursement for massage or for services provided by massage therapists. See 2012 Fla. ALS 197; see also Fla. Stat. § 627.736(1)(a)(5).

407.    What is more, pursuant to Florida law, massage therapists cannot lawfully perform physical therapy services without supervision unless they also are licensed as physical therapists. See Fla. Stat. § 486.028.

408.    As a result, the Defendants listed Keane as the treating provider, or at least the direct supervisor of the treatments, on almost every single bill for almost every single service that they purported to provide through Quality Diagnostic, including almost every individual physical therapy service that was billed through Quality Diagnostic to GEICO.

409.    In fact, and as set forth above, Keane did not perform or directly supervise any of the physical therapy services that were billed through Quality Diagnostic to GEICO and other insurers.

410.    Keane could not physically have performed or even directly supervised the massive number of physical therapy services that were billed through Quality Diagnostic to GEICO, let alone the other health care clinics where he contemporaneously purported to perform a massive number of health care services.

411.    Even so, Garcia, Martinez, Acebo Martinez, Queral, Keane, and Quality Diagnostic routinely falsely represented in the billing submitted through Quality Diagnostic to

GEICO for physical therapy services that Keane personally performed or directly supervised the underlying physical therapy services, when in fact the services unlawfully had been performed by Viera, to the extent that they were performed at all, without any legitimate supervision by Keane.

412.    As set forth above, in order for a health care service to be eligible for PIP reimbursement, it must be "lawfully" provided. See Fla. Stat. § 627.736.

413.    Pursuant to the No-Fault Law, "lawful" or "lawfully" means "in substantial compliance with all relevant applicable criminal, civil, and administrative requirements of state and federal law related to the provision of medical services or treatment." See Fla. Stat. § 627.732.

414.    In each of the claims for physical therapy services identified in Exhibit "1", the Defendants falsely represented that the services were lawfully provided and eligible for PIP reimbursement.

415.    In fact, in the claims for physical therapy services identified in Exhibit "1", the services were not lawfully provided, inasmuch as: (i) the putative physical therapy services were performed – to the extent that they were performed at all – by Viera, who was not licensed to practice physical therapy, without any legitimate supervision by Keane; and (ii) the Defendants deliberately misrepresented the identities of the individuals who purported to perform or supervise the physical therapy services in their billing for the physical therapy services, in a calculated attempt to induce GEICO to pay the unreimbursable charges.

416.    In a legitimate clinical setting, the individual physical therapy services that are provided to an individual patient should be tailored to that patient's individual circumstances and presentment.

417.    In keeping with the fact that the purported "physical therapy" services that were billed through Quality Diagnostic to GEICO were not medically necessary, the Defendants did not tailor the physical therapy services they purported to provide to each Insured's individual circumstances and presentment.

418.    There is a large number of individual types of physical therapy services that potentially can be provided to a patient, depending on the patient's individual symptomatology and needs.

419.    However, the Defendants routinely purported to provide the same handful of physical therapy "treatments" to virtually every Insured in the claims identified in Exhibit "1", without regard for the Insureds' individual circumstances.

420.    Specifically, the Defendants purported to provide virtually every Insured in the claims identified in Exhibit "1" with two-to-three months of physical therapy, consisting of electrical stimulation, ultrasound, hot/cold/compression treatments, therapeutic exercises, neuromuscular reeducation, manual therapy, and therapeutic activities. This, despite the fact that the Insureds were differently situated, and could not possibly all have required a substantially-identical course of physical therapy.

**4.    The Fraudulent Charges for Services That Never Were Performed in the First Instance**

421.    Not only did the Defendants falsely represent that Quality Diagnostic was eligible to collect PIP Benefits, when in fact it never was eligible to collect PIP Benefits because it was operated in violation of the licensing and operating requirements set forth in the Clinic Act, and not only did the Defendants misrepresent the nature, extent, and reimbursability of the Fraudulent Services, but they also routinely billed GEICO for services that they never provided in the first instance.

422.     As set forth above, the Defendants routinely billed GEICO for more than 20 hours of physical therapy and other services that Keane purported to personally perform, or at least directly supervise, on individual dates of service.

423.     For example:

(i)      Garcia, Martinez, Acebo Martinez, Queral, Keane, and Quality Diagnostic billed GEICO for more than 18 hours of putative physical therapy and other services that Keane purported to perform or at least directly supervise for 13 individual Insureds on June 13, 2017.

(ii)     Garcia, Martinez, Acebo Martinez, Queral, Keane, and Quality Diagnostic billed GEICO for more than 20 hours of putative physical therapy and other services that Keane purported to perform or at least directly supervise for 20 individual Insureds on June 21, 2017.

(iii)    Garcia, Martinez, Acebo Martinez, Queral, Keane, and Quality Diagnostic billed GEICO for more than 28 hours of putative physical therapy and other services that Keane purported to perform or at least directly supervise for 19 individual Insureds on June 22, 2017.

(iv)     Garcia, Martinez, Acebo Martinez, Queral, Keane, and Quality Diagnostic billed GEICO for more than 29 hours of putative physical therapy and other services that Keane purported to perform or at least directly supervise for 19 individual Insureds on June 28, 2017.

(v)      Garcia, Martinez, Acebo Martinez, Queral, Keane, and Quality Diagnostic billed GEICO for more than 31 hours of putative physical therapy and other services that Keane purported to perform or at least directly supervise for 22 individual Insureds on July 5, 2017.

(vi)     Garcia, Martinez, Acebo Martinez, Queral, Keane, and Quality Diagnostic billed GEICO for more than 30 hours of putative physical therapy and other services that Keane purported to perform or at least directly supervise for 22 individual Insureds on July 6, 2017.

(vii)    Garcia, Martinez, Acebo Martinez, Queral, Keane, and Quality Diagnostic billed GEICO for more than 31 hours of putative physical therapy and other services that Keane purported to perform or at least directly supervise for 21 individual Insureds on July 7, 2017.

(viii)   Garcia, Martinez, Acebo Martinez, Queral, Keane, and Quality Diagnostic billed GEICO for more than 30 hours of putative physical therapy and other services

that Keane purported to perform or at least directly supervise for 21 individual Insureds on July 10, 2017.

(ix)  Garcia, Martinez, Acebo Martinez, Queral, Keane, and Quality Diagnostic billed GEICO for more than 28 hours of putative physical therapy and other services that Keane purported to perform or at least directly supervise for 23 individual Insureds on July 12, 2017.

(x)  Garcia, Martinez, Acebo Martinez, Queral, Keane, and Quality Diagnostic billed GEICO for more than 31 hours of putative physical therapy and other services that Keane purported to perform or at least directly supervise for 23 individual Insureds on July 13, 2017.

(xi)  Garcia, Martinez, Acebo Martinez, Queral, Keane, and Quality Diagnostic billed GEICO for more than 30 hours of putative physical therapy and other services that Keane purported to perform or at least directly supervise for 22 individual Insureds on July 17, 2017.

(xii)  Garcia, Martinez, Acebo Martinez, Queral, Keane, and Quality Diagnostic billed GEICO for more than 27 hours of putative physical therapy and other services that Keane purported to perform or at least directly supervise for 20 individual Insureds on July 18, 2017.

(xiii)  Garcia, Martinez, Acebo Martinez, Queral, Keane, and Quality Diagnostic billed GEICO for more than 32 hours of putative physical therapy and other services that Keane purported to perform or at least directly supervise for 24 individual Insureds on July 19, 2017.

(xiv)  Garcia, Martinez, Acebo Martinez, Queral, Keane, and Quality Diagnostic billed GEICO for more than 38 hours of putative physical therapy and other services that Keane purported to perform or at least directly supervise for 28 individual Insureds on July 26, 2017.

(xv)  Garcia, Martinez, Acebo Martinez, Queral, Keane, and Quality Diagnostic billed GEICO for more than 29 hours of putative physical therapy and other services that Keane purported to perform or at least directly supervise for 23 individual Insureds on August 2, 2017.

424.  These are only representative examples. In the claims identified in Exhibit "1", the Defendants routinely billed GEICO for an improbable or impossible number of services, purportedly performed or directly supervised by a single person – namely Keane – on individual dates of service.

425.     What is more, and as set forth above, GEICO Insureds constitute only a fraction of the Florida automobile insurance market.

426.     Therefore, upon information and belief, the Defendants not only were billing GEICO for an improbable or impossible number of services per day, but also – simultaneously – were billing other Florida automobile insurers for a commensurate, and impossible, number of services per day.

427.     In fact, the Defendants were able to bill an improbable or impossible number of services to GEICO and other automobile insurers because they were not actually providing the services in the first instance.

## III.     The Fraudulent Claims the Defendants Submitted or Caused to be Submitted to GEICO

428.     To support their fraudulent charges, the Defendants systematically submitted or caused to be submitted hundreds of HCFA-1500 forms and treatment reports through Quality Diagnostic to GEICO, encompassing thousands of individual charges, seeking payment for the Fraudulent Services for which the Defendants were not entitled to receive payment.

429.     The claims that the Defendants submitted or caused to be submitted to GEICO were false and misleading in the following, material respects:

(i)      The HCFA-1500 forms and treatment reports submitted or caused to be submitted by the Defendants uniformly misrepresented to GEICO that Quality Diagnostic was in compliance with the Clinic Act, the Patient Brokering Act, and the Anti-Kickback Statute, and eligible to collect PIP Benefits in the first instance. In fact, Quality Diagnostic never was in compliance with the Clinic Act, the Patient Brokering Act, and the Anti-Kickback Statute, and never was eligible to collect PIP Benefits, because of the fraudulent scheme described above.

(ii)     The HCFA-1500 forms and treatment reports submitted or caused to be submitted by the Defendants uniformly misrepresented to GEICO that the Fraudulent Services were lawfully provided and eligible for PIP reimbursement. In fact, the Fraudulent Services were not lawfully provided, and were not eligible for PIP reimbursement, because: (a) they were medically unnecessary and provided – to

the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (b) they were provided – to the extent they were provided at all – in pervasive violation of the Clinic Act, the Patient Brokering Act, and the Anti-Kickback Statute; (c) they were provided – to the extent they were provided at all – by independent contractors; and (c) in the case of the physical therapy services, because they were provided by an unsupervised massage therapist in contravention of Florida law.

(iii)   The HCFA-1500 forms and treatment reports submitted or caused to be submitted by the Defendants uniformly misrepresented to GEICO that the Fraudulent Services were medically necessary and, in many cases, misrepresented to GEICO that the Fraudulent Services actually were performed. In fact, the Fraudulent Services frequently were not performed at all and, to the extent that they were performed, they were not medically necessary and were performed as part of a pre-determined fraudulent treatment and billing protocol designed solely to financially enrich the Defendants, not to benefit the Insureds who supposedly were subjected to them.

(iv)   The HCFA-1500 forms and treatment reports submitted by and on behalf of the Defendants uniformly misrepresented and exaggerated the level of the Fraudulent Services and the nature of the Fraudulent Services that purportedly were provided.

## IV.   **The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance**

430.   The Defendants were legally and ethically obligated to act honestly and with integrity in connection with their performance of the Fraudulent Services and their submission of charges to GEICO

431.   To induce GEICO to promptly pay the fraudulent charges for the Fraudulent Services, the Defendants have systemically concealed their fraud and have gone to great lengths to accomplish this concealment.

432.   Specifically, the Defendants knowingly misrepresented and concealed facts related to the Fraudulent Services in an effort to prevent discovery that Quality Diagnostic lacked a legitimate medical director, and therefore was ineligible to collect PIP Benefits in the first instance.

433.   Furthermore, the Defendants knowingly misrepresented and concealed facts in

order to prevent GEICO from discovering that the Fraudulent Services were medically unnecessary and were performed – to the extent that they were performed at all – pursuant to a fraudulent pre-determined protocol designed to maximize the charges that could be submitted, not to benefit the Insureds who supposedly were subjected to them.

434.     Likewise, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services frequently never were performed in the first instance.

435.     The Defendants have hired law firms to pursue collection of the fraudulent charges for the Fraudulent Services from GEICO and other insurers. These law firms routinely file expensive and time-consuming litigation against GEICO and other insurers if the charges are not promptly paid in full.

436.     GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days. The facially-valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and acts of concealment described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO has incurred damages of more than $145,000.00.

437.     Based upon the Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

**FIRST CAUSE OF ACTION**
**Against Quality Diagnostic**
**(Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)**

438.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 437 above.

439.     There is an actual case in controversy between GEICO and Quality Diagnostic regarding more than $75,000.00 in pending fraudulent claims for the Fraudulent Services that have been submitted to GEICO.

440.     Quality Diagnostic has no right to receive payment for any pending bills submitted to GEICO because it unlawfully was operated in violation of the Clinic Act, the Patient Brokering Act, and the Anti-Kickback Statute.

441.     Quality Diagnostic has no right to receive payment for any pending bills submitted to GEICO because the underlying Fraudulent Services were not lawfully provided.

442.     Quality Diagnostic has no right to receive payment for any pending bills submitted to GEICO because the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

443.     Quality Diagnostic has no right to receive payment for any pending bills submitted to GEICO because, in many cases, the Fraudulent Services never were provided in the first instance.

444.     Quality Diagnostic has no right to receive payment for any pending bills submitted to GEICO because the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

445.     Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Quality Diagnostic has no right to receive payment for any pending bills submitted to GEICO.

## SECOND CAUSE OF ACTION
### Against Martinez, Acebo Martinez, and Garcia
### (Violation of RICO, 18 U.S.C. § 1962(c))

446.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 437 above.

447.    Quality Diagnostic is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

448.    Martinez, Acebo Martinez, and Garcia knowingly have conducted and/or participated, directly or indirectly, in the conduct of Quality Diagnostic's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis seeking payments that Quality Diagnostic was not eligible to receive under the No-Fault Law because: (i) Quality Diagnostic unlawfully was operated in violation of the Clinic Act, the Patient Brokering Act, and the Anti-Kickback Statute; (ii) the underlying Fraudulent Services were not lawfully provided; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) the Fraudulent Services were provided - to the extent they were provided at all – by independent contractors; (v) in many cases, the Fraudulent Services never were provided in the first instance; and (vi) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

449.   A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".

450.   Quality Diagnostic's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Martinez, Acebo Martinez, and Garcia operated Quality Diagnostic, inasmuch as Quality Diagnostic was not engaged in a legitimate health care practice, and acts of mail fraud therefore were essential in order for Quality Diagnostic to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that Quality Diagnostic was created specifically to continue the fraudulent scheme that Martinez carried out through Benefica, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through Quality Diagnostic to the present day.

451.   Quality Diagnostic is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Quality Diagnostic in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

452.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $145,000.00 pursuant to the fraudulent bills submitted through Quality Diagnostic.

453.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### THIRD CAUSE OF ACTION
**Against Martinez, Acebo Martinez, Queral, Keane, Garcia, and Viera**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

454.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 437 above.

455.    Quality Diagnostic is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

456.    Martinez, Acebo Martinez, Queral, Keane, Garcia, and Viera are employed by or associated with the Quality Diagnostic enterprise.

457.    Martinez, Acebo Martinez, Queral, Keane, Garcia, and Viera knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of Quality Diagnostic's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis seeking payments that Quality Diagnostic was not eligible to receive under the No-Fault Law because: (i) Quality Diagnostic unlawfully was operated in violation of the Clinic Act, the Patient Brokering Act, and the Anti-Kickback Statute; (ii) the underlying Fraudulent Services were not lawfully provided; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) the Fraudulent

Services were provided - to the extent they were provided at all – by independent contractors; (v) in many cases, the Fraudulent Services never were provided in the first instance; and (vi) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

458.   A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1". Each such mailing was made in furtherance of the mail fraud scheme.

459.   Martinez, Acebo Martinez, Queral, Keane, Garcia, and Viera knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other automobile insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

460.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $145,000.00 pursuant to the fraudulent bills submitted through the Quality Diagnostic enterprise.

461.   By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## FOURTH CAUSE OF ACTION
### Against all Defendants
### (Under Fla. Stat. 501.201 et. seq.)

462.   GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1 through 437 above.

463.    The Defendants are actively engaged in trade and commerce in the State of Florida.

464.    GEICO and its Insureds are "consumers" as defined by Fla. Stat. 501.203.

465.    The Defendants engaged in unfair, deceptive, and unconscionable acts or trade practices in their trade or commerce in the pursuit and execution of their scheme to illegally-obtain PIP Benefits from GEICO.

466.    The claims and supporting documents submitted to GEICO in connection with the Fraudulent Services were fraudulent in that they misrepresented: (i) Quality Diagnostic's eligibility to collect PIP Benefits in the first instance; (ii) that the Fraudulent Services were lawfully provided; (iii) that the Fraudulent Services were medically necessary; (iv) that the Fraudulent Services were rendered by Quality Diagnostic; and (v) that the Fraudulent Services actually were performed in the first instance.

467.    Such acts and practices offend public policy and are immoral, unethical, oppressive, and unscrupulous.  Additionally, the conduct of the Defendants has been materially injurious to GEICO and its Insureds.

468.    The conduct of the Defendants was the actual and proximate cause of the damages sustained by GEICO.

469.    Defendants' unfair and deceptive acts have caused GEICO to sustain damages of at least $145,000.00.

470.    By reason of Defendants' conduct, GEICO is also entitled to recover costs, and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2).

## FIFTH CAUSE OF ACTION
### Against Martinez, Acebo Martinez, Queral, Keane, Garcia, and Viera
### (Under Fla. Stat. 772.103 et. seq.)

471.    GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1 through 437 above.

472.    In furtherance of the fraudulent scheme, Martinez, Acebo Martinez, Queral, Keane, Garcia, and Viera submitted or caused to be submitted thousands of fraudulent bills to GEICO seeking payment pursuant under automobile insurance policies issued by GEICO to Florida Insureds.

473.    When the billing was submitted, Martinez, Acebo Martinez, Queral, Keane, Garcia, and Viera knew that the billing contained false and misleading information concerning facts material to the claims for which reimbursement was being sought in that: (i) Quality Diagnostic unlawfully was operated in violation of the Clinic Act, the Patient Brokering Act, and the Anti-Kickback Statute; (ii) the underlying Fraudulent Services were not lawfully provided; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) the Fraudulent Services were provided - to the extent they were provided at all – by independent contractors; (v) in many cases, the Fraudulent Services never were provided in the first instance; and (vi) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

474.    These knowing and intentional acts constitute a pattern of criminal activity, in that said acts constitute insurance fraud in violation of Fla. Stat. § 817.234(1)(a).

475.     This pattern of criminal activity resulted in Martinez, Acebo Martinez, Queral, Keane, Garcia, and Viera receiving more than $145,000.00 in PIP Benefits to which they were not entitled.

476.     Martinez, Acebo Martinez, Queral, Keane, Garcia, and Viera's pattern of criminal activity has caused GEICO to sustain damages of at least $145,000.00.

477.     By reason of Martinez, Acebo Martinez, Queral, Keane, Garcia, and Viera's conduct, GEICO is also entitled to recover threefold the actual damages it actually sustained, reasonable attorney's fees, and court costs pursuant to Fla. Stat. § 772.104.

**SIXTH CAUSE OF ACTION**
**Against all Defendants**
**(Common Law Fraud)**

478.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 437 above.

479.     The Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent bills through Quality Diagnostic for the Fraudulent Services.

480.     The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that that Quality Diagnostic was in compliance with the Clinic Act and eligible to collect PIP Benefits in the first instance, when in fact Quality Diagnostic never was in compliance with the Clinic Act, and never was eligible to collect PIP Benefits, because it was operated without a legitimate medical director and in violation of the Clinic Act's licensing requirements; (ii) in every claim, the representation that the Fraudulent Services were lawfully provided and eligible for PIP reimbursement, when in fact

the Fraudulent Services were not lawfully provided, and were not eligible for PIP reimbursement; (iii) in every claim, the representation that the Fraudulent Services were medically necessary, when in fact they were not medically necessary; (iv) in every claim, the representation that the Fraudulent Services were provided by Quality Diagnostic, when in fact the Fraudulent Services were provided by independent contractors, and were not eligible for PIP reimbursement; and (v) in many claims, the representation that the Fraudulent Services actually were performed, when in many cases they were not actually performed.

481.   The Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Quality Diagnostic that were not reimbursable.

482.   GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $145,000.00 pursuant to the fraudulent bills that were submitted or caused to be submitted by the Defendants through Quality Diagnostic.

483.   The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

484.   Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## SEVENTH CAUSE OF ACTION
### Against all Defendants
### (Unjust Enrichment)

485.    GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1 through 437 above.

486.    As set forth above, the Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

487.    When GEICO paid the bills and charges submitted or caused to be submitted by the Defendants, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

488.    The Defendants have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that the Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

489.    The Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

490.    By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $145,000.00.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co. demand that a Judgment be entered in their favor:

A.    On the First Cause of Action against Quality Diagnostic, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Quality Diagnostic has no right to receive payment for any pending bills submitted to GEICO;

B.    On the Second Cause of Action against Martinez, Acebo Martinez, and Garcia, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $145,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C.    On the Third Cause of Action against Martinez, Acebo Martinez, Queral, Keane, Garcia, and Viera, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $145,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

D.    On the Fourth Cause of Action against all Defendants, compensatory damages in an amount to be determined at trial but in excess of $145,000.00, together with costs and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2);

E.    On the Fifth Cause of Action against Martinez, Acebo Martinez, Queral, Keane, Garcia, and Viera, compensatory damages in an amount to be determined at trial but in excess of $145,000.00, together with treble damages, reasonable attorney's fees, and court costs pursuant to Fla. Stat. 772.104;

F.    On the Sixth Cause of Action against all Defendants, compensatory damages in an amount to be determined at trial but in excess of $145,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

G.      On the Seventh Cause of Action against all Defendants, more than $145,000.00 in

compensatory damages, plus costs and interest and such other and further relief as this Court

deems just and proper.

Dated:          July 20, 2018

*/s/ Lindsey T. Trowell*
Lindsey R. Trowell (FBN 678783)
John P. Marino (FBN 814539)
Kristen W. Bracken (FBN 92136)
SMITH, GAMBRELL & RUSSELL, LLP
50 North Laura Street, Suite 2600
Jacksonville, Florida 32202
Phone:  (904) 598-6100
Facsimile:  (904) 598-6204
ltrowell@sgrlaw.com
jmarino@sgrlaw.com
kbracken @sgrlaw.com

Steven T. Henesy (admitted *pro hac vice*)
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11550
Phone:  (516) 357-3000
Facsimile:  (516) 357-3333
steven.henesy@rivkin.com

*Counsel for Plaintiffs, Government   Employees*
*Insurance  Co.,  GEICO  Indemnity  Co.,  GEICO*
*General  Insurance  Company  and  GEICO  Casualty*
*Co.*

## CERTIFICATE OF SERVICE

I certify that on July 20, 2018, I electronically filed the foregoing document with the Clerk

of the Court using the CM/ECF system, which will provide notice to the counsel of record on the

attached service list.

*/s/ John P. Marino*
Attorney

## SERVICE LIST

**Case No. 18-cv-20101-Civ-MARTINEZ/GOODMAN**

Lindsey R. Trowell
John P. Marino
Kristen W. Bracken
SMITH, GAMBRELL & RUSSELL, LLP
50 North Laura Street, Suite 2600
Jacksonville, Florida 32202
Phone:  (904) 598-6100
Facsimile:  (904) 598-6204
ltrowell@sgrlaw.com
jmarino@sgrlaw.com
kbracken @sgrlaw.com

*Attorneys for Plaintiffs*

Steven T. Henesy (admitted *pro hac vice*)
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11550
Phone:  (516) 357-3000
Facsimile:  (516) 357-3333
steven.henesy@rivkin.com

*Attorneys for Plaintiffs*

Christian Carrazana
CHRISTIAN CARRAZANA, P.A.
P.O. Box 900520
100 NE 15 St., Suite 101B
Homestead, Florida 33030
Phone: (786) 226-8205
Facsimile:  (786) 364-7477
Email: christian@carrazana-legal.com

*Attorney for Defendants*